UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR-08-50-B-W |
| | ) | |
| DANIEL POULIN | ) | |

**ORDER ON MOTIONS TO DISMISS THE INDICTMENT ON THE GROUNDS OF PROSECUTORIAL / INVESTIGATIVE MISCONDUCT**

After an evidentiary hearing, the Court denies the Defendant's motions to dismiss the Indictment on the ground of prosecutorial and/or investigative misconduct.

**I.     STATEMENT OF FACTS**

   **A.     The Filings**

On March 12, 2008, a federal grand jury indicted Daniel Poulin for production of child pornography, an alleged violation of 18 U.S.C. § 2251(a).  *Indictment* (Docket # 1).  On September 30, 2008, Mr. Poulin moved to dismiss the Indictment on the grounds of prosecutorial and/or investigative misconduct.  *Def.'s Mot. to Dismiss the Indictment on the Grounds of Prosecutorial/Investigative Misconduct* (Docket # 24) (*Def.'s Mot.*).  On February 25, 2009, Mr. Poulin filed an amended motion to dismiss for prosecutorial and/or investigative misconduct.  *Def.'s Mot. to Dismiss the Indictment on the Grounds of Prosecutorial/Investigative Misconduct (Modified)* (Docket # 66) (*Def.'s Mod. Mot.*).  The Government responded first on March 18, 2009.  *Mem. in Opp'n to Def.'s Mot. to Dismiss for Misconduct* (Docket # 81) (*Gov't's Opp'n*).  Mr. Poulin filed a pre-hearing memorandum on April 14, 2009.  *Def. Poulin's "Aid to Court"– Type Pre-Hr'g Mem. in Supp. of Mot. to Dismiss for Investigative/Prosecutorial Misconduct* (Docket # 112) (*Def.'s Aid to Court Br.*).  The Government responded finally on June 10, 2009.

*Gov't's Supplemental Mem. in Opp'n to Def.'s Mot. to Dismiss for Misconduct* (Docket # 138) (*Gov't's Supplemental Opp'n*).

On April 17, 2009, the Court held an evidentiary hearing at which the Defendant called Steven Juskewitch, Mr. Poulin's former lawyer, and Catherine Scovill, the Defendant's mother; the Government called Stephen McFarland, a detective with the Hancock County District Attorney's Office, Patrick Kane, a lieutenant with the Hancock County Sheriff's Office, and Scott Kane, a deputy sheriff with the Hancock County Sheriff's Office.[1]

### B.    Piecing Together the Sequence of Events

#### 1.    The CDs Are Discovered

In the fall of 2006, Daniel Poulin lived in the town of Islesford on Little Cranberry Island, Maine with his girlfriend, Wendy R., and her children.[2] Mr. Poulin, Wendy, and her children lived in a cabin; nearby the cabin was a main house in which Catherine Scovill, Mr. Poulin's mother, lived. Ms. Scovill owned both properties. In late October, Wendy discovered a number of computer discs, which had fallen to the ground from cracks in a soffit of the main house. When Wendy viewed the discs, she learned they contained images of Nicole and of her in the bathroom of their shared premises in varying states of undress. The discs appeared to have been the result of surreptitious taping.

On October 25, 2006, Wendy, Nicole, and Nicole's boyfriend confronted Mr. Poulin about the discs and Wendy and Nicole took a set of house keys to their house from Mr. Poulin's boat. Wendy then contacted Richard Howland, the area constable, and the Hancock County Sheriff's Office about the discs; on October 26, 2006, Nicole also spoke to the Hancock County

---

[1] The Defendant also called Arlo West, a forensic expert, who testified regarding matters relating to another pending motion.
[2] Mr. Poulin and Wendy and her children, including Nicole R., had lived together in various places over the last few years. By the time the discs were discovered, Nicole R. had turned eighteen. However, during a significant part of the time Mr. Poulin and Wendy had lived together, Nicole R. had been a minor.

Sheriffs about the discs. Although the timing is not clear, at some point, Mr. Poulin contacted Steven Juskewitch, an Ellsworth attorney, and he and his mother, Catherine Scovill, met with Mr. Juskewitch in his office.

### 2. The Officers Visit the Island

On October 27, 2006, Detective McFarland and Deputy Kane traveled by ferry to Little Cranberry Island to investigate. When they arrived, they were picked up by Wendy, who drove them to the residence of Ms. Scovill, Mr. Poulin's mother. Here, the sequencing becomes muddled, because the witnesses' memories are vague. Mr. Juskewitch recalled that his first conversations with the officers involved their desire to search the cabin. Apparently, Mr. Juskewitch was in touch with Mr. Poulin, who was not on the Island, because Mr. Juskewitch testified that Mr. Poulin was very concerned that if the officers searched the properties they would cause extensive damage. Mr. Poulin volunteered to come to the Island and assist them in their search to minimize potential damage. As Mr. Juskewitch explained it, the idea was that Mr. Poulin would be present with a hammer and other tools and if the officers asked him to take down a wall, he would do so. However, if this happened, Mr. Juskewitch said the officers agreed that there was to be no conversation about the case itself with Mr. Poulin. At this point, another concern was expressed. Word of the incident was leaking out to the Island residents and there was discussion about whether Mr. Poulin's presence on the Island would incite some of the inhabitants. The net result was that the officers agreed to talk to Mr. Poulin on the telephone to gain his assistance in searching the cabin. After some further discussion, Mr. Juskewitch allowed the officers to talk directly to Mr. Poulin over the telephone without his listening in;

3

however, as Mr. Juskewitch recalls, he had an agreement with the officers that they were not to discuss the case itself.[3]

### 3. The Poulin Telephone Call

The transcript of the October 27, 2006 telephone call confirms the substance of what led to the call. After the parties to the call identify themselves, the following exchange took place:

> McFarland: Steve Juskewitch has called us, and told us that, ahh, that you were giving us consent, uhh, to let us search for certain things on ahh, at your mother's property?
>
> Dan Poulin: Yes.
>
> McFarland: Okay, does she know this?
>
> Poulin: Yes.
>
> McFarland: Okay, and uhh, I guess you've offered to help ahh, point us in, in certain locations.
>
> Dan Poulin: Yeah, I would, if I was not umm, ashamed to show my face out there, I would come out, and take them out, and give them to you, but,
>
> McFarland: Yeah, I, I think it would be better over-all, if we tried to do it over the phone actually. Do you think that's possible?
>
> Dan Poulin: Yes, I do.

The officers and Mr. Poulin then engaged in a detailed discussion about where the hidden cameras were located in the bathroom of the cabin and the location of other evidence, such as the CDs, a computer, and a briefcase.

### 4. The Scovill Search

---

[3] Although it is not entirely clear, it appears that the officers were communicating with Mr. Poulin's cell phone through a land-based network at the Sheriff's Office, which recorded the conversation, and Mr. Juskewitch could not be patched into the call.

The sequencing of the Scovill search and the Poulin phone call is inexact. However, Ms. Scovill recalls greeting the officers on the area between the main house and the cabin, asking them why they were there, and telling them that if they intended to search the premises, they would need a search warrant. They urged her to let them in, and said that they had the right to search the cabin in any event. There was something of a stand-off. It seems that Ms. Scovill telephoned Mr. Juskewitch to ask him whether to allow the officers into her house. Mr. Juskewitch was surprised to learn that the Scovill residence was at issue. He observed that he did not represent Ms. Scovill, but explained to her that if the police had probable cause for a warrant, they would be able to perform the search at some point, whether she wanted it to happen or not.

One of the officers' interests was the Poulin computer, since they wanted to determine whether he had posted any of the videos on the internet. Also, there had been discussion about CDs contained in a briefcase in Mr. Poulin's mother's loft. After the confrontation with Ms. Scovill, the officers retreated from her property to a nearby schoolhouse which is where they called Mr. Poulin. When Mr. Poulin spoke with the officers, he told them that before releasing the computer, he wanted to talk to Mr. Juskewitch, and promised to call them back at his mother's.

In the end, Mr. Juskewitch brokered a deal between the officers and Ms. Scovill. The officers did not enter into Ms. Scovill's main house, but based on Mr. Juskewitch's advice and in consultation with her son, she agreed to fetch a black box and briefcase for them. She went to the loft and carried the black box and briefcase downstairs and handed them over to the police.

    **5.**    **The October 27, 2006 Search**

On October 27, 2006, Deputy Kane and Detective McFarland conducted what they later described as a limited search of the cabin. They checked the walls of the bathroom and found three cameras behind the wall concealed in pop rivets.

### 6. The Search Warrant Affidavits

During Mr. Poulin's October 27, 2006 telephone conversation with the police, he told them that there were three pinhole cameras in the bathroom of the cabin that had not been discovered. On October 28, 2006, Wendy contacted the Hancock County Sheriff's Office and reported that she had found two additional pinhole cameras in the bathroom. On October 30, 2006, Lieutenant Kane swore out an affidavit in support of state search warrants. The affidavit contained two errors: first, he stated that Wendy had called on September 28, not October 28; and, second, he stated that Wendy had reported finding three more cameras, not two. On November 13, 2006, Detective McFarland swore to an affidavit in support of a request for a search warrant in this Court. The affidavit reiterates the numerical error – three, not two additional cameras. The September 28 reference was corrected.

### 7. The Number of Pinpoint Cameras

In his motion, Mr. Poulin alleged that "[t]he number of cameras allegedly recovered by the investigators/Government to date in this matter has ranged from 15 to 7." *Def.'s Mot.* at 7; *Def.'s Mod. Mot.* at 7. The Government responded that on June 12, 2008, it confirmed that six pinhole cameras were recovered from Mr. Poulin's briefcase, another four cameras were recovered from the bathroom, and a single camera from inside a clock radio discovered in a shed behind Mr. Poulin's property. *Gov't's Opp'n* at 8, Ex. G, H. On February 23, 2009, however, the Government set the record straight, representing that a total of eight pinhole cameras were

finally recovered: four from the bathroom in the cabin and four from the briefcase in Ms. Scovill's attic. *Proposed Stipulations* ¶ 6 (Docket # 139).[4]

### 8. Sony Affidavit

In his motion, Mr. Poulin says cryptically that "[t]he Government has provided an affidavit (purportedly from a representative of Sony Manufacturing Company) that states that certain items contained in the investigators' affidavits, as detailed above, were each generated from Sony's on-screen menu when, in fact, four of the five proffered screens are generated by other devices." *Def.'s Mot.* at 8; *Def.'s Mod. Mot.* at 7-8. The Government provided some context. In effect, in seeking to determine whether the devices that Mr. Poulin purportedly used to produce the images were "mailed, or shipped or transported in interstate or foreign commerce," the Government obtained a letter, not an affidavit, from a Sony representative that turned out to contain some erroneous information due largely to problems in translating English to Japanese and vice versa. *Gov't's Opp'n* at 8-10.

## II. The Defendant's Allegations

As refined in his supplemental motion, Mr. Poulin has identified four failings/improprieties that he says justify a dismissal of the indictment:

(1) The Government's October 27, 2006 interrogation of Mr. Poulin, which went beyond areas authorized by his attorney, Steven Juskewitch;

(2) The filing of "demonstrably false and inaccurate affidavits" by members of the Hancock County Sheriff's Office in support of search warrants;

(3) The Government and investigators repeatedly providing conflicting and inconsistent information respecting the quantity of cameras obtained from Mr. Poulin's premises; and,

---

[4] The Government confirmed that the clock radio "did not, in fact, contain a camera." *Proposed Stipulations* ¶ 6.

7

> (4) The Government promulgated a false affidavit from Sony manufacturing about a computer menu screen at issue in the prosecution.

*Def.'s Mod. Mot.* at 1-2.[5]

## III. DISCUSSION

### A. Legal Standards

In his motion, Mr. Poulin contends that he is entitled to a dismissal of the indictment because of asserted instances of prosecutorial or investigative misconduct. *Def.'s Mot.* at 1; *Def.'s Mod. Mot.* at 1. By returning an indictment, a grand jury is carrying out a constitutional function set forth in the Bill of Rights. U.S. Const. amend. V (stating that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury"). Unlike civil actions, an indictment is not generally subject to dispositive motion practice. "'[D]ismissing an indictment is an extraordinary step.'" *United States v. Nai Fook Li*, 206 F.3d 56, 62 (1st Cir. 2000) (quoting *United States v. Stokes*, 124 F.3d 39, 44 (1st Cir. 1997)). In *Whitehouse v. United States District Court*, the First Circuit observed that "[w]hen a federal court uses its supervisory power to dismiss an indictment it directly encroaches upon the fundamental role of the grand jury. That power is appropriately reserved, therefore, for extremely limited circumstances." 53 F.3d 1349, 1360 (1st Cir. 1995).

"Where a defendant seeks dismissal of the indictment before there is a petit jury verdict, such relief 'is appropriate only if it is established that the violation substantially influenced the

---

[5] Mr. Poulin moved separately for various forms of relief based on mistakes the Maine Computer Crimes Unit made in the course of processing physical evidence against him. *Mot.* in Limine *Seeking Exclusion of Work Product, Opinions and Materials Derived from or Associated with the Maine Computer Crimes Lab* (Docket # 132); *Def.'s Mem. in the Form of an "Offer of Proof" Regarding Computer Crime Lab Errors and Associated Mem. of Extant Legal Standard* (Docket # 133). In light of the Government's recent agreement to refrain from "introducing *any* evidence about what was digitally stored on the evidence examined by the Computer Crimes Unit," *Gov't's Mem. in Opp'n to Def.'s Mot.* in Limine *Re: Computer Crimes Unit* at 2 (emphasis in original) (Docket # 143), the Court scheduled a conference of counsel to determine what issues, if any, remain for judicial resolution with respect to the Maine Computer Crime Unit. *Letter to Counsel* (Docket # 154).

grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations.'" *Goodrich v. Hall*, 448 F.3d 45, 50 (1st Cir. 2006) (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988)); *see United States v. Luisi*, 482 F.3d 43, 59 (1st Cir. 2007) (observing that dismissal may be available in "very rare instances" where government misconduct violates due process by "'shocking . . . the universal sense of justice'" (quoting *United States v. Russell*, 411 U.S. 423, 432 (1973))). Further, "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956).

  **B.**  **The October 27, 2006 Telephone Conversation**

The Defendant's position that the indictment should be dismissed because of the circumstances surrounding the October 27, 2006 telephone conversation is wholly untenable. After reviewing the transcript and listening to the tape, the Court concludes that the officers did not act inappropriately during the conversation. Mr. Juskewitch allowed the officers direct contact with his client to attempt to locate the cameras hidden in the bathroom walls of the cabin. Of course, by describing precisely where the cameras were located and how to extract them from their hiding places, Mr. Poulin was making admissions to the officers. Mr. Juskewitch had to know this and so did Mr. Poulin.

As sometimes occurs, from the outset, Mr. Poulin was anxious to come clean and unburden himself. As he described to the officers where the pinpoint cameras were located and how to extract them, he mixed in voluntary admissions about his role in the case:

<u>McFarland</u>: Okay. At this point, uhh, we're just trying to locate the things that are out there, you know, uhh, uhh, we, we're not going to try to do any interview with you, or

9

> anything like that.  We've talked with your attorney, and uhh, if that materializes down the road, we would do that through Steve Juskewitch.
>
> <u>Dan Poulin</u>:  Yes.
>
> <u>McFarland</u>:  So, ahh, we're just taking it a step at a time, and the first step is just trying to collect, ahh, the things that are out there.  Just to make sure we've got everything.
>
> <u>Dan Poulin</u>:  And I understand that, sir.  I, I don't know you, and I don't know who you are.  I'm not running from this.
>
> <u>McFarland</u>:  No, I wou, I, ahh.  That's pretty evident.
>
> <u>Dan Poulin</u>:  I, umm, would have stayed out there, and done what I could to apologize, and make amends that night, and you know, I, I, I didn't share this with anybody.  I didn't show it to anybody.  I didn't do anything like that.  Umm.  I'm not proud of it at all, and there are no minors.  Well, she was a minor through a lot of it, but it's not a little girl thing.  If you've seen this girl, you know that she is a very attractive, and well developed girl, and I am not a pedophile.

As this colloquy reveals, the officers were not attempting to interview Mr. Poulin.  In fact, they told him that any interview would be carried out later and would be coordinated with his attorney.  It was Mr. Poulin who elected to volunteer information, not the officers who were attempting to extract it.

    Notably, during the conversation itself, Mr. Juskewitch actually called Mr. Poulin.  Mr. Poulin told the officers that he had a call coming in on another line, noted that it was Mr. Juskewitch, and asked if he could speak to him.  Detective McFarland said: "sure, yeah."  Mr. Poulin and Mr. Juskewitch spoke briefly and Mr. Poulin returned to the line and continued his conversation with the officers.

Although Mr. Poulin's decision to speak without counsel with the law enforcement officers who were investigating his complicity in a possible crime may have been well thought out, it still carried the risk that, even unprompted, he would blurt out incriminating statements. This is precisely what happened. Mr. Poulin was not subject to improper questions by law enforcement. To the contrary, they allowed him to speak with his lawyer during the conversation, and did not engage in any aggressive or inappropriate tactics. Likely Mr. Poulin rues his decision to speak with the very people who were investigating him, but regret is not a legal basis for dismissing the indictment.

### C.    Demonstrably False Affidavits

The reference in the state and federal search warrant affidavits to Wendy's statement that she had found three, not two, additional pinhole cameras is inconsequential. The search warrants would have established probable cause in any event. Further, if a defendant wishes to challenge the legal sufficiency of a search warrant based on an inaccurate affidavit, the Supreme Court in *Franks v. Delaware* provided for a hearing to attack the veracity of the affidavit and to contest whether the warrant was properly issued. 438 U.S. 154 (1978); *United States v. Scalia*, 993 F.2d 984, 986 (1st Cir. 1993) ("To mount an effective challenge based on an alleged use of deliberate or reckless falsehoods by an affiant, a defendant must request an evidentiary hearing pursuant to [*Franks*]."). Further, a *Franks* hearing is required "only if the defendant makes a 'substantial preliminary showing (1) that a false statement in the affidavit has been made knowingly and intentionally, and (2) that the false statement is necessary for the finding of probable cause.'" *Id.* at 986-87 (quoting *United States v. Paradis*, 802 F.2d 553, 558 (1st Cir. 1986)); *United States v. Nelson-Rodriguez*, 319 F.3d 12, 34 (1st Cir. 2003) (adding "reckless disregard for the truth" as an alternative to the requirement that the false statement be knowing and intentional). Here, Mr.

Poulin has not requested a *Franks* hearing, has not proven that the misstatements as to the number of additional pinpoint cameras were made knowingly and intentionally, or in reckless disregard for the truth, has not shown that the misstatements had any impact on the finding of probable cause, and lastly has not demonstrated that he is entitled to the dismissal of the indictment for such a trivial mistake.

### D. Number of Pinpoint Cameras

Although there may have been some confusion as to the actual number of pinpoint cameras Mr. Poulin possessed, the Government cleared up any confusion on June 12, 2008 by stating precisely the number of pinhole cameras in its possession and by attaching a report detailing specific information about each. Clarification of the results of the Government investigation does not come close to the First Circuit's dismissal standard.

### E. Sony Affidavit

The Government clarified the temporary confusion about whether the screen captures were produced by Sony products and in the Court's view, the mistake, caused in part by translation problems, does not merit dismissal of the indictment.

## IV. CONCLUSION

The Court DENIES Defendant's Motion to Dismiss the Indictment on the Grounds of Prosecutorial/Investigative Misconduct (Docket # 24) and Defendant's Motion to Dismiss the Indictment on the Grounds of Prosecutorial / Investigative Misconduct (Modified) (Docket # 66).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 17th day of August, 2009