UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

DANIEL POULIN,                            )
                                          )
              Movant,                     )
                                          )
       v.                                 )        1:08-cr-00050-JAW
                                          )        1:12-cv-00114-JAW
UNITED STATES OF AMERICA,                 )
                                          )
              Respondent                  )

**RECOMMENDED DECISION ON 28 U.S.C. § 2255 MOTION**

On January 27, 2010, the court entered its judgment, following a jury-waived trial, that Daniel Poulin was guilty of production of child pornography, in violation of 18 U.S.C. § 2251(a). The court sentenced Poulin to fifteen years (180 months), the statutory minimum sentence.  See id. § 2251(e).  The First Circuit Court of Appeals affirmed the conviction on direct appeal. United States v. Poulin, 631 F.3d 17 (1st Cir. 2011) (rejecting arguments that the crime of conviction lacked a nexus to interstate commerce and that the evidence was insufficient to prove the production of sexually explicit images of a minor with materials that traveled interstate).  On April 6, 2012, Poulin filed a motion pursuant to 28 U.S.C. § 2255, which motion the United States concedes is timely.  (ECF No. 224.[1])  On April 13, 2012, I granted Poulin's motion for appointment of counsel and ordered the United States to answer Poulin's motion.  The United States filed its response, including a request for dismissal without hearing, on October 17, 2012, following multiple extensions.  (ECF No. 276.)  The Court referred the habeas corpus pleadings for report and recommendation.  Based on my review of the record, I offer the following report and recommend that the court deny and dismiss Poulin's section 2255 motion.

---

[1] ECF is an acronym for Electronic Case Files and is a shorthand reference to this court's electronic docket.

## THE CLAIMS

Poulin raises two challenges in his motion.  First, he contends that his trial counsel was ineffective for failing to effectively pursue charges of prosecutorial misconduct that he describes as Brady and Giglio violations, the manufacture of evidence, and fraud upon the court, which misconduct he says prevented him from receiving a fair trial.  (Motion at 4.)  Second, he contends that his trial counsel was ineffective for failing to properly object to and appeal the cumulative effect of multiple alleged errors related to ground one.  (Id. at 5.)  These claims will be discussed after presentation of the relevant background.

## BACKGROUND

In 1999 or 2000, Daniel Poulin purchased spy camera equipment from a vendor in Texas and installed the cameras in various residences he shared with his former girlfriend and her children, including in the bathroom walls and toilet of a cabin in Islesford, Maine.  Using these cameras and related video capture and recording equipment,[2] all of which traveled in interstate commerce, Poulin videotaped sexually explicit images of his girlfriend's daughter, including images captured when the daughter was a minor.  Poulin, 631 F.3d at 18-19;  United States v. Poulin, 643 F. Supp. 2d 157, 158-59 (order denying motion to suppress statements).[3]  This came to an end in October 2006, when Poulin's girlfriend found some DVDs lying on the ground outside of the Islesford cabin and discovered, upon investigation, that they contained nude images of her daughter.  She, the daughter, and the daughter's boyfriend confronted Poulin and he left the island.

---

[2]     The record associated with Poulin's motion does not provide a very precise description of the camera equipment because the motion focuses so heavily on the computer equipment.  The seized evidence included pinhole lenses that were installed within the walls and attached by wire to recorder equipment kept in a locked room off the bathroom.  The recording equipment included a Sony, a Phillips, and a Panasonic recorder.  (Van Dyke Aff. ¶ 5, ECF No. 225.)  Poulin also used a "potty cam" or "toilet cam," but that device was never seized.  (Transcript of Bench Trial, Vol. IV, at 451, ECF No. 199.)

[3]     The Court of Appeals's opinion is also available at ECF No. 209 and this court's order on the motion to suppress is available at ECF No. 155.

On that day or the day after, law enforcement came to the property to search for and seize the equipment and digital media.  Poulin communicated by telephone with the lead investigator, Detective McFarland of the Hancock County District Attorney's Office, to assist the sheriff's deputies in their efforts because Poulin was concerned that otherwise they would cause extensive damage to the cabin in their quest to uncover camera equipment and wiring installed in the walls. Poulin, 643 F. Supp. 2d at 159.  During this conversation, which was recorded, Poulin described in detail where he installed the cameras and also authorized the seizure of a cache of digital media disks (DVDs/CDs)[4] and some additional pinhole cameras located in his mother's neighboring home.  United States v. Poulin, 645 F. Supp. 2d 17, 20-21 (D. Me. 2009) (order on motions to dismiss the indictment on the grounds of prosecutorial / investigative misconduct).[5] Poulin also made inculpatory statements in relation to the daughter's status as a minor, including the following statement:

> I, umm, would have stayed out there, and done what I could to apologize, and make amends that night, and, you know I, I, I didn't share this with anybody.  I didn't show it to anybody. I didn't do anything like that, umm.  I'm not proud of it at all, and there are no minors. Well, she was a minor through a lot of it, but it's not a little girl thing.  . . .  I'm not a pedophile.

Poulin, 643 F. Supp. 2d at 160 n.3.  In addition to such statements and the equipment and media already described, the deputies seized two personal computers with their respective hard drives installed (one E-Machines desktop tower and one Dell laptop), two "loose" hard drives (one Samsung drive and one Hitachi drive), a Simpletech external hard drive, and a Panasonic DVD-R player containing a Maxtor hard drive, making six hard drives in all.[6]

---

[4]      Among the seized media were some digital video cassettes.  (McFarland testimony, Transcript of Bench Trial, Vol. I, at 96, ECF No. 196.)

[5]      The court's order on the misconduct motion is available at ECF No. 157.

[6]      It is not entirely clear from the record whether *all* of the computer equipment was seized on the day of the conversation between Poulin and McFarland.  Poulin references a search warrant executed sometime after this initial encounter, but it matters not for purposes of the two grounds raised in his section 2255 motion. (Poulin Aff. ¶ 1, ECF No. 240.)  In his affidavit Poulin criticizes McFarland for an alleged misstatement in a search warrant affidavit

Hancock County officials chose to refer the case to the United States Attorney's Office, which accepted the case for prosecution under federal child pornography law.  The case was eventually assigned to Assistant U.S. Attorney Gail Fisk Malone.  Meanwhile, the Hancock County Sheriff's Office placed the computer hardware and drives (including the Panasonic DVD-R player and its drive) in the custody of the Maine Computer Crimes Task Force on November 17, 2006.  (ECF No. 234-2 (date received and requesting officer categories);  ECF No. 231-2 (task force property invoice).)  The property invoice prepared by the task force agent who accepted initial custody of the hardware correctly recorded that there were six relevant hard drives, but incorrectly identified each item of inventory as item number 1.  (ECF No. 231-2.)  At some point over the next few months, task force agent Inez Dudley examined the multiple hard drives for evidence.  Somehow the task force came to identify the loose Samsung hard drive (serial # S01CJ10X316001) as a second hard drive associated with the E-Machines tower, which was mistaken.  (ECF No. 239-2.)  How that came to pass is not clear, but it is a major underpinning of Poulin's motion and is something he would like to have addressed in an evidentiary hearing.

In June 2007, McFarland also delivered to the task force several of the DVDs in the hope that the task force could determine when the information was burned to the disks.  (See Malone e-mail of May 6, 2009, ECF No. 235-2.)  At some point the task force produced a data spread sheet that itemized multiple DVDs and their purported creation dates.  (ECF Nos. 227-1, 228-1.) This document was shared with the defense post-indictment.

---

to the effect that Poulin admitted responsibility to the girlfriend and daughter and concerning statements about the number of pinhole cameras.  However, there is absolutely no basis for questioning the existence of probable cause to search the premises or the hardware and media recovered from the premises, as the court quite clearly explained in its order denying the "misconduct" motion.  Poulin, 645 F. Supp. 2d at 24-25 (ECF No. 157 at 11-12).

Prior to presenting the case to the grand jury, AUSA Malone engaged in plea negotiations with Poulin through Poulin's counsel, David Van Dyke.  According to Poulin, Malone aggressively encouraged Poulin to plead guilty (to what charge Poulin does not say) and Malone represented that there was computer involvement in the crime, but never disclosed the actual findings the task force made concerning the computer hard drives taken into their custody. (Poulin Aff. ¶ 2, ECF No. 240.)

The grand jury indicted Poulin on March 12, 2008.  In April, Malone provided defense counsel with certain discovery, including (1) a report that Inez Dudley had recovered certain images on the DVR machine's internal hard drive and on the loose Samsung hard drive (ECF No. 226-1) and (2) the DVD data spread sheets (ECF Nos. 227-1, 228-1, 229-1) that purported to identify certain images and to date them within "the prosecutable temporal window," meaning the window of time between the applicable period of limitation and the victim's eighteenth birthday.  (Van Dyke Aff. ¶ 4, ECF No. 225.)  On page four of Dudley's report, Dudley indicated that Malone had requested forensic analysis to determine whether "potty cam" images were stored on any of the hard drives and/or posted on the Internet.  On page five of the report, Dudley indicated that she did not find any evidence of images being posted to the Internet.  Also on page five, the report indicated that Dudley did find images on the Maxtor hard drive in the Panasonic "DVR machine," including a "quad-split screen with select 'close up' single pane view[s] of young women going to the bath room, bathing, and getting dressed."  Additionally, she reported that the loose Samsung drive contained what appeared to be unedited data including images of the same two females "bathing and going to the bathroom."

Dudley's report did not state that Dudley was able to date any of the images she recovered and identified on the hard drives.  Particularly significant to Poulin is the fact that

Dudley's report contained erroneous information on pages two and three that Poulin points to as proof of investigative misconduct. Specifically, the list of examined hard drives identifies seven hard drives rather than six. The error, according to Poulin, is that the list includes two Samsung drives and states that one was taken from inside the E-Machines tower[7] and that another was "loose." When Dudley reported finding explicit images on a Samsung drive, she described the drive as "the loose Samsung drive (listed as evidence #4 at the time of acquisition)."

The Samsung hard drives identified on pages two and three of the report are, in fact, the same hard drive. The serial number listed for the hard drive named "HDD4" is the unit's actual serial number. The serial number listed for the hard drive named "HD7" is the unit's part number. (Compare ECF No. 231-2 (identifying the "PN" for the "loose" 120 GB Samsung hard drive).) Poulin complains that Dudley's report was false and harmful because it suggested that the Samsung drive was associated with the E-Machines computer (and by extension, possibly the Internet). However, Dudley's report clearly states that she found no evidence of images being posted to the Internet.

The other issue emphasized by Poulin is his contention that Dudley had, as of April 2008, informed AUSA Malone in a report or otherwise that she could not reliably determine the creation date of the media, meaning that Malone had supplied the defense with misleading inculpatory information in the form of the data spread sheets without including "exculpatory" evidence to the effect that Dudley could not reliably determine creation dates. (Poulin Aff. ¶ 6.) Poulin would like an evidentiary hearing to address what he believes was serious investigative/prosecutorial misconduct in linking the Samsung drive to the E-Machines tower and withholding the allegedly "exculpatory" information from Dudley.

---

[7]       In fact, the hard drive in the E-Machines was a Hitachi unit.

As part of the investigation, Malone sought to obtain evidence that would link up particular images with specific recording equipment, based on screen images or embedded coding.  One issue was to which device the quad-split screen could be attributed.  (Van Dyke Aff. ¶¶ 6-7.)  In May 2008, Malone said the screen was produced by a Panasonic recorder, but in June 2008 she maintained that it was produced by a Sony recorder.  Poulin avers that he engineered this change of view by falsely stating in a telephone conversation with Attorney Van Dyke that the quad-screen image was a Sony image.  He suspects that someone was listening in and that this explains why investigators sent a letter to Sony to inquire whether the image came from a Sony camcorder.  (Poulin Aff. ¶¶ 8-9.)  He appears to want a hearing to determine whether correspondence from Sony (ECF No. 230-1) was forged, but acknowledges that he does not know if the correspondence is addressed to the exact same screen shot (Poulin Aff. ¶ 9).  Poulin says that after Malone reported in discovery that these images came from a Sony camcorder, he "took the appropriate camcorder brochures to Attorney Van Dyke's office and demonstrated to him that the arguments AUSA Malone was making were incorrect."  (Id. ¶ 10.)  Van Dyke brought the issue to Malone's attention and told her that based on these same brochures Sony was mistaken and that he would have to depose Sony.  (Van Dyke ¶ 10.)  Evidently, he also ascribes some malign purpose to Malone's refusal to agree to a Sony deposition.  (Id.)

On September 30, 2008 (roughly one year prior to trial), Poulin filed his opening salvo of motions, including a motion to dismiss for prosecutorial/investigative misconduct (ECF No. 24).  In the motion, Van Dyke wrote that investigative failings and improprieties were "of such a magnitude that they go to the very heart of the legitimacy of this prosecution."  (Id. at 1.)  Among the complaints was an accusation that the "Government has promulgated a false affidavit

from Sony . . . respecting a computer menu screen at issue in this prosecution."  (<u>Id.</u> at 2, ¶ 6.)
Concerning the Sony matter, Van Dyke asserted in the motion that there was "an affidavit"
(actually a letter) stating that certain "items . . . were each generated from Sony's on-screen
menu when, in fact, four of the five proffered screens are generated by other devices."  (<u>Id.</u> at 8.)
In other words, Poulin sought dismissal based not on the contention that the image in question
was produced by a device that did not travel in interstate commerce, but that the government has
settled on the wrong device.

On October 31, 2008, Van Dyke filed another motion requesting a Sony deposition.
(ECF No. 33.)  On December 16, 2008, the court denied the request for an order permitting a
Sony deposition because Poulin failed to demonstrate exceptional circumstances that would
either warrant a pretrial deposition or serve to preserve evidence.  (Order on Motion for
Discovery at 12, ECF No. 52.)

The case first came onto the trial list for December 2008.  (ECF No. 31.)  However, in
December it was continued to the February list.  (ECF No. 56.)  It would be continued repeatedly
on motion and finally came on for trial in September 2009.  (ECF No. 150.)  In the meantime the
government continued to investigate and develop its evidence of the interstate origin of Poulin's
video equipment.  This includes some December email correspondence with Sony
representatives that was shared with the defense in February 2009.  (Van Dyke Aff. ¶ 11 & Van
Dyke Aff. Ex. F, ECF No. 231-3.)  As of April 2009, Malone still understood that two Samsung
hard drives had been recovered.  Van Dyke raised the issue with her and Malone acknowledge
by April 14 that there was a mistake in the Dudley report and that there was only one Samsung
drive, but the explanation for why the task force ever indicated there were two or for why the
task force ever associated the drive with the E-Machines tower were not satisfactory from the

perspective of the defense (although Malone had already conceded that she did not intend to suggest that any hard drives had ever been used to distribute images on the Internet).  (Van Dyke Aff. ¶¶ 12-14.)  Malone, working with Dudley, attempted to produce a new report that would be accurate concerning the hard drives, but did not provide the defense with a new report until May 5.  The parties were working to meet a May 8 deadline to file "stipulations regarding government error and crime lab issues," and were also to prepare supplemental briefs over the course of May to address a series of pending in limine motions (see ECF Nos. 66, 69, 73-77), but particularly the motion to dismiss for investigative/prosecutorial misconduct (see ECF Nos. 66, 112), as related in a minute entry for April 17 (ECF No. 113).  On April 29, the court granted a motion continuing the trial to the July list.  (ECF No. 119.)

On May 5, AUSA Malone produced a "corrective" report from Dudley.  In the footer of the document it is stated that the report was printed on May 5.  (Van Dyke Aff. Ex. P, ECF Nos. 234-2, 234-3.)  The report was sent by Federal Express, but was preceded with an email and with a facsimile copy of the report on May 5.  The email indicated that Malone had received the report on May 4 and instructed that it go out that day, but that Malone's assistant had "dropped the ball."  (Van Dyke Aff. Ex. O, ECF No. 234-1.)  Attorney Van Dyke was suspicious that perhaps another version of the report was in Malone's possession because she had "received" the report on May 4 but the report copied to him was dated (actually it reads "printed on")[8] May 5. (Van Dyke Aff. ¶¶ 19-20.)

On May 6, the court granted an extension of the deadline to file stipulated facts concerning the alleged error and crime lab issues, pushing the deadline to May 22, 2009.  (ECF No. 123.)  Van Dyke was not satisfied with the corrective report and asserted that it was "still

---

[8]        The record does not indicate whether Dudley's corrective report was encoded to change the print date to whatever date it was actually opened and printed on.

wrong." (Van Dyke Aff. ¶ 21.) In particular, Van Dyke complained that the report indicated imagery was found on the loose Hitachi hard drive, suggesting that this was the first time this had ever been asserted. (Id. ¶ 23; Van Dyke Aff. Ex. P, ECF NO. 234-3; Ex. S, ECF No. 235-3.) As for the expectation that the parties arrive at some stipulations, Van Dyke indicated that he would "only accept a stipulation that details each of the separate errors in the various reports" and that he would "require a stipulation that the numerosity and context of the errors arise to the level of intent." (Van Dyke Aff. Ex. S.) On May 28, Van Dyke filed a motion in limine seeking the exclusion of all task force work product. (ECF No. 132.)

On June 2, the court granted another continuance, removing the case from the July trial list. (ECF No. 135.) The motions concerning task force evidentiary matters and alleged misconduct were all finally briefed in June. In a supplemental response to the motion to dismiss, the government explained that it had decided not to use any task force work as evidence at trial because "it did not satisfy our standards of reliability." (ECF No. 138 at 1.) The government conceded that the task force had failed to "log, handle or analyze the evidence . . . properly." (Id.) However, observing that misconduct must truly be shocking to justify dismissal on due process grounds, the government opposed the idea of dismissing the indictment. (Id. at 2-3, citing, inter alia, United States v. Luisi, 482 F.3d 43, 59 (1st Cir. 2007), and United States v. Guzman, 282 F.3d 56, 59 (1st Cir. 2002).) Concerning the task force, or "computer crimes unit," the government stated that it did "not wish to minimize the confusion and frustration to which Defendant was subject[ed] by the agents' errors," and that it was responsible for compounding the problem by repeating the errors in correspondence that was meant to cure them. (Id. at 8.) The government rejected the idea that there was a bad faith purpose to mislead or to falsely inculpate the defendant and also reiterated that it had explained to the defendant "from the

10

outset" that it did not have evidence of file sharing over the Internet. (Id. at 9.)  To resolve the matter the government "agreed not to use at trial any of the evidence generated by the agents at the Computer Crimes Unit," which concession it felt would insulate the defendant from any prejudice that might have arisen in connection with the preparation of his defense. (Id.)

On June 18, 2009, the government further conceded that it would restrict McFarland's testimony to avoid any reference to the task force forensic examination, but observed that McFarland was still able to authenticate all of the physical evidence because he was present when all of the evidence was seized;  inspected, tagged, and logged each piece of evidence according to its serial number found on external markings;  photographed, inspected, and recorded the manufacturer's mark on each piece of evidence;  handled each piece of evidence numerous times as part of his investigation;  and, therefore "was able to testify from personal knowledge whether the physical characteristics of each piece of evidence are the same now as when he recovered it." (ECF No. 143 at 2.)  As for restricting McFarland's testimony, the government stated:

> Det. McFarland will *not* be able to testify that the digital storage on any given piece of evidence is in the same condition as when he seized it.  However, the Government has already agreed not to use any evidence derived from the Computer Crimes Unit's forensic examination of the digital storage capacity of the pieces of evidence that came into its possession.  Pursuant to this agreement, the Government will not be introducing *any* evidence about what was digitally stored on the evidence examined by the Computer Crimes Unit.

(Id.)

On August 17, 2009, the court denied Poulin's motion to dismiss the indictment. (ECF No. 157.)  Though the court denied the motion to dismiss the indictment, the in limine motion concerning task force work product remained pending.  The court conducted a conference of counsel on August 21, 2009, to determine how to proceed on that matter. (Transcript of

Conference of Counsel at 5-6, ECF No. 265.)  The court observed that AUSA Malone had, as of

that date at least, stipulated that she would not introduce in the government's case-in-chief *any*

findings, determinations, reports, or other work product that the task force generated from its

forensic review and the court indicated that that seemed to be all that Poulin could reasonably

expect.  (Id. at 6.)  Poulin, on the other hand, was insisting on more, requesting that all

equipment and media that ever came into the task force's custody be suppressed as well (which

would extend to the DVDs and other non-hard-drive media).  (Id.)  This relief the court was

unwilling to provide.  Malone indicated that she would work with Van Dyke to craft language

for the jury (ultimately there would be a bench trial) to explain that there was no evidence that

images ever were uploaded to the Internet.  (Id. at 7.)  On August 24, 2009, the court denied that

portion of Poulin's misconduct in limine motion that sought more relief than the exclusion of

task force findings and work product.  (ECF No. 164 at 3 (excluding "any findings,

determinations, reports or other work product that the Maine State Police Computer Crimes Unit

generated from its forensic review of evidence seized from Defendant in this case").)

    A bench trial[9] commenced September 8 and the government rested its case on September

10, a Thursday.  (Transcripts of Bench Trial, ECF Nos. 196-199.)  The government's second

witness was Detective McFarland.  McFarland described his initial investigation at the Islesford

residence on October 26, 2006, the circumstances surrounding the seizure of the physical

evidence on that day, and the circumstances surrounding the acquisition of Poulin's admissions,

a tape and transcript of which were admitted in evidence.  (Id. at 69-94.)  From there,

McFarland's testimony procured the admission of multiple photographs showing the

manufacturer marks on the pinhole cameras, the admission of multiple DVD disks and

---

[9]    On the first day of trial, Poulin waived his right to a jury trial.  (Transcript of Bench Trial, Vol. I, at 17-22, ECF No. 196.)

minicassette tapes, two transmitters, a Sony camcorder, a JVC VHS recorder, a Panasonic DVD recorder, and photographic and testimonial evidence of manufacturer marks found on the electronic equipment and media disks/cassettes.  (Id. 111-130.)

McFarland viewed all of the media evidence and selected a small percentage to show to the court as evidence of sexually explicit images that were taken when the victim was a minor. McFarland explained a methodology for being able to link those images to specific media DVDs/cassettes.  (Id. at 134-37.)  When the government moved the admission of its selection in bulk, Attorney Van Dyke preserved an objection that a specific series of images that included a toilet cam image were selectively joined to falsely date the toilet cam image.  (Id.  at 138.)  The court admitted the evidence, but allowed that Van Dyke could seek to challenge the evidence in relation to the date of its making.  (Id.)  McFarland then testified about the methods developed to determine the victim's age in the images.  These included the date of a fire that destroyed an Augusta residence, which indicated that the victim was seventeen or younger when she was filmed in that particular residence;  a Playboy bunny tanning sticker/tattoo (non-permanent) on the left pelvis that the victim acquired when 16;  the absence of a navel piecing that the victim obtained on her eighteenth birthday and a shoulder tattoo acquired shortly after the eighteenth birthday;  and images from a Howland residence not lived in after her seventeenth birthday.  (Id. at 141-45, 155, 171-75.[10])  McFarland did not purport to date the images based on DVD properties, but rather based on these distinguishing marks.  It was on cross examination that McFarland indicated that he could not determine the creation date of a specific image based on DVD properties, except to say that the image must have been made before the creation date of the disk itself.  (Id. at 184-85.)  McFarland also allowed that he could not be certain of time

---

[10]     The victim testified concerning these personal marks as well.  (Transcript of Bench Trial, Vol. II, at 238-41.)  The operator of the local tanning salon testified concerning the sticker/tattoo as well.  (Id. at 287-90.)

stamps found in any images because he could not be certain that the equipment that recorded the images had a properly calibrated internal clock.  (Id. at 194.)

In addition to this evidence the government introduced testimony from a Panasonic representative who testified that Panasonic makes its digital media in Japan or in China (Vol. II at 311);  a representative of Fujifilm who testified that the company's media is mostly made in Japan and that none is made in Maine (Vol. III, at 396);  a representative of Sony who testified that Sony's media products are generally made in Taiwan, Japan, or Mexico, and never in Maine (Id. at 399);  a representative of Verbatim who testified that its products are made in Taiwan, China, and Singapore, but never in Maine (Id. at 402);  and a representative of Maxell who testified that its products are not made in the United States (Id. at 404).  The government also called Terry Dicus, the Texas vendor who testified that he supplied Poulin with the pinhole cameras.  (Id. at 405, 410-12.)

Prior to the start of trial, Van Dyke issued a subpoena to the task force requesting their entire file.  (Van Dyke Aff. ¶ 27.)  This was delivered at the courthouse on September 10 by Tina Plourde, a task force employee.  (Id.)  According to Poulin and his mother, who were both present when the file was delivered at the courthouse, they saw within the file a May 4, 2009, corrective report prepared by Dudley that "was not identical to any report that had ever been disclosed to the defense."  (Poulin Aff. ¶ 32;  Catherin Scovill Aff. ¶ 5, ECF No. 246.)  Poulin says the report did not state that media was forensically recovered from a computer.  (Poulin Aff. ¶ 32.)  Poulin inquired about this with Plourde, who then called her supervisor at the task force, Glenn Lang.  Poulin could hear both sides of the conversation in the close quarters of the conference room and heard Lang instruct Plourde to pick up the file and bring it back to the task force offices.  (Id.;  Scovill Aff. ¶ 7.)  That afternoon, Poulin, his mother, and Van Dyke

travelled to the task force offices in Vassalboro and spoke with Lang.  Poulin avers that Lang told them that the forensic findings related in the copy of the Dudley report printed and delivered to them on May 5 were false.  (Poulin Aff. ¶ 33.)  Scovill declares that Lang told them that the forensic finding that images were recovered from a computer was false and that it was Malone's fault for concealing the fact.  (Scovill Aff. ¶ 10.)  Van Dyke swears that Lang stated that he would not let them see the non-produced report and that he "had informed AUSA Malone on or about May 6, 2011, that the report . . . produced to the defense was inaccurate," but that Malone had told him it was "too late" because the report has "already gone out."  (Van Dyke Aff. ¶¶ 29.)

Poulin presented a written Rule 29 motion on September 11 (a Friday).  (ECF No. 178.) Poulin did not otherwise raise the new evidence concerning the task force file.  On September 14, the court denied the Rule 29 motion orally in open court and explained that viewed in the light most favorable to the government the victim's testimony was sufficient to establish her minority in child pornography images based on "the most obvious and significant piece of evidence," the Playboy bunny sticker;  that the evidence was also sufficient to demonstrate the use of equipment that was shipped in interstate commerce, including based on the testimony of the Texas vendor who sold Poulin the covert camera equipment;  and that the images met the statutory definition of "sexually explicit."  (Transcript of Bench Trial, Vol. IV, at 443-444, ECF No. 199.)  To a pointed objection that the government had not proved recordation of visual images with a specific piece of equipment, the court explained that the camera evidence and the digital media capturing the images were capable of supporting the inference that the camera-captured images were recorded with some equipment.  (Id. at 446.) The court reasoned that the law did not require that the government prove that a particular recording device recorded particular images from a particular camera or that every piece of equipment used was shipped in

interstate commerce.  (<u>Id.</u> at 447.)  The court further rejected the contention that the government's evidence must be tied to first-generation images.  (<u>Id.</u>)  As to the statute of limitation defense, the court observed that, assuming the limitation period were five years as Poulin maintained, the Playboy-bunny-dated images were within the limitation period based on the testimony presented at trial.  (<u>Id.</u> at 448.)  The court also explained that viewed in the light most favorable to the government the toilet cam images could be placed inside the limitation period and that the recorded images from the toilet camera could sustain a verdict even though the toilet camera was never recovered by the government.  (<u>Id.</u> at 451.)

Poulin declined to present evidence following the court's resolution of the Rule 29 motion and the government rested finally.  (<u>Id.</u> at 452-54.)  Following closing arguments and a recess the court delivered its verdict.  (<u>Id.</u> at 478.)

The court conducted a sentencing hearing on January 27, 2010.  The court's sentencing guideline analysis did not include any mention of computer use or any computer-based enhancement.  (Transcript of Sentencing Proceedings at 33, ECF No. 266.)  Nor did the court's discussion of the circumstances mention any computer usage as a factor relevant to the sentence imposed.  (<u>Id.</u> at 39-42.)  The court imposed a fifteen-year (180-month) term of imprisonment, the statutory minimum for production of child pornography.  (<u>Id.</u> at 42.)

Poulin, through Attorney Van Dyke, pursued an appeal.  On appeal Poulin raised two challenges to the conviction.  First, he raised a constitutional challenge to the effect that 18 U.S.C. § 2251(a) cannot criminalize "purely personal" conduct that does not have a substantial effect on interstate commerce.  <u>Poulin</u>, 631 F.3d at 18.  Second, he pressed his contention that the evidence at trial was insufficient for failing to demonstrate production of child pornography

with materials that traveled interstate.  Id.  The Court of Appeals affirmed the conviction.  Id.

On the sufficiency of the evidence to prove "production," the Court succinctly observed:

> A reasonable factfinder could have found that the substantial evidence introduced
> at trial -- pinhole cameras recovered from the cabin bathroom;  wiring from the
> cameras that led to the bedroom closet;  cables, transmitters, and recording
> devices that Poulin secreted in his mother's attic;  and DVDs evincing sexually
> explicit images of a minor -- proved that Poulin "produced" the images.
>
> Finally, Poulin admitted to taping N.R. over the course of several years.  Indeed,
> several witnesses testified at trial that Poulin confessed to them that he had been
> "taking pictures of," "making movies of," and "videotaping" N.R. while she was a
> minor.  A reasonable factfinder could have credited this testimony as proving
> production.
>
> With respect to Poulin's argument that no particular image was connected to a
> particular recording device that traveled in interstate commerce, it too fails.  All
> of the media equipment and materials seized were manufactured outside of
> Maine.  It was reasonable for a factfinder to conclude that Poulin used these
> materials to produce the sexually explicit images.

Id. at 23.

### DISCUSSION

Poulin raises two grounds in his section 2255 motion, both of which he classifies as

ineffective assistance of counsel claims.  In his first ground Poulin complains that Van Dyke

should have stood firm with the motion to dismiss for "prosecutorial misconduct in the context

of Due Process violations under Brady and Giglio, manufacturing evidence, and patterned

extrinsic and intrinsic fraud on the court," which he maintains "improperly influenced the trier"

and "unfairly hampered [his] ability to prepare and present a defense."  (Motion at 4.)  In his

second ground Poulin contends that Van Dyke was ineffective for "failing to 'properly' object to,

and appeal, the cumulative effective [sic] of the multiple errors in this case."  (Id. at 5.)  Poulin

says he should have an evidentiary hearing at which he can "advance his claim with the benefit

of counsel."  (Id.)

## A.     Standard of Review

Pursuant to 28 U.S.C. § 2255(a), a person may move to vacate his sentence:

> upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack.

If the section 2255 movant shows that he may be able to demonstrate an entitlement to habeas relief, then "it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry." Bracy v. Gramley, 520 U.S. 899, 908-909 (1997) (quoting Harris v. Nelson, 394 U.S. 286, 300 (1969)). An evidentiary hearing is required "unless 'the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" Owens v. United States, 483 F.3d 48, 57 (1st Cir. 2007) (quoting 28 U.S.C. § 2255). In making its assessment, the court must "take as true the sworn allegations of fact set forth in the petition 'unless those allegations are merely conclusory, contradicted by the record, or inherently incredible.'" Id. (quoting Ellis v. United States, 313 F.3d 636, 641 (1st Cir. 2002)).

When the court reviews Poulin's section 2255 motion and this recommended decision, it will be "at liberty to employ the knowledge gleaned during previous proceedings and make findings based thereon without convening an additional hearing." United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993). In issuing this recommended decision I cannot take such liberty, but I can approach the record in a fashion that takes into account this court's ability to do so on review of this recommended decision.

## B.     Cause and Prejudice

To succeed on his ineffective assistance of counsel claim, Poulin "must establish both that counsel's representation fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." Turner v. United States, 699 F.3d 578, 584 (1st Cir. 2012). The two prongs of the ineffective assistance test are commonly referred to as the "cause" and "actual prejudice" tests. E.g., Bucci v. United States, 662 F.3d 18, 29 (1st Cir. 2011). A district court reviewing such claims need not address both prongs of the test because a failure to meet either prong will undermine the claim. Strickland v. Washington, 466 U.S. 668, 697 (1984).

As for the "cause" test, the court must be "fairly tolerant" of counsel's performance because the Constitution does not guarantee a perfect defense. Moreno-Espada v. United States, 666 F.3d 60, 65 (1st Cir. 2012) (quoting Scarpa v. Dubois, 38 F.3d 1, 8 (1st Cir. 1994)). The issue is whether counsel's performance was "'within the wide range of reasonable professional assistance' that a competent criminal defense counsel could provide under 'prevailing professional norms.'" Bucci, 662 F.3d at 30 (quoting Strickland, 446 U.S. at 688-89). "Judicial scrutiny of the defense counsel's performance is 'highly deferential,' and the defendant must overcome a 'strong presumption . . . that, under the circumstances, the challenged action might be considered sound trial strategy.'" Id. (quoting Strickland, 446 U.S. at 689).

As for the "actual prejudice" test, the question is whether the showing is "sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. The court must consider "the totality of the evidence before the judge or jury" when measuring the prejudicial effect. Turner, 699 F.3d at 584 (quoting Stephens v. Hall, 294 F.3d 210, 218 (1st Cir. 2002)). Factors that are commonly considered include the strength of the prosecution's case, the effectiveness of the defense presented at trial, and the potential for new evidence and new avenues for cross-examination to undermine the credibility of government witnesses. Id.

C.      **Merits of the Section 2255 Motion**

Although Poulin's charges, taken as true, indicate that one or more members of the task force engaged in investigative malfeasance and that AUSA Malone sought to withhold any evidence suggestive of that fact, Poulin's presentation falls short of the cause and actual prejudice standards and does not indicate that Poulin can demonstrate an entitlement to habeas relief, such as a vacated sentence, much less dismissal of the grand jury's indictment.

As for cause, Attorney Van Dyke vigorously pursued a defensive strategy designed to restrict the government's ability to prove that child pornography was "produced" with equipment that traveled interstate.  Van Dyke achieved a concession from the government and an exclusionary order from the court that removed from the case all forensic evidence gathered or developed (or allegedly fabricated) by the task force.  More than that could not reasonably have been expected of Van Dyke given the quality of the case against Poulin.  Poulin fails to identify any actual deficiency, let alone ineffectiveness, in Van Dyke's representation.

As for prejudice, the government's case against Poulin was all but bullet-proof.  The government had Poulin's own admissions of guilt and it had a reliable method for establishing that the primary victim was a minor when certain sexually explicit images were captured with Poulin's cameras and related equipment.  This method did not depend on any forensic evidence.  The government also had a wealth of digital media containing the essential images and the government did not depend on any images forensically recovered from any of the hard drives examined by the task force.  Consequently, the controversy over the task force's errors and alleged malfeasance does not tend to undercut the value or weight of this substantial evidence of guilt.  Even if Poulin's worst suspicions are accurate—that the task force did not find forensic evidence of the production of child pornography on any of the hard drives it examined but falsely

20

asserted that it had—that fact would not have undermined the government's proof at trial because production of child pornography and the interstate nexus were so amply demonstrated by the evidence that remained and none of that evidence depended on task force work. In other words, Poulin would not have gained any trial advantage from eliciting testimony to the effect that the task force's forensic review was inconclusive because the government built its case by means of evidence other than the hard drives. For these reasons, I conclude that an evidentiary hearing is unwarranted in this case and that the motion should be dismissed. The balance of this discussion addresses the individual arguments raised in Poulin's memorandum in support of his motion.

### 1. Ground One

Citing Giglio v. United States, 405 U.S. 150 (1972), and Brady v. Maryland, 373 U.S. 83 (1963), Poulin argues that prosecutorial misconduct "including evidence manufacturing and patterned intrinsic and extrinsic fraud on the court" are established by his filings (Motion at 5), and that the result of the prosecution would have been different had he enjoyed the benefit of a true and accurate report concerning the task force's findings (id. at 6-7). He contends that he was subjected to "a kind of double-acting prosecutorial error: a failure to communicate salient information, which, . . . should be disclosed to the defense, and a deliberate insinuation that the truth is to the contrary." (Reply at 11, ECF No. 285, quoting United States v. Udechukwu, 11 F.3d 1101, 1106 (1st Cir. 1993).)

In Giglio the Supreme Court restated the long-established maxim that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" 405 U.S. 153 (quoting Mooney v. Holohan, 294 U.S. 103, 112 (1935)). Along the same lines, in Brady the Supreme Court held that prosecutorial

suppression of material evidence undermining the credibility of a witness whose testimony might have been determinative of guilt or innocence requires a new trial.  Id. (describing Brady, 373 U.S. at 87).  Suppression of evidence does not always call for a new trial.  It must first be shown that there is a reasonable probability that the evidence in question would have changed the fact finder's judgment.  Id.;  United States v. Bagley, 473 U.S. 667, 682 (1st Cir. 1985) (discussing the Brady rule in the context of a section 2255 motion).

Although Poulin's memorandum is quite lengthy, one thing it does not adequately do is explain how the task force evidence undermined the testimony of any particular witness.[11] Poulin says that somehow the alleged evidentiary maneuver "recast" Poulin's activity into a child pornography production charge and that the government suppressed evidence that would have "dramatically reinforced his claim of innocence."  (Motion at 5.)  This contention is not supported by the record put forth by Poulin.  Poulin seems to believe that he was guilty, at most, of mere possession of child pornography, even though the images in question were quite clearly first captured and preserved in media through his own exploitative efforts.  The evidence conclusively establishes that Poulin created his own catalogue of nude images of the victim, including select images that qualify as child pornography product.  Even if the hard drives were devoid of any such images, that would not tend to disprove Poulin's personal production of child pornography given the overwhelming weight of the evidence introduced at trial.

_____

[11]      Poulin states that "counterfeit material" was used at his trial, an extremely serious charge, but he does not indicate which material introduced at trial was false. (Motion at 8.)  In his memoranda, Poulin identifies only material introduced, or discussed, in a pretrial search warrant affidavit and in the context of the discovery controversy related to the work of the task force.  (Motion, passim;  Reply at 4-7.)  The court has already explained that the search warrant affidavit recited more than abundant probable cause, even if the applicant gave the wrong total number of pinhole cameras recovered or erroneously associated a DVR hard drive with a computer rather than with a DVR machine.  This recommended decision addresses the balance of the discovery-related contentions. Poulin also contends that the government introduced "false testimony" at his trial and that he was denied an opportunity to impeach "a key government witness who was testifying falsely regarding the primary elements of the alleged offense."  (Reply at 3, ECF No. 285.)  Presumably Poulin means Detective McFarland, whose testimony has been summarized herein, but what pieces of that testimony were "false" remains a mystery.

Poulin may well have "steadfastly denied" producing child pornography (Motion at 5), but that is a formalistic denial intended only to reject the idea that he generated the material for interstate purposes.  The government was not required to prove that Poulin used the images in interstate commerce, only that he produced the images using equipment that traveled interstate. This was established with evidence concerning the pinhole cameras Poulin used, including testimony from the Texas vendor who sold the cameras to Poulin, and with the other evidence consisting of manufacturer marks and testimony indicating that the digital media were not manufactured in Maine.  The task force findings, even if they were negative concerning the hard drives, would not have tended to disprove the production charge.

Poulin's notion that disproving computer involvement and Internet distribution would demand an acquittal (Motion at 9-10) is legally erroneous.  The government did not charge distribution and stated early in the discovery process that it did not intend to prove that Poulin distributed child pornography.  Poulin may well have believed that computer involvement was the most important issue in the case, but it simply was not a legal element of the production charge.  Computer involvement is not even necessary to a conviction for possession under 18 U.S.C. § 2252(a)(4)(B).  Once the grand jury returned an indictment charging production, computer involvement was neither essential to conviction, 18 U.S.C. § 2251(a), nor material to the sentencing guidelines analysis.

Poulin also maintains that the evidence demonstrates a prejudicial impact on plea negotiations.  (Id. at 10-11.)  Poulin says that Malone pressured him to plead guilty by repeatedly stressing the alleged fact that she could demonstrate computer involvement and that this would warrant a sentencing enhancement.  (Id. at 10.)  However, the charge in the indictment was production, not transportation, receipt, distribution, or possession.  Poulin does not assert as a

ground for his motion that he was unfairly deprived of the opportunity to plead to a charge under 18 U.S.C. § 2252 instead of a charge under § 2251.

Assuming that the government did extend an offer of a plea to a trafficking or possession charge, that did not prohibit the government from indicting Poulin on the more serious offense of production after he rejected the plea offer.  United States v. Yeje-Cabrera, 430 F.3d 1, 24 (1st Cir. 2005) ("[I]f the negotiations are not successful, due process is not violated if the prosecutor carries out threats made during the negotiations that the defendant will be reindicted on a more serious charge which will bring higher penalties.").  See also United States v. Ruiz, 536 U.S. 622, 633 (2002) (holding that "the Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant").  Once the indictment was returned charging 18 U.S.C. § 2251, it is fair to assume that a plea to 18 U.S.C. § 2252 was off the table.  Poulin could not have received a sentence of less than fifteen years once the indictment was returned.  The court imposed a fifteen-year sentence for production, the statutory minimum.  Nothing the government did in connection with plea negotiations prejudiced Poulin.[12]

Poulin also asserts that the task force understood that whatever images they were able to recover from the hard drives could not reliably be analyzed to determine the date on which any particular image was first created.  (Id. at 11.)  The point seems to assume that at least one hard

---

[12]    The statute charged in the indictment, 18 U.S.C. § 2251, criminalizes the production of child pornography and directs a fifteen-year minimum sentence.   The related sentencing guideline imposes a base offense level of 32 for production of sexually explicit visual material.  U.S.S.G. § 2G2.1 (2009).  By comparison, the offense of receiving, distributing, or possessing related materials, 18 U.S.C. § 2252(a), has a minimum sentence of five years and a base offense level of either 18 or 22, U.S.S.G. § 2G2.2.  There is nothing in the transcript of the court's sentencing hearing or in the presentence investigation report that would suggest that the mere use of a computer to produce child pornography would have increased Poulin's sentence exposure on a production charge.
    Given an essentially bullet-proof case of exploitation in the form of production, built atop Poulin's admissions, the cameras in the wall, the sexually explicit images recovered from the digital media disks, and testimony establishing that the victim was a minor in many of the images, it is not at all clear what additional leverage the prosecution had over Poulin's decision whether to plead based on whether or not it could prove that Poulin used a computer in the production process.  If AUSA Malone extended Poulin an offer pre-indictment to plead to a section 2252 charge, it was an opportunity for Poulin, not a trap.

drive contained recoverable, sexually explicit images of the minor victim (likely the DVR machine's hard drive).  Assuming this is so and that Dudley advised Malone that she could not determine the creation date of a given image, the failure to disclose this fact was not prejudicial to Poulin because the government did not present at trial any evidence derived from a forensic examination of the hard drives.  Had Poulin possessed a statement from Dudley to that effect and had he called her as a witness at trial, her testimony would not have undermined the evidence the government used to date the images because that evidence turned on the presence of a sticker/tattoo, a navel piercing, the residence in question, and so forth, not hard drives.

Poulin argues that McFarland testified falsely at trial concerning his "Properties Report" (ECF No. 235-5) "even though he knew that examiner Dudley had determined creation dates to be inaccurate" (Motion at 25).  However, this argument itself mischaracterizes the evidence.  Dudley conducted a forensic examination of hard drives.  As for the DVDs the task force merely itemized them and listed their embedded creation dates in the data spread sheets.  McFarland, on the other hand, placed the DVDs in a computer and simply marked down their creation dates based on the "properties" menu.  (ECF No. 235-5.)  McFarland's testimony on this topic is not undermined by Dudley's forensic analysis of the hard drives or by the data spread sheets, whether those spread sheet dates are reliable or not.  McFarland himself acknowledged that creation dates are uncertain, which is why the government relied on tattoos, piercings, and the like to date the essential images.  McFarland's low-tech "Properties Report" was a practical means of trying to demonstrate, pre-trial, that an image on a DVD was likely captured on or before the creation date of the disk and when asked on cross-examination to address the issue of creation dates he conceded that he could not determine the creation date of any original image by this means.  (See Motion at 26.)

Poulin also contends that Malone engaged in further impropriety and alleged "lie[s] to the court" in connection with the correspondence from Sony, which involved the "imagery/device connection element" and Poulin's desire to depose Sony.  (Id. at 13-16.)  In his affidavit Poulin peddles what I would describe as a conspiracy theory that his communications were being monitored post-indictment and that this explains why correspondence from Sony first entered into the case.  This theory is not pressed in Attorney Van Dyke's affidavit, though his habeas counsel evidently embraces it.  (Reply at 11-12 & n.3.)  There are obvious reasons to doubt Poulin's allegation.  The record shows evidence of several communications between investigators and Sony and discovery about whether particular menu screens appearing in images came from a particular camcorder was something the government was seeking to develop quite apart from anything Poulin may have been talking about with Attorney Van Dyke.  The government had seized a Sony camcorder and it had every reason to pursue this discovery on its own initiative.  In any event, even if the court credits this allegation, Poulin fails to articulate how Van Dyke's representation was ineffective or how the Sony discovery controversy prejudiced his defense.  There was testimony that the pinhole cameras traveled interstate and they quite obviously were used to capture the images in question.  Moreover, as the Court of Appeals indicated, there was evidence that all of the media and media equipment were manufactured outside Maine.  Poulin, 631 F.3d at 23.  The government was not required to prove which precise camera-recorder connection was involved in capturing and preserving each sexually explicit image.  Logical inference supplied the necessary finding that the images were produced with the seized equipment, all of which traveled interstate.

Poulin cites Ferrara v. United States, 284 F. Supp. 2d 384 (D. Mass 2005), in support of his motion, arguing that AUSA Malone's conduct in this case went "far beyond that described in

Ferrara." (Motion at 19.) In Ferrara, a section 2255 movant obtained relief from a conviction based on his guilty plea where the showing was that the prosecution withheld evidence that its chief witness ("the only source of direct evidence") had repeatedly indicated that the movant had not ordered the jailhouse murder he was being charged with ordering. Id. at 387. The court characterized the withheld information as information that "directly negated his guilt." Id. The prejudice was that the movant agreed to plead guilty not knowing there was evidence contradicting the proposed testimony of what was essentially the government's only witness against him. Id. at 388. The distinctions between that case and this case are many and do not require extended discussion. Suffice it to say that, by comparison, Poulin's showing of prejudice is unpersuasive.

From this point on in his memorandum, Poulin returns to the issue of the several Dudley reports, though he focuses on what transpired in May 2009 through September 2009. Poulin's chief complaint is that AUSA Malone managed to divert the whole issue of error/misconduct by stipulating that the government would not introduce task force evidence at trial because the task force did not log, handle, or analyze the evidence properly. Poulin feels that Malone by sleight of hand managed with her exclusionary stipulation to bury a Dudley report that would have been exculpatory if it had been disclosed to the defense and would have reinforced his motion for dismissal based on misconduct. (Motion at 23-31; Reply at 13.) Poulin also says that Van Dyke was ineffective for not vigorously pursuing, or preserving on appeal, his motion requesting dismissal of the indictment for investigative and prosecutorial misconduct. (Motion at 31.) I have already articulated why this evidence does not demonstrate "cause" in the form of ineffective assistance by Van Dyke and why it does not demonstrate prejudice for purposes of either Strickland or Brady because of the inability of the hard drive evidence to reasonably call

into question the solid and overwhelming evidence of child pornography production and the use of media equipment that traveled interstate.  That analysis logically extends even to the controversy Poulin raises about his confrontation with Glenn Lang at the task force offices on September 10, 2009.  The allegations are surprising, to be sure, but they do not indicate that there is a reasonable prospect of habeas relief in this case and Poulin does not have standing to serve as a private attorney general pursuing a misconduct investigation in the context of a section 2255 motion.

Finally, Poulin argues that AUSA Malone engaged in "fraud on the court" based on representations she made in filings and during court conferences with counsel related to the pretrial motions.  (Reply at 14-19.)  This argument, in my view, dovetails with the materiality analysis surrounding the asserted Brady violation.  I have already outlined why I conclude that Poulin fails to demonstrate a reasonable probability that some portion of a purportedly suppressed Dudley report or finding would "undermine confidence in the outcome" of the bench trial.  United States v. Benjamin, 252 F.3d 1, 11 (1st Cir. 2001) (quoting Bagley, 473 U.S. at 682).  Moreover, this "fraud on the court" basis for habeas relief likely raises the bar for Poulin.  Remedial action based on fraud on the court "may be justified only by 'the most egregious misconduct directed to the court itself,' and . . . it 'must be supported by clear, unequivocal and convincing evidence.'"  Yeje-Cabrera, 430 F.3d at 28 n.22 (quoting Herring v. United States, 424 F.3d 384, 386-87 (3d Cir. 2005), and In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions, 538 F.2d 180, 195 (8th Cir. 1976)).  Of course, as finder of fact at trial and as arbiter of pre-trial motions practice, the court is in the unique position to assess the weight of Poulin's presentation.  McGill, 11 F.3d at 225.  Only the court can determine whether it believes it was misled or deceived in a material way in connection with the pre-trial motions and trial.

28

The court will, of course, have the opportunity to address the matter in the context of its review of this recommended decision.

### 2.      *Ground Two*

Ground two depends on ground one.  Poulin argues:

> As demonstrated in Ground One, trial counsel's ineffective assistance was substantially exacerbated by the cumulative effect of the prosecutorial misconduct, manufacturing of evidence, the Brady and Giglio violations, and fraud on the court.  However, there is no excuse for counsel abandoning the meritorious claims presented herein, after they were preserved for appeal by objections.

(Motion at 31.)  For the reasons already related with respect to ground one, Poulin does not demonstrate with ground two that he may be able to demonstrate an entitlement to habeas relief, even when his assertions are taken as true.[13]

### CONCLUSION

I recommend that the court dismiss Poulin's section 2255 motion at this juncture, without any further evidentiary development.  The motion for habeas relief raises a controversy whether the task force was able to recover sexually explicit images of a minor from two "loose" hard drives and whether the government was fully forthcoming about the quality of its forensic investigation.  However, in light of (1) the government's concession and the court's ruling that excluded all task force forensic findings and work product from the trial and (2) the abundant independent evidence of guilt, which the excluded evidence does not tend to undermine, the controversy does not hold forth any prospect of habeas relief.  The charges leveled at the task

---

[13]      A habeas petition is not a substitute for an appeal.  Berthoff v. United States, 308 F.3d 124, 127 (1st Cir. 2002).  "Accordingly, a defendant's failure to raise a claim in a timely manner at trial or on appeal constitutes a procedural default that bars collateral review, unless the defendant can demonstrate cause for the failure and prejudice or actual innocence."  Id.  Assuming for the sake of argument that Attorney Van Dyke's abandonment of the misconduct issue on appeal amounted to "cause for the failure," Poulin still fails to demonstrate actual prejudice for the reasons given in the discussion of ground one.  Finally, it is more than plain that Poulin has not demonstrated actual innocence.

force and at the government neither demonstrate ineffective assistance on the part of Attorney

Van Dyke nor undercut the substantial evidence of Poulin's guilt such that one could reasonably

conclude that the trial and the judgment would have been any different had the alleged

misconduct not transpired.  The lack of any deficiency on Attorney Van Dyke's part undermines

Poulin's motion insofar as it demonstrates a failure to satisfy Strickland's "cause" requirement;

whereas the lack of prejudice undermines Poulin's motion whether it is evaluated under the

prejudice requirement of Strickland or under the prejudice requirement that applies to Brady

violations first raised in the habeas context.  For these reasons, no evidentiary hearing is

warranted under Rule 8 of the Rules Governing Section 2255 Cases and I recommend that the

court deny Poulin's motion for habeas relief under 28 U.S.C. § 2255.  I further recommend that

the court deny a certificate of appealability pursuant to Rule 11 of the Rules Governing Section

2255 Cases because there is no substantial showing of the denial of a constitutional right within

the meaning of 28 U.S.C. § 2253(c)(2).

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

April 16, 2013                                  /s/ Margaret J. Kravchuk
                                                      U.S. Magistrate Judge