UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:08-cr-00050-JAW |
| | ) | 1:12-cv-00114-JAW |
| DANIEL POULIN | ) | |

**ORDER ON MOTION UNDER 28 U.S.C. § 2255**

Pursuant to 28 U.S.C. § 2255, on April 6, 2012, Daniel Poulin filed a petition to vacate his conviction, dismiss the charge with prejudice, or remand the case for evidentiary hearing or trial.[1] *Mot. Under 28 U.S.C. 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Fed. Custody* at 9 (ECF No. 224) (*Pet'r's Mot.*). On April 16, 2013, after briefing by both sides, the Magistrate Judge recommended that the Court deny relief under 28 U.S.C. § 2255 and dismiss the petitions. *Recommended Decision on 28 U.S.C. § 2255 Mot.* (ECF No. 228) (*Rec. Dec.*). Mr. Poulin objected to the Recommended Decision on May 18, 2013. *Objection to the Magistrate's Recommended Decision* (ECF No. 291) (*Pet'r's Obj.*). The Government did not respond to Mr. Poulin's objection. Under 28 U.S.C. § 636(b)(1), "[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *see Gioiosa v. United States*, 684 F.2d 176, 178 (1st Cir. 1982).

---

[1] On April 6, 2012, Mr. Poulin also filed an accompanying memorandum expanding on his legal theories of relief. *Supporting Mem. for a Mot. to Vacate, Set Aside, or Correct Sentence* (ECF No. 223) (*Supporting Mem.*).

1

## I.   FACTUAL OVERVIEW[2]

From the time she was about thirteen until after she turned eighteen, Daniel Poulin secretly videotaped his girlfriend's daughter while she was in the bathroom. At first, his videotaping, though surreptitious, was amateurish, showing the victim naked but at a distance. Over time, Mr. Poulin became more and more sophisticated. He ended up building a hidden, elaborate "studio" in the bathroom of the home he shared with his girlfriend's family. By the time he was found out, he had strategically placed numerous pinhole cameras in different areas of the bathroom and had even installed a "toilet camera" to focus on the girl's genitals while she was on the toilet. Mr. Poulin not only recorded these images; he edited them into specific disks, collating, repeating and slowing down his favorite images.

Mr. Poulin's obsessive conduct came to a sudden halt when his girlfriend discovered four disks on the ground outside their home, put the disks in a disk-player, and was shocked to realize the images of the naked girl in their bathroom was her daughter. Initially contrite, Mr. Poulin confessed to friends that he had been taping the victim for several years, that he was "sick," and that he needed help. In fact, concerned that law enforcement would destroy the cabin where the family lived in their search for the hidden cameras, Mr. Poulin described to law enforcement in detail where he installed the cameras and authorized the seizure of a cache of digital media disks and some additional pinhole cameras in his mother's attic.

---

[2]   The First Circuit Court of Appeals described the underlying facts in greater detail in *United States v. Poulin*, 631 F.3d 17, 18-20 (1st Cir. 2011).

2

The police obtained equipment from the Poulin residence in Islesford, Maine, including the walls of the bathroom and a closet off a bedroom that was kept locked, and from Mr. Poulin's mother's attic. The equipment included covert camera equipment, clock radios with a pinhole camera and wireless transmitter, receivers, unadorned pinhole cameras, cables, power supplies, wireless transmitter systems, and various recording and monitoring devices. In a briefcase stored in his mother's attic that Mr. Poulin turned over to the police, there were additional DVDs, a mini-cassette camcorder and power cables, thirty-two mini-cassette tapes, additional pinhole cameras, transmitters, a DVD recorder, a VHS recorder, additional cables, a computer hard drive, a video maker magazine, and empty condom wrappers.

After he was indicted for the production of child pornography by a federal grand jury, Mr. Poulin put the Government to its proof. At the close of a three-day trial in September 2010, during which the victim testified and identified nude images of herself and one of her girlfriends, the Court found Mr. Poulin guilty of producing child pornography in violation of 18 U.S.C. § 2251(a). On January 27, 2010, the Court sentenced Mr. Poulin to 180 months incarceration, the statutory minimum term, ten years of supervised release, and a $100 special assessment.

## II. SYNOPSIS OF PETITIONER'S ARGUMENT

Mr. Poulin's petition is an unusually hard-hitting argument, grounded on his contention that his defense lawyer failed to object to multiple instances of alleged prosecutorial misconduct, including charges of discovery violations, *Brady*[3] and

---

[3] *Brady v. Maryland*, 373 U.S. 83 (1963).

*Giglio*[4] violations, the submission of counterfeit evidence, and fraud on the Court.[5] *Supporting Mem.* at 5-32. Mr. Poulin concedes that his conduct in videotaping his girlfriend's daughter (and her friend) while they were in the bathroom invaded the privacy of "certain individuals," but he claims that the prosecutor "engaged in patter[n] of witness and evidence manipulation aimed at the recasting of Petitioner's activity into a production of child pornography charge." *Id.* at 5. Asserting that "the prosecution possessed both physical and forensic evidence that would have dramatically reinforced his claim of innocence," Mr. Poulin alleges that "that evidence was surreptitiously suppressed by the prosecution, in defiance of discovery obligations, defense production requests, and constitutional obligations of disclosure under the doctrines of *Brady v. Maryland*, Rule 16 and the Maine Code of Professional Responsibility." *Id.*

## III. THE RECOMMENDED DECISION

The Magistrate Judge issued a thoughtful thirty page decision, recommending that the Court deny Mr. Poulin's petition and deny a certificate of appealability. *Rec. Dec.* at 1-30. In her extended opinion, the Magistrate Judge recited in detail the convoluted events surrounding the Maine Computer Crime Task Force's misidentification and mishandling of the Poulin equipment, Mr. Poulin's successful objection to the Task Force reports, the prosecution's concession not to use any findings, determinations, reports, or other Task Force work product

---

[4] *Giglio v. United States*, 405 U.S. 150 (1972).
[5] The Court resolves this petition based on the assumption that Mr. Poulin's manifestly serious allegations of prosecutorial misconduct and fraud are true. In doing so, the Court does not find or imply that these allegations of professional misconduct—no matter how vehemently expressed—are in fact true.

4

in its case-in-chief, the evidence the Government adduced at trial, and the Court's verdict and sentence. The Magistrate Judge also described Mr. Poulin's allegation that the Task Force had produced a report that the prosecution was required to share with the defense but had failed or refused to do so.

Observing that the evidence against Mr. Poulin was "all but bullet-proof," *Rec. Dec.* at 20, the Magistrate Judge concluded that the Task Force's mistakes and alleged malfeasance did not undercut the substantial evidence of his guilt. The Magistrate Judge recommended denial of Mr. Poulin's petition because his defense counsel had in fact obtained a major concession from the Government—namely, the Government's agreement not to use any Task Force evidence in its case-in-chief, and because—regardless of the Task Force activities, there was abundant independent evidence of guilt. The Magistrate Judge recommended the denial of Mr. Poulin's demand for a Rule 8 hearing and of his request for the issuance of a certificate of appealability.

## IV. DISCUSSION

In his objections, Mr. Poulin contends that the Magistrate Judge committed multiple errors. *Pet'r's Obj.* at 1-41. The Court has carefully reviewed the Magistrate Judge's recommended decision and disagrees with Mr. Poulin's strongly-worded contention that the Magistrate Judge erred. The Court addresses those issues that merit discussion.

### A. Legal Standard for Review

In the Recommended Decision, the Magistrate Judge addressed the legal standard applicable to the "fraud on the court" allegation. *Rec. Dec.* at 28. Citing *United States v. Benjamin*, 252 F.2d 1, 11 (1st Cir. 2001), the Magistrate Judge first concluded that Mr. Poulin had failed "to demonstrate a reasonable probability that some portion of a purportedly suppressed Dudley report or finding would 'undermine confidence in the outcome' of the bench trial." *Rec. Dec.* at 28. Furthermore, the Magistrate Judge wrote that Mr. Poulin's fraud on the court allegation "likely raises the bar for Poulin." *Id.* The Magistrate Judge explained that remedial action based on fraud on the court "may be justified only by 'the most egregious misconduct directed to the court itself,' and . . . it 'must be supported by clear, unequivocal and convincing evidence.'" *Id.* (quoting *United States v. Yeje-Cabrera*, 430 F.3d 1, 28 n.22 (1st Cir. 2005)).

Mr. Poulin contends that the Magistrate Judge erred in applying these legal standards to his petition, arguing that they constitute a "much heavier burden than what is required to establish a violation warranting relief in this case." *Pet'r's Obj.* at 3. He says that the correct standard is whether "the suppressed evidence was material and favorable, and . . . was willfully or inadvertently withheld, resulting in prejudice." *Id.* He says that he is not required to prove that there would have been an acquittal. *Id.* (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Instead, he maintains that the "suppressed evidence is material for *Brady* purposes if it 'could reasonably be taken to put the whole case in such a different light as to

6

undermine confidence in the verdict." *Id.* (citing *Kyles v. Whitley*, 514 U.S. 419, 435-36 (1995)). Mr. Poulin argues that the Magistrate Judge "previously recognized 'the obvious difference' between the two standards" in *Irving v. Camden*, 2:10-cv-00367-MJK, 2012 U.S. Dist. LEXIS 81944 (D. Me. Jun. 13, 2012). *Pet'r's Obj.* at 4.

The Court views Mr. Poulin's argument as an effort to create an issue where there is none. In *Benjamin*, the First Circuit addressed an allegation that the prosecution failed to give the defendant access to material exculpatory evidence and reiterated the standard established by the United States Supreme Court:

> The prosecution is obligated to provide a defendant access to material exculpatory that is in its control. . . . Evidence is material only when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." . . . A "reasonable probability" is one that is "sufficient to undermine confidence in the outcome."

*Benjamin*, 252 F.3d at 11 (internal citations omitted) (quoting *Bagley*, 473 U.S. at 682). In relying on *Benjamin*, (which in turn relied on *Bagley*), the Magistrate Judge echoed longstanding Supreme Court and First Circuit law. The difference between the Magistrate Judge's standard—"reasonable probability that some portion of a purportedly suppressed Dudley report or finding would 'undermine confidence in the outcome' of the bench trial," *Rec. Dec.* at 28—and Mr. Poulin's preferred language—"could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," *Pet'r's Obj.* at 3—is syntactical, not substantive.[6]

---

[6] Mr. Poulin is correct that at one point the Magistrate Judge wrote that the petitioner must show "there is a reasonable probability that the evidence in question would have changed the fact finder's judgment." *Rec. Dec.* at 22. In *Kyles*, the Supreme Court explained that "[a] defendant need

7

As regards Mr. Poulin's assertions that the Magistrate Judge used the wrong legal standard for evaluating the fraud on the court claim, the First Circuit set forth the legal standard for such claims in *Yeje-Cabrera*:

> In rare instances, the doctrine of fraud on the court will warrant remedial action. *See Herring v. United States*, 424 F.3d 384, 386-87 (3d Cir. 2005) ("[A] determination of fraud on the court may be justified only by 'the most egregious misconduct directed to the court itself,' and . . . it 'must be supported by clear, unequivocal and convincing evidence.'" (quoting *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 538 F.2d 180, 195 (8th Cir. 1976))).

430 F.3d 1, 28 n.22. It is difficult to find fault with the Magistrate Judge's "fraud on the court," standard as she quoted and applied the 2005 *Yeje-Cabrera* formulation. *Rec. Dec.* at 28. Mr. Poulin prefers an earlier First Circuit version of the "fraud on the court" standard described in *Anderson v. Cryovac*, 862 F.2d 910, 923-24 (1st Cir. 1988). *Pet'r's Obj.* at 4. But the two First Circuit formulations are not contradictory, and in any event the significance of any distinction between them depends upon the impact on the verdict of the Task Force's alleged malfeasance and the prosecutor's actions. Here, as the Court describes below, any difference between the Magistrate Judge's and Mr. Poulin's formulations is immaterial because nothing that Mr. Poulin alleges affected the verdict.

---

not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at 433-34. A more accurate description of the standard is the one the Magistrate Judge used later: a "reasonable probability" that the suppressed evidence "would undermine confidence in the outcome of the bench trial", *Rec. Dec.* at 28 (internal quotations omitted), which is the standard by which the Court has reviewed Mr. Poulin's objection to the Recommended Decision.

8

## B. Defense Counsel's Performance

As Mr. Poulin acknowledges, his § 2255 petition is grounded on a claim that his trial lawyer provided ineffective assistance of counsel. *Pet'r's Obj.* at 27-28 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). "To establish ineffective assistance of counsel, the defendant must satisfy both a performance prong and a prejudice prong." *Pina v. Maloney*, 565 F.3d 48, 54 (1st Cir. 2009). "Specifically, the defendant must prove both (1) that counsel's performance fell below an objective standard of reasonableness (*viz.*, 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment'); and (2) that counsel's deficient performance prejudiced the defense." *Id.* at 54-55 (quoting *Strickland*, 466 U.S. at 687-88).

### 1. Defense Counsel's Performance

The record here confirms just the opposite. Mr. Poulin's trial counsel vigorously and professionally defended him. Defense counsel identified problems with the Task Force's handling of the seized equipment, filed a number of motions to bring these problems to the Court's attention and to demand significant remedies, including dismissal of the indictment, argued those motions persuasively, and in fact extracted a concession from the Government that it would not use the results of the Task Force examination at trial. Mr. Poulin naturally prefers his lawyer had been able to convince the Court to dismiss the indictment in light of the Task Force's errors. But his lawyer tried. Defense counsel moved to dismiss the indictment and—presumably knowing that the standards for dismissal of an

9

indictment are rigorous—also moved to exclude the Task Force's work product. *See Def.'s Mot. to Dismiss the Indictment on the Grounds of Prosecutorial/Investigative Misconduct* (ECF No. 24); *Def.'s Mot. to Dismiss the Indictment on the Grounds of Prosecutorial/Investigative Misconduct (Modified)* (ECF No. 66); *Mot.* in Limine *Seeking Exclusion of Work Product, Opinions and Materials Derived From or Associated with the Me. Computer Crimes Lab* (ECF No. 132) (*Def.'s Exclusion Mot.*). The defense lawyer demanded and obtained an evidentiary hearing on the motion to dismiss, but the Court denied the motions. *Order on Mots. to Dismiss the Indictment on the Grounds of Prosecutorial/Investigative Misconduct* (ECF No. 157).

Having failed to get the indictment dismissed, Mr. Poulin's attorney pressed the Court to exclude "any and all . . . work product, findings, opinions or determinations, of any nature whatsoever in this case, derived from the work of the Maine Computer Crimes Lab." *Def.'s Exclusion Mot.* at 1. He also again demanded that the Court dismiss the indictment and exclude from trial all materials that entered the Task Force's possession. *Id.* Here, he was partially successful. The Court ordered that the Task Force's work not be admitted into evidence at trial, but it refused to extend the order to equipment only passing through the Maine Computer Crimes Lab. *Order on Mot.* in Limine *Seeking Exclusion of Work Product, Opinions and Materials Derived From or Associated with the Me. Computer Crimes Lab* (ECF No. 164).

There is nothing in the trial lawyer's performance that would begin to reach *Strickland* standards of deficient performance. Defense counsel has the responsibility to identify and raise significant issues but is not the judge and cannot resolve legal controversies or write judicial opinions. Here, defense counsel did all he could do to defend Mr. Poulin against this serious federal charge. He did so laboring under an insurmountable problem: his client was demonstrably and unequivocally guilty.

### 2. Prejudice

To describe the evidence in this case as "bullet-proof" is an understatement. The grand jury charged Mr. Poulin with production of child pornography, a violation of 18 U.S.C. § 2251(a). Section 2251(a) reads in pertinent part:

> Any person who employs, uses . . . any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct . . . shall be punished as provided under subsection (e) . . . if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means . . . .

18 U.S.C. § 2251(a). The evidence consisted of numerous DVDs that contained countless nude images of Mr. Poulin's girlfriend's daughter from the time she was thirteen to the time she was over eighteen. There was no question that the girl whose images appeared in the DVDs was, in fact, Mr. Poulin's girlfriend's daughter. The daughter appeared at trial and identified herself as the person in the DVDs, and the Court could readily compare the facial features of the person in the DVDs with the facial features of the witness. The victim was also able to identify the

various bathrooms where the images were taken as being the bathrooms where the family lived with Mr. Poulin from the time she was thirteen onward.

When the DVDs were discovered, law enforcement officers went to Mr. Poulin's cabin where the family lived on Islesford and discovered an elaborate secret taping system installed in the bathroom, running to a room off one of the bedrooms, which Mr. Poulin kept locked. Mr. Poulin was the person who had built the cabin and the evidence revealed that Mr. Poulin spent up to five hours a day in the locked room. Furthermore, additional DVDs and recording equipment, including pinhole cameras, were discovered in Mr. Poulin's mother's attic.

During a conversation with the police, Mr. Poulin all but confessed to the crime:

> I, umm, would have stayed out there, and done what I could to apologize, and make amends that night, and, you know, I, I, I didn't share this with anybody. I didn't show it to anybody. I didn't do anything like that, umm. I'm not proud of it at all, and there are no minors. Well, she was a minor through a lot of it, but it's not a little girl thing. If you've seen the girl, you know that she is a very attractive, and well developed girl, and I am not a pedophile.

*United States v. Poulin*, 645 F. Supp. 2d 17, 23-24 (D. Me. 2009). He then described to the officers in detail where the hidden cameras were located and how to extract them from their hiding places. *Id.* at 23. Also, Mr. Poulin confessed to one of his business associates, George Von York, that he had made video recordings from cameras he had placed in the bathroom of his girlfriend's residence and that he had started videotaping his girlfriend's daughter when she was a minor. Mr. Poulin told Mr. Von York that he had a sexual addiction to pornography and was working with

other people with the same problem and trying to get help. Finally, Mr. Poulin has never claimed he did not videotape the victim while she was a minor:

> There is no dispute that Defendant Poulin surreptitiously taped Nicole R. for a number of years at a variety of locations, including Howland, Augusta, Trenton and Islesford, Maine. Defendant Poulin had never denied that fact and the testimony of numerous individuals was presented at trial who confirm Defendant Poulin's admission to the foregoing.

*Def. Daniel Poulin's Mot. for J. of Acquittal* at 3 (ECF No. 178).

The cumulative evidence, including the contents of the DVDs and Mr. Poulin's statements, made this criminal charge an especially difficult one to successfully defend. The defense focused on two issues: (1) whether the victim was a minor when the images of sexually explicit conduct were taken, and (2) whether the visual depictions were produced using materials mailed, shipped, or transported in or affecting interstate or foreign commerce by any means.

### a. Was the Victim a Minor?

The first defense was based on the fact that the victim was twenty-two as of September 2009, the date of trial, making her eighteen or nineteen in the fall of 2006 when the DVDs were discovered. As the Court has noted, the secret videotaping of the victim began when she was about thirteen but had become increasingly sophisticated and sexually explicit as time went on. The first videos of the victim did not fit within the definition of "sexually explicit conduct" under federal law; even though they captured nude images of the victim, they did not constitute the "lascivious exhibition of the genitals or pubic area." 18 U.S.C. §

2256(2)(A)(v).[7] By the time the DVDs were discovered, the images, particularly the "toilet cam" images, fit well within this definition. But these images could have been made when the victim was eighteen or older. The problem for the Government was to establish that the sexually explicit images were taken when the victim was under eighteen.

The Government was able to produce compelling evidence that some of the explicit images were created when the victim was a minor. For example, some explicit images were taken in the bathroom of the Defendant's father's home in Trenton, Maine. The victim testified that this bathroom had silver handicap bars on the shower, which were there until the Defendant's father passed away. He died when the Defendant was sixteen and the bars were removed when she was seventeen. As the handicapped bars were visible in the bathroom when some of the explicit images were taken, the victim was either sixteen or seventeen when they were created.

Next, the victim testified that when she was fifteen, she started going to a tanning salon in the spring and stopped in the summer. When she went to the tanning salon, she used a tanning sticker. A tanning sticker is a small adhesive patch, which is used to let the tanner compare the tanned and untanned areas of her body. The victim chose a tanning sticker in the shape of a Playboy Bunny and applied the sticker near her underwear line on the right side of her hip. She used

---

[7] In addition, Mr. Poulin contended that the applicable statute of limitations, 18 U.S.C. § 3282, barred any images before November 2001, a contention with which the Government disagreed. *Compare Def. Daniel Poulin's Mot. for J. of Acquittal* at 3; *with Gov't's Mem. in Resp. to Def.'s Mot. for J. of Acquittal* at 1-6 (ECF No. 182). The Court did not and does not need to resolve this dispute because some of the sexually explicit images were taken within the applicable statute of limitations.

the Playboy Bunny sticker only once, when she was fifteen. In fact, the Government called Brenda Dunn, the owner of the tanning salon, and identified business records that confirmed the victim was a client from March 18, 2003 to May 16, 2003, when the victim was fifteen. The victim identified one of the sexually explicit images as showing the Playboy Bunny image from the tanning sticker that she had used.

Third, the victim said that she got a tattoo on her left shoulder the day after she turned eighteen and got her belly button pierced some time thereafter. Some of the explicit images showed the tattoo, but others did not; some showed a navel piecing and belly button hoop, but others did not. For those images that did not show the tattoo or the belly button hoop/navel piercing, the victim was under eighteen.

The Court found that this cumulative evidence established beyond a reasonable doubt that Mr. Poulin had taken sexually explicit images of the victim when she was a minor. Significantly, none of this evidence related in any way to the Task Force's errors.

### b. Were the Visual Depictions Produced Using Materials Mailed, Shipped, or Transported in or Affecting Interstate or Foreign Commerce?

The second problem of proof for the Government was to demonstrate that the visual depictions were produced using materials mailed, shipped, or transported in or affecting interstate or foreign commerce. Again, the evidence here was compelling. The production equipment in the Poulin residence and in his mother's attic consisted of Fujifilm mini-digital cassette tapes, Sony media products,

Verbatim DVD-R disks, and Maxell Corp. DVD-RAM disks. Not surprisingly, the Government was able to produce witnesses from each of these companies who testified that their products were not manufactured in the state of Maine.

The Government also produced Terry Dicus, a witness from Houston, Texas, who owned and operated a business called The Spy Shop. Mr. Dicus testified that (during the victim's minority) he sold Mr. Poulin a host of devices consistent with the surreptitious videotaping, including a clock radio with a pinhole camera, police-grade color board pinhole cameras, cable, several adapters, a single channel wireless system, a four-channel video recorder with a 120-gigabyte hard drive. Mr. Dicus identified the equipment that the police had retrieved from Mr. Poulin's bathroom walls and his mother's attic as consistent with the equipment that he had sold Mr. Poulin.

Thus, regardless of Mr. Poulin's allegations of prosecutorial misconduct and Task Force errors, the Court found that the Government produced evidence that satisfied beyond a reasonable doubt the element of the offense that requires the use of materials shipped in interstate or foreign commerce.

### c. Conclusion as to Prejudice

The evidence of Mr. Poulin's guilt of the charged crime was simply overwhelming. Even assuming the truth of the misconduct that Mr. Poulin alleges, the Government established he produced child pornography in violation of 18 U.S.C. § 2251(a) beyond any shadow of a doubt.

## V. CONCLUSION

Having performed a de novo review of the Magistrate Judge's Recommended Decision, the Court AFFIRMS the Recommended Decision of the Magistrate Judge (ECF No. 288) for the reasons in her Recommended Decision and for the additional reasons set forth herein. The Court DENIES Daniel Poulin's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (ECF No. 224). The Court DENIES Daniel Poulin's request for the issuance of a certificate of appealability.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 15th day of January, 2014