| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )     1:08-cr-00050-JAW |
| | )     1:12-cv-00114-JAW |
| DANIEL POULIN | ) |

## ORDER ON MOTION FOR RECONSIDERATION

It is difficult to know why Daniel Poulin and his attorney are so brimming with a sense of injustice. From his girlfriend's daughter's early to late teens, Mr. Poulin surreptitiously videotaped her while she was naked in a series of family bathrooms. Utterly obsessed for years with this young girl, Mr. Poulin ended up constructing a highly elaborate secret studio with multiple hidden pinhole cameras in the walls of the bathroom and he recorded countless hours of her most private moments. Initially unsophisticated, as time went on, he constructed an elaborate studio in the family bathroom with multiple cameras angled to capture her genitals. Toward the end, he installed a toilet camera and videotaped her going to the bathroom. Mr. Poulin's production of pornography was found out. His girlfriend discovered four discs on the ground outside their home, put the discs in a disc-player, and recognized her daughter as the naked female. Immediately after his activity was discovered, Mr. Poulin confessed to a number of friends that he had been taping her for years, that he was sick, and that he needed help. He assisted law enforcement in locating the pinhole cameras and consented to the seizure of a cache of digital media discs in his mother's attic. In light of this accumulated

evidence, it was virtually inevitable that Mr. Poulin would be charged, convicted, and sentenced for his criminal actions.

Mr. Poulin was indicted federally with the production of child pornography and was well represented by an exceptionally able Maine lawyer. He waived jury trial, and at the close of a four-day trial the Court found Mr. Poulin guilty as charged. Even though his guideline sentence was between 210 and 262 months, the Court sentenced Mr. Poulin to the statutory minimum of 180 months incarceration, the most lenient sentence it could legally impose. Mr. Poulin appealed the guilty verdict to the Court of Appeals for the First Circuit and the First Circuit affirmed the conviction.

Despite overwhelming evidence that Mr. Poulin is actually guilty of this crime, confessed to much of it, was properly convicted, and received the most lenient sentence that the law allows, his attorney appears to believe that Mr. Poulin, not the young woman, is the victim of his own crime. His current defense lawyer has written increasingly hot memoranda, proclaiming his actual innocence, accusing the prosecutor of all manner of misconduct, charging law enforcement with manufacturing evidence, and blasting the Court for not agreeing with her. Her latest barrage includes an accusation that during the pendency of the original action, the Court improperly forced the defense to abandon legitimate complaints about egregious police and prosecutorial misconduct, refused to hold an evidentiary hearing on the Government's misconduct, and dismissed the motion to dismiss for prosecutorial misconduct. She now charges that the Court is completely

mischaracterizing her arguments, utterly mischaracterizing the record, completely ignoring the Government's horrendous pattern of bad faith manipulation of the circumstances, whitewashing her persuasive claims of a fraud on the Court, presenting a false rendition of the events in this case, and misunderstanding the applicable standards of review.

Although nonplussed by counsel's rhetorical indignation, the Court will address once again her angry assertions in a final effort to address her concerns. But Mr. Poulin and Attorney Williams should know that the Court recalls this case extremely well. It remembers the hours of video that Mr. Poulin took of this unsuspecting young woman. It recalls the victim's credible and persuasive testimony. It recollects the photographic evidence of the Poulin bathroom in Islesford, which Mr. Poulin constructed, and the multiple minute secret cameras placed in the rivets located strategically to gain revealing angles of this young girl's body. It recalls the toilet camera, the gynecological images, and the overwhelming evidence that this young woman was a minor when some of the most graphic pornographic images were made. The Court remains convinced beyond any shadow of a doubt that Mr. Poulin did precisely what the grand jury charged and that he has been properly incarcerated for his horrendous breach of trust, his multi-year invasion of this girl's privacy, and his deliberate, obsessive, and injurious criminal acts.

# I.    LEGAL STANDARD

A motion "to alter or amend a judgment" is available under Federal Rule of Civil Procedure 59(e).  FED. R. CIV. P. 59(e).  Such motions are sometimes referred to in shorthand as "motions for reconsideration."  *E.g.*, *United States v. $23,000 in U.S. Currency*, 356 F.3d 157, 165 n.9 (1st Cir. 2004).  "However, a Rule 59(e) motion is not a vehicle to force the court to think twice; it is not an opportunity for the losing party simply to press his unsuccessful arguments a second time in the hope that, by repetition, the court will see them his way."  *Widi v. McNeil*, 2:12-cv-00188-JAW, 2014 U.S. Dist. LEXIS 19778, *3 (D. Me. Feb. 18, 2014).  Thus, the motion "is normally not a promising vehicle for revisiting a party's case and rearguing theories previously advanced and rejected."  *Palmer v. Champion Mortg.*, 465 F.3d 24, 30 (1st Cir. 2006).

Instead, the motion provides the court with an opportunity to correct "manifest errors of law or fact or to present newly discovered evidence."  *Lakshman v. Univ. of Me. Sys.*, 338 F. Supp. 2d 162, 164 (D. Me. 2004) (internal quotations omitted). "As an 'extraordinary remedy', a motion for reconsideration's utility is properly limited to: '(1) the availability of new evidence not previously available, (2) an intervening change in controlling law, or (3) the need to correct a clear error of law or to prevent manifest injustice.'"  *Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 490 F. Supp. 2d 184, 187 (D.N.H. 2007) (quoting *Villanueva-Mendez v. Nieves Vazquez*, 360 F. Supp. 2d 320, 324 (D.P.R. 2005)).

## II.    BACKGROUND

The Court recited most of the salient historical facts in its January 27, 2014 Amended Order. *See Am. Order on Mot. Under 28 U.S.C. § 2255*, at 2-3 (ECF No. 295). However, to provide context, the Court recites the facts essential to this decision.

### A.    Mr. Poulin's Conviction

On March 12, 2008, a grand jury indicted Mr. Poulin on one count of production of child pornography. *Indictment* (ECF No. 1). Before trial, Mr. Poulin and his counsel, David Van Dyke, discovered a number of problems with evidence generated by the Maine State Police Computer Crimes Unit (MCCU). These problems, described in more detail below, centered on an intake form generated by the MCCU and certain reports authored by MCCU forensic examiner Inez Dudley. Mr. Poulin also alleged that Assistant United States Attorney (AUSA) Gail F. Malone, the federal prosecutor handling his case, made deliberate misstatements to Mr. Van Dyke and the Court during the period of pre-trial discovery, and supplied certain evidence to Mr. Van Dyke that she knew to be fabricated. After significant motion practice on this issue, including a motion to dismiss the indictment and a motion to suppress evidence, the Government agreed not to use any of the evidence generated by the MCCU at trial and the Court otherwise denied Mr. Poulin's motion to dismiss for prosecutorial misconduct. *Order on Mots. to Dismiss the Indictment on the Grounds of Prosecutorial / Investigative Misconduct* (ECF No. 157) (Aug. 17, 2009). The Government honored its commitment not to use evidence from the MCCU.

At the close of a four-day bench trial from September 8 through September 14, 2009, this Court convicted Mr. Poulin of the charges against him. *Courtroom Minutes: Trial Proceedings* (ECF No. 184) (Sept. 14, 2009). On January 27, 2010, the Court sentenced Mr. Poulin to 180 months imprisonment, *J. in a Criminal Case* (ECF No. 190), the mandatory statutory minimum for his crime. 18 U.S.C. § 2251(e).

The First Circuit affirmed Mr. Poulin's conviction on direct appeal. *United States v. Poulin*, 631 F.3d 17 (1st Cir. 2011).

### B.    Procedural Posture of this Habeas Petition

On April 6, 2012, Mr. Poulin filed a motion under 28 U.S.C § 2255 to vacate his sentence, with a supporting memorandum. *Mot. Under 28 U.S.C. § 2255* (ECF No. 224) (*Habeas Pet.*); *Supporting Mem. for a Mot. to Vacate, Set Aside, or Correct Sentence* (ECF No. 223) (*Supporting Mem.*).[1] The Government answered the habeas petition on October 17, 2012, and moved to dismiss it. *Gov't's Mot. for Summ. Dismissal of Mot. to Vacate, Set Aside, or Correct Sentence* (ECF No. 276) (*Gov't's Mot. to Dismiss*). Mr. Poulin replied to the Government's motion to dismiss on January 18, 2013. *Pet'r's Reply to Gov't Mot. for Summ. Dismissal* (ECF No. 285) (*Pet'r's Reply*).

On April 16, 2013, the Magistrate Judge issued a Recommended Decision recommending that the Court deny Mr. Poulin's habeas petition. *Recommended*

---

[1]    Mr. Poulin's Habeas Petition is signed by his habeas counsel, Lynne Williams, Esq., *Habeas Pet.* at 9, but his Supporting Memorandum of Law is signed only by Mr. Poulin. *Supporting Mem.* at 32. The Supporting Memorandum is also unsworn. *See id.* at 1-32. Mr. Poulin cites the Supporting Memorandum as his "petition," *e.g.*, *Motion for Recons.* at 5 (ECF No. 291), but this appears not to be correct.

*Decision* (ECF No. 288) (*Rec. Dec.*). Mr. Poulin objected to the Recommended Decision on May 18, 2013, *Objection to the Magistrate's Recommended Decision* (ECF No. 291), and the Government did not respond.

On January 15, 2014, the Court issued an Order denying Mr. Poulin's habeas petition, *Order on Mot. Under 28 U.S.C. § 2255* (ECF No. 293), and amended that order on January 27, 2014. *Am. Order on Mot. Under 28 U.S.C. § 2255* (ECF No. 295) (*Order*). The Court largely approved of the Recommended Decision, but wrote separately to add detail regarding the application of the error and prejudice prongs of *Strickland v. Washington*, 466 U.S. 668 (1984).

Mr. Poulin filed a motion for reconsideration of the Court's denial of his habeas petition on January 29, 2014. *Pet'r's Mot. for Recons.* (ECF No. 296) (*Mot. for Recons.*). The Government opposed this motion on February 28, 2014. *Gov't's Opp'n to Pet'r's Mot. for Recons.* (ECF No. 298) (*Gov't's Opp'n*). However, before counsel for Mr. Poulin could file a reply to the Government's opposition, Mr. Poulin himself filed a pro se appeal of the Order on February 24, 2014. *Notice of Appeal* (ECF No. 299).

Two days after Mr. Poulin's notice of appeal, the Government filed a motion urging the Court to recognize that the appeal had divested the Court of jurisdiction to rule on the motion for reconsideration. *Gov't's Mot. Invoking Court's Lack of Jurisdiction to Rule on Pet'r's Mot. for Recons.* (ECF No. 303). On March 4, 2014, counsel for Mr. Poulin replied to the Government's opposition to the motion for reconsideration, *Reply to Gov't's Opp'n to Pet'r's Mot. for Recons.* (ECF No. 304)

(*Pet'r's Second Reply*), and also opposed the Government's motion to divest the Court of jurisdiction. *Pet'r's Objections to Gov't's Mot. to Dismiss Mot. for Recons. and Req. to Withdraw Pro Se Notice of Appeal* (ECF No. 305). The Government replied to this opposition on March 6, 2014, but made no further arguments in support of divesting the Court of jurisdiction. *Gov't's Resp. to Pet'r's Objections to Gov't's Mot. to Dismiss Mot. for Recons.* (ECF No. 306).

## III. JURISDICTION

The Government is correct that "[t]he filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). However, Federal Rule of Appellate Procedure 4(a)(4)(B)(i) states that:

> If a party files a notice of appeal after the court announces or enters a judgment--but before it disposes of any motion listed in Rule 4(a)(4)(A)--the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered.

Among the motions listed under Appellate Rule 4(a)(4)(A) is a motion "to alter or amend the judgment under Rule 59," FED. R. APP. P. 4(a)(4)(A)(iv)—in other words, a motion for reconsideration. The net effect of these rules is to delay the effective date of the Notice of Appeal until after the Court has ruled on the present Motion for Reconsideration. Therefore, the Court has not been divested of jurisdiction, and the Notice of Appeal will be effective the date of this order.

## IV.    THE ISSUES AT TRIAL

### A.    The Temporal Window

The grand jury issued its indictment of Mr. Poulin on March 12, 2008, charging him with a violation of 18 U.S.C. § 2251(a), the production of child pornography.  *Indictment* at 1.  To prove its case, the Government was required to prove beyond a reasonable doubt that the victim was a minor when Mr. Poulin produced the images.  Under 18 U.S.C. § 2256(1), a minor is defined as "any person under the age of eighteen years."  The victim in this case was born in November 1986 and turned eighteen in November 2004.  The Government was therefore required to demonstrate that Mr. Poulin produced the images before November 2004.

Also, under 18 U.S.C. § 3282(a), the general statute of limitations for most criminal offenses is five years.  However, on July 27, 2006, as part of the Adam Walsh Act, Congress eliminated the statute of limitations for most federal offenses involving minors.  Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 211, 120 Stat. 587 (codified at 18 U.S.C. § 3299).  The Government argued that the existing statute of limitations for the production of child pornography had not run as of July 27, 2006 and therefore the 2006 amendment applied to Mr. Poulin.  *Gov't's Mem. in Resp. to Def.'s Mot. for J. of Acquittal* 1-6 (ECF No. 179).

At trial, although the Court suggested that the Government's analysis was correct, the Court did not rule on the statute of limitations issue because it

determined that Mr. Poulin had produced child pornography within the five year window in any event, namely after March 12, 2003 and before November 2004.

## B.     Sexually Explicit Conduct

The law requires that the images depict the minor engaged in "sexually explicit conduct."  18 U.S.C. § 2251(a).  The law contains a number of definitions of sexually explicit conduct, but the one applicable to this case was the "lascivious exhibition of the genitals or pubic area of any person."  *Id.* § 2256(2)(A)(v).  Early on, Mr. Poulin produced images of the victim while she was naked, but those images would not have met this definition.  To prove this element of the case, the Government was required to prove beyond a reasonable doubt that Mr. Poulin produced images that showed the "lascivious exhibition of the genitals or pubic area" of the victim.  Combining the temporal window with the definition of sexually explicit conduct, the Government was required to prove that Mr. Poulin produced images of the victim engaged in the "lascivious display of the genitals or pubic area" between March 12, 2003 and November 2004.

## C.     What Mr. Poulin Admitted

On August 31, 2009, Mr. Poulin filed a trial memorandum with the Court, setting forth the issues that were being presented for trial.  In that memorandum, Mr. Poulin emphasized in bold print:

> **Defendant Poulin does not now and has never denied (1) placing surreptitious cameras in bathrooms, (2) making recordings/depictions and thereby violating the privacy of various individuals.**
>
> **However, Defendant Poulin adamantly denies producing child pornography.**

**Defendant Poulin maintains that no "toilet-cam" images were produced of any minor: Defendant Poulin maintains that he judiciously avoided making any "toilet-cam" or pornographic images of [the victim] before her 18th birthday.**

. . .

**Defendant Poulin maintains that the investigators and prosecutors in this matter have manipulated evidence to create the appearance that he (a) created child pornography and (b) placed that child pornography over the internet.**

*Pre-Trial Mem. of Def. Daniel Poulin* at 3 (ECF No. 168) (emphasis in Defendant's memorandum). During his closing argument, Mr. Poulin's trial lawyer stressed:

Mr. Poulin has never denied - - not just as a matter of taking the stand before Your Honor, but in all of his dealings three years ago, he never denied for a moment placing surreptitious cameras in various homes, recording [the victim] at various ages.

*Tr. of Proceedings* 465:23-466:2 (ECF No. 199).

### D. The Elements

Congress has criminalized the production of child pornography:

Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct . . . shall be punished . . . if that visual depiction was produced . . . using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer.

18 U.S.C. § 2251(a). Thus, to sustain its burden of proof, the Government had to prove three elements beyond a reasonable doubt:

1) That the Defendant knowingly employed or used a minor to engage in sexually explicit conduct;

2) That he did so for the purpose of making a visual depiction of the conduct; and,

3) That the visual depiction was produced using materials that had been mailed, shipped, or transported in interstate or foreign commerce.

## V. THE EVIDENCE

### A. Sexually Explicit Conduct

In this case, the Government produced a volume of images of the victim and a clip of one of her friends in the bathrooms of places where Mr. Poulin and the victim either lived or visited. As noted earlier, some of the images were extremely graphic and constituted pornography within the statutory definition. Still Mr. Poulin put the Government to its proof as to the "confluence" of three elements: (1) minor age, (2) sexual explicitness, and (3) production. Although Mr. Poulin contested whether the admitted images constituted pornography under the so-called *Dost* factor analysis, the Court found that at least some of the images would meet the statutory definition. *See United States v. Amirault*, 173 F.3d 28, 31-32 (1st Cir. 1999) (citing *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986)).

### B. Interstate Nexus

The Government produced evidence that all the media, namely the cameras, the recording devices, and their components, were manufactured outside the state of Maine. Also, the Government called as a witness a man from Texas, Terry Dicus, who testified that he had sold Mr. Poulin cameras similar to the ones found in the Poulin bathrooms and that he had shipped those devices to Mr. Poulin in Maine. The Court found that the Government had established the interstate commerce nexus.

### C.	Minor

The most difficult element for the Government to demonstrate was that the females in the images were under eighteen when Mr. Poulin made them. Likely due to the problems with the MCCU, the Government did not attempt to date the age of the person in the images by reference to computer-generated dating.

Instead, the Government relied on extrinsic evidence combined with what the images revealed to sustain its burden of proof on this issue. For example, once the dates of birth of each of the filmed females (the victim and her friend) were established, the question was when certain filming took place. Some of the witnesses testified that the images were made in the bathroom of a house in Howland, Maine where Mr. Poulin, his girlfriend, and his girlfriend's family lived. The Government also produced evidence through a state Fire Marshal Office report that the Howland residence burned in July 2004. As the images were made in the Howland house before it burned, the females in the Howland images were necessarily under eighteen, one being 17 and the other 16.

Another series of images was taken at a residence in Trenton, Maine where Mr. Poulin's father, Lucien, had resided. The victim recognized two handrails near the toilet in the images that existed up to the date Lucien passed away. Lucien died when the victim was sixteen, and after Lucien's death, Mr. Poulin remodeled the bathroom and removed the handrails. Therefore, as there were images of the victim that revealed handrails, these images had to have been taken when the victim was younger than eighteen.

In the spring of the year when the victim was fifteen, she went tanning at a local spa in Howland owned by Brenda Dunn. When she tanned, she used so-called "tanning stickers," which keep the area under the sticker away from the tanning source and allow the tanner to know her progress. When the victim was fifteen, she used a tanning sticker in the shape of a Playboy bunny. The sticker image dissipated as time went on. Thus, if an image showed the outline of a Playboy bunny on her body, the image would have been taken when she was fifteen.

There were two additional age markers. The day she turned eighteen, the victim got a belly button piercing, and one month after her eighteenth birthday she got a tattoo of a moon and star on her left shoulder. Thus, if the piercing or the tattoo appeared in an image, she was at least eighteen. If the piercing did not appear, she was under eighteen and if the tattoo did not appear, it was evidence that she was under eighteen.

Carefully collating all of this age evidence and comparing it with the actual images, the Court found that some of the pornographic images were in fact produced when the victim and her friend were under eighteen. For example, the Government produced images of the victim and her friend in the bathroom at the residence in Howland, which as noted burned in July 2004, when the two girls were minors. Furthermore, the primary victim did not have a belly-button piercing or a left shoulder tattoo. Contrary to Mr. Poulin's claim that he had "judiciously" avoided recording any pornographic images of the victim before she was eighteen, the Court found these images were in fact pornographic. A hidden camera had been

placed in a low position with an upward trajectory to focus on their genitals and these images met the statutory lascivious display definition. This series of images was but one of an enormous number that Mr. Poulin produced of this victim in Howland, Trenton, and Islesford, Maine during her minority, which the Court found readily met the statutory definition of pornography.

### D. The Defendant's Admissions

After his filming was found out, Mr. Poulin confessed his misconduct to at least three individuals and their testimony was introduced at trial.[2]

The day the DVDs were discovered, Mr. Poulin confessed his activity to Paul Fernald of Islesford. *2 Tr. of Proceedings* at 325:3-331:6 (ECF No. 197). Mr. Poulin told Mr. Fernald that he had "made a huge mistake" and had "basically ruined his life and [the victim's]." *Id.* at 328:7-10. He confessed to "videotaping [the victim]." *Id.* at 328:11-12. He explained that he "had an attraction to her - - and it was something that he felt like he couldn't control, I guess." *Id.* at 328:11-14. He told Mr. Fernald that he had been taping the victim for "about four years." *Id.* at 328:15-16. He said he had taped her in Trenton, in Howland and on Islesford. *Id.* at 328:17-18. Mr. Fernald recalled that he "might have said something about her being 14 or 15 when it started." *Id.* at 328:24-329:2. He said that "mostly it was toweling off in the bath, you know, on the toilet, changing her tampon one thing he said." *Id.* at 329:3-7.

---

[2] The Government introduced the testimony of Jay Perruzzi, Brenda Fernald, Greg Theriault, and Tim Kirby, each of whom testified that Mr. Poulin had made similar confessions to them.

In October 2006, Evelyn Boxley, an Islesford resident, observed Mr. Poulin walking across the schoolyard "sort of slumped over." *2 Tr. of Proceedings* at 276:22-277:5 (ECF No. 197). Mr. Poulin came over to her car and she asked him what was going on. *Id.* at 277:5-6. Mr. Poulin told Ms. Boxley that he had done "something really bad." *Id.* at 277:6-7. He told her that he had "cameras" and had been "taking pictures of [the victim]." *Id.* at 277:9-10. She responded that it could not be that bad and he replied, "Yes, it really was." *Id.* at 277:10-11.

In November 2006, Mr. Poulin called a longtime friend, George Von York, and told him that his girlfriend and her daughter had discovered video recordings made from cameras that he had placed in the bathroom of their residence. *3 Tr. of Proceedings* at 391:3-6 (ECF No. 198). Mr. Poulin told Mr. Von York that he had made the recordings without the knowledge of the persons being filmed. *Id.* at 391:7-9. He confessed to Mr. Von York that he had begun filming the victim when she was a minor. *Id.* at 391:14-17. He told Mr. Von York that he "had a sexual addiction and an addiction to pornography, and he was working with other groups of people with the same problem and trying to get help at that time." *Id.* at 391:18-23.

### E.     Conclusion

In the Court's view, when all the evidence was considered, the Government had made out an unusually strong case that Mr. Poulin had produced pornographic images of his girlfriend's daughter and her friend when they were minors and had used equipment that had been mailed, shipped or transported in interstate or foreign commerce.

## VI.   THE APPEAL

Mr. Poulin appealed his conviction to the First Circuit Court of Appeals and on January 7, 2011, the First Circuit affirmed the conviction. *Poulin*, 631 F.3d at 23. On appeal, Mr. Poulin raised a constitutional claim based on the Commerce Clause, *id.* at 20-22, and he attacked the sufficiency of the evidence to support the conviction. *Id.* at 22-23. This decision is final and the issues that the First Circuit resolved are not subject to attack on collateral review. *United States v. Frady*, 456 U.S. 152, 165 (1982) ("a collateral challenge may not do service for an appeal").

## VII.   FACTUAL DISPUTES

Beginning with his initial habeas filing, Mr. Poulin has continued to make a series of extremely serious allegations against the Government, specifically against the MCCU and against AUSA Malone. *Supporting Mem.* Mr. Poulin's initial memorandum sets forth the charges:

> Petitioner asserts that certain findings of fact were determined by the trier in the absence of exculpatory evidence willfully suppressed by the prosecution. Petitioner further asserts that false evidence was placed into the record by the prosecution, evidence that would have been directly refuted by the suppressed exculpatory evidence. Petitioner can demonstrate clearly and convincingly that the prosecution's numerous acts of fraud conducted in the context of discovery violations, suppression of exculpatory evidence, and defiance of the Court's orders unfairly hampered Petitioner's ability to prepare a defense.

*Id.* at 5. These allegations of prosecutorial and law enforcement misconduct have permeated all of Mr. Poulin's filings in his habeas petition.

Specifically, Mr. Poulin says that the Government performed three separate forensic examinations: (1) a hard drive examination, (2) a media examination, and (3) a court-ordered corrective report. *Id.* at 7. Mr. Poulin asserts that "[e]ach

examination produced information that was materially favorable to Petitioner but, in each situation, the favorable forensic information was withheld or concealed while false information was placed into the record by the prosecution." *Id.*

## A.    "Exculpatory" and "Falsely Inculpatory" Examination Reports

In his Motion for Reconsideration, Mr. Poulin expresses his disappointment that the Court did not address in more detail his objection to the Magistrate Judge's findings that there was a single withheld report from the MCCU, and that "false inculpatory" reports were "knowingly placed into the record." *Mot. for Recons.* at 2-3.[3]

### 1.    The "Exculpatory" Reports

> After describing the [M]agistrate Judge's recommendation with some reverence, as "a thoughtful thirty-page decision," the Court reflects upon the magistrate's determination that there was a single task force Dudley report that the prosecution was required to produce and had failed or refused to do so . . . . This is simply NOT correct.  This issue was thoroughly addressed in Petitioner's objection brief . . . .  The record clearly establishes that there were at least three (3) exculpatory Dudley reports that were systematically suppressed by the prosecution on multiple occasions over the course of several years.

*Id.* at 2 (citing *Objection* at 8-10, 16-19, 20-21).  The Court previously declined to address this contention in detail because, as the Court explains below, Section VIII.D.4.a.iii, *infra*, the reports to which Mr. Poulin refers were based on improbable evidence and conclusory assertions of wrongdoing.  Furthermore, they were immaterial to the trial evidence.  *Id.*  However, in the interest of completeness and in an effort to assure Attorney Williams and Mr. Poulin that it understands,

---

[3]    Mr. Poulin's Motion for Reconsideration lacks page numbers.  In its pinpoint citations, the Court refers to the page numbers generated by the electronic docketing system.

but disagrees with, their contentions, the Court recites the factual allegations on which Mr. Poulin relies most heavily.

### a. The DVD Media Examination Report

In his objection to the Magistrate Judge's recommended decision, Mr. Poulin asserts that "[t]he Magistrate [Judge] failed to address the DVD Media Examination fraud." *Objection* at 8. The subject of this alleged fraud is a Media Examination Report that Mr. Poulin claims the state crime lab produced in 2007. *Supporting Mem.* at 9-10. Mr. Poulin further alleges that the document originally proffered to the defense as the Media Examination Report was, in fact, a fraud manufactured by Detective Stephen McFarland. *Id.* at 11.

To demonstrate that the original report was a fraud, it would have been helpful if Mr. Poulin had provided the Media Examination Report that he claims is correct and exculpatory. However, despite careful screening of the habeas record, the Court has not been able to locate the supposedly true report. Mr. Poulin does not at any point expressly direct the Court to Media Examination Report in the attachments to his affidavits. *See id.* at 1-32. Mr. Poulin's Affidavit hints that the Media Examination Report was "materially favorable to the defense," *Poulin Aff.* ¶ 25, and was produced "to the defense right before the start of trial," *id.* ¶ 31, so the Court assumes that the Media Examination Report must exist. Mr. Van Dyke's Affidavit states that "[a] second . . . disk examination was . . . produced to the defense [in] early September 2009, right before trial began," *Van Dyke Aff.* ¶ 25, and identifies this report as Exhibit T. However, Exhibit T consists of a single page cover sheet marked "Page 1 of 2"; page 2 is not available. *See Van Dyke Aff.* at Ex. T

*Forensic Synopsis* (ECF No. 235-4) (*Forensic Synopsis*). Furthermore, Mr. Poulin elsewhere alleges that Exhibit T is the "Brief Report" that is the third piece of alleged "false inculpatory evidence" offered by the Government in this case. *See Poulin Aff.* ¶ 25 (citing *Forensic Synopsis*).

The Objection claims that AUSA Malone "open[ly] "admi[tted] . . . suppression" of this DVD Media Examination. *Objection* at 9 (citing *Objection* at 18-19). As evidence of this admission, Mr. Poulin offers Exhibit R to the Van Dyke Affidavit, an email dated May 6, 2009 in which AUSA Malone wrote:

> [I]n June 2007, [Detective] Steve McFarland had several [of] the DVDs recovered from Mr. Poulin delivered to the Computer Crimes Unit to determine if they could tell when the information had been burned to the disks. On April 8, 2008, you received in discovery a spreadsheet (discovery page #0279-0297) containing technical information retrieved from those disks, including the file creation date. . . . Because the review of these disks was completed in a separate operation from the review of the hard drives, the work was not included in Inez Dudley's original forensic report. I have asked Inez to generate a brief report documenting her work on these disks.

*Van Dyke Aff.* at Ex. R (ECF No. 235-2) (*May 6 Malone Email*). This confirms the existence of a Media Examination Report—assuming it is this to which Ms. Malone refers in the email—but it does not shed any light on the specific nature of its contents, and specifically no evidence that it contained exculpatory information.

In Section IV(K) of his objection to the Recommended Decision, Mr. Poulin claims that "Examiner Dudley had forensically determined [the file dates of images burned on to the DVDs] to be inaccurate in the suppressed 2007 Media Examination Report." *Id.* at 18. However, Mr. Poulin gives no citation to evidence to support this claim. He also claims that AUSA Malone "produced to the defense a

second set of data spread sheets, again presenting false inculpatory dates of imagery appearing to reside within the prosecutable temporal window, while continuing to suppress the exculpatory information that directly refuted this false representation." *Id.* (citing *Supporting Mem.* at 20, *Poulin Aff.* ¶ 22; and *Pet'r's Reply* at 6-7). But the first two citations do not support Mr. Poulin's assertion. Page 20 of the Supporting Memorandum cites no evidence at all, *see Supporting Mem.* at 20, while pages 6 and 7 of the Petitioner's Reply cite no evidence related to this proposition other than the Supporting Memorandum itself. *See Pet'r's Reply* at 6-7.

Paragraph 22 of Mr. Poulin's Affidavit does contain at least one concrete assertion about the Media Examination Report:

> [T]hese were the data sheets [disclosed in 2008] produced by examiner Dudley in 2007 in which she stated that the information on the data sheets is "often times not accurate as it depends on the date/time that was set on the machine."

*Poulin Aff.* ¶ 22. In other words, any examination of the creation dates of files on a DVD cannot be proved accurate without also knowing that the internal clock of the computer that burned the DVD was set correctly. Presumably the MCCU could not determine what computer had burned the DVDs, and therefore had no way to be sure that the computer's clock was properly set at the time the DVDs were burned.

In sum, the evidence of the existence and contents of the Media Examination Report is threadbare. The Court assumes for the purpose of analysis that there existed some Media Examination Report generated by Ms. Dudley in 2007, and that in it Ms. Dudley expressed the opinion that she could not tell with forensic certainty

when the files on any DVD then in evidence were burned to that DVD. The Court further assumes that Ms. Malone placed into discovery sometime in April 2008 the pages found in Exhibit B of Mr. Poulin's Affidavit, which are Bates-stamped 279-297. *See Poulin Aff.* at Ex. B (ECF No. 227-1). The Court discusses the provenance of these pages below. Section VII.A.2.a, *infra*.

### b. The Corrective Report of May 4, 2009

Mr. Poulin posits the existence of a Corrective Report dated May 4, 2009, that contradicted the Corrective Report of May 5, 2009. The only evidence of the existence of this May 4 Corrective Report are the affidavits of Mr. Van Dyke, Mr. Poulin, and Mr. Poulin's mother Catherin Scovill.

The mystery of the May 4 Corrective Report begins on May 5. AUSA Malone had represented to Mr. Van Dyke the previous day that she "ha[d] just gotten off the phone with Inez Dudley. She has completed her re-do of the forensic exam. By the end of the day, you should have a new forensic report and a separate report detailing every error in the original acquisition and examination." *Van Dyke Aff.* ¶ 18 (citing *Van Dyke Aff.* at Ex. N (ECF No. 233-7) (May 4 email from AUSA Malone to Mr. Van Dyke)). On May 5, Mr. Van Dyke received the report by email from AUSA Malone's paralegal, Jane Deane, who claimed that she had "dropped the ball in getting them faxed to you yesterday." *Id.* ¶ 19 (citing *Van Dyke Aff.* at Ex. O (ECF No. 234-1) (May 5 email from Ms. Deane to Mr. Van Dyke)). However, Mr. Van Dyke observed that the new Corrective Report was dated May 5, 2009, that same day, and concluded that AUSA Malone "could not have had this report on the

previous day, and wondered if there was yet another report circulating." *Id.* ¶ 20 (citing *Van Dyke Aff.* at Ex. P (ECF No. 234-2) (*May 5 Corrective Report*)).

Mr. Van Dyke subpoenaed the complete MCCU file in September, 2009. *Id.* ¶ 27. MCCU produced a keeper of records, Tina Plourde, and the full MCCU file for review by the defense, on September 10, 2009. *Id.* By that time, the Government had rested its case. *Poulin Aff.* ¶ 32. Mr. Van Dyke had to leave to attend to other matters, *Van Dyke Aff.* ¶ 27, and so Mr. Poulin, Ms. Scovill, and Mr. Poulin's pastor all reviewed the MCCU file together with Ms. Plourde. *Poulin Aff.* ¶ 32; *Scovill Aff.* ¶ 4.

Mr. Poulin and Ms. Scovill swear that in this review they encountered a Corrective Report dated May 4, 2009, one day before the report that was produced to Mr. Van Dyke on May 5. *Poulin Aff.* ¶ 32; *Scovill Aff.* ¶ 5. They claim that this May 4 Corrective Report differed from the May 5 version in several ways beyond just the date. First, while the May 5 version had several areas of bold type, the May 4 version did not. *Poulin Aff.* ¶ 32; *Scovill Aff.* ¶ 5. Second, they claim that it "did NOT contain the accusation of media forensically recovered from a computer which existed in the May 5 report." *Poulin Aff.* ¶ 32; *Scovill Aff.* ¶ 5.

Mr. Poulin and Ms. Scovill claim that they confronted Ms. Plourde with this discrepancy, and that she called her supervisor, Sgt. Glenn Lang. *Poulin Aff.* ¶ 32; *Scovill Aff.* ¶ 7; *Van Dyke Aff.* ¶ 28(C). Both claim that they could hear Sgt. Lang clearly over the phone because they were in close proximity to Ms. Plourde and Mr. Lang was speaking loudly. *Poulin Aff.* ¶ 32; *Scovill Aff.* ¶ 7. Both claim that Sgt.

Lang, after ascertaining that Mr. Van Dyke was not present, told Ms. Plourde repeatedly to take the file out of the courthouse and return to MCCU with it. *Poulin Aff. ¶ 32; Scovill Aff. ¶ 7.*

Mr. Poulin called Mr. Van Dyke and asked Mr. Van Dyke to meet him and Ms. Scovill at the MCCU's physical location in Vassalboro. *Poulin Aff. ¶ 33; Scovill Aff. ¶ 8.* There, the three met with Sgt. Lang, who allegedly admitted the forensic findings of the May 5 Corrective Report were false, particularly the finding of imagery located on a computer. *Poulin Aff. ¶ 32; Scovill Aff. ¶ 10.* Sgt. Lang allegedly claimed that Ms. Dudley had been fired because of the false report, and that he had told AUSA Malone not to disseminate it. *Van Dyke Aff. ¶ 29; Poulin Aff. ¶ 32; Scovill Aff. ¶ 10.* When pressed, Mr. Lang refused to produce a copy of the May 4 Corrective Report. *Van Dyke Aff. ¶ 29; Scovill Aff. ¶ 11.*

### c. The Brief Report

In her email of May 6, AUSA Malone discussed a "brief report [by Ms. Dudley] documenting her work" on the DVDs. *May 6 Malone Email.* The Objection claims that AUSA Malone suppressed this Brief Report and instead produced a "false inculpatory 'Properties Report' to the defense that was created by Detective McFarland." *Objection* at 20 (citing *Supporting Mem.* at 20 and *Poulin Aff. ¶ 25*). Page 20 of the Supporting Memorandum cites no evidence, while paragraph 25 of Mr. Poulin's affidavit cites Exhibit T of the Van Dyke Affidavit, discussed previously. However, Exhibit T is a single page (marked "Page 1 of 2") cover sheet, indicating only that Ms. Dudley "received 8 CD/DVD[]s from the Office of the United States Attorney. I was asked by AUSA Gail Malone [to] check the discs'

[m]etadata for camera information." *Forensic Synopsis*. Exhibit T contains no description of the evidence it supposedly summarizes other than these statements.

Exhibit U, which follows Exhibit T, does appear to be a list of the purported creation dates of certain DVDs, and it may be that this exhibit is the "false inculpatory 'Properties Report'" to which Mr. Poulin refers. *Van Dyke Aff.* at Ex. U *Report on DVD "Properties" "Created" Dates / Times* (ECF No. 235-5). There is nothing in Exhibit U that suggests it was attached to Exhibit T at any time, and Mr. Van Dyke does not swear to this in his affidavit. *Van Dyke Aff.* ¶ 25. However, Exhibit U also appears to be the first page of Exhibit 25a of Mr. Poulin's Affidavit, which he identifies as the McFarland Properties Report that was attached to the document presented in Exhibit T. *Poulin Aff.* ¶ 25; *Poulin Aff.* at Ex. 25a *Report on DVD "Properties" "Created" Dates / Times* (ECF No. 244-1) (*McFarland Properties Report*).

The McFarland Properties Report states that "[t]he DVD[]s were placed in a computer and their creation dates were checked under their 'properties.' This was done by Det. Stephen McFarland on June 22 – 24, 2009." *Id.* The Report lists individual DVDs, some of which are ascribed a creation date. *Id.* It does not, as Mr. Poulin claims, "represent[] dates of imagery appearing to reside within the prosecutable temporal window," *Objection* at 20; to the contrary, it represents, at best, the dates on which the DVDs themselves were burned. It is not at all clear that the DVD burn dates themselves were the subject matter of the DVD Media Examination Report, because that Report apparently addressed the creation dates

of the files *within* the DVD, not of the DVD itself. *See* Section VII.A.1.a, *supra*. However, the Court assumes that the creation date of the DVD suffers from the same forensic infirmity as the internal files.

There is no trace, in the record material, of the actual Brief Report. Mr. Poulin claims that AUSA Malone "suppressed" it, *Objection* at 21, but there is no evidence of that either. He cites page 22 of the Supporting Memorandum, which itself cites only Ms. Malone's email of May 6, 2009; paragraph 25 of his own Affidavit, which contains no assertions based on Mr. Poulin's own personal knowledge; and pages 7-8 of the Petitioner's Reply. Those pages cite paragraph 24 of the Van Dyke Affidavit, which has nothing to do with this issue, and pages 22 through 26 of the Supporting Memorandum, which contain citations to no relevant evidence.

In short, as evidence of the Brief Report (summarizing the DVD Media Examination Report), the Court has on hand: (1) the first page of Ms. Dudley's Forensic Synopsis; (2) the McFarland Properties Report; and (3) the May 6 Malone Email. The defense apparently received at least the first page of the Brief Report in the form of the Forensic Synopsis. The McFarland Properties Report, also received by the defense, states on its face that it was generated by Detective McFarland, not by Ms. Dudley. Thus, although it was produced to the defense as Mr. Poulin claims, it is not at all clear from the evidence that AUSA Malone held it out as Ms. Dudley's Brief Report.

### 2. The "False Inculpatory" Reports

Mr. Poulin also claims that each of the suppressed exculpatory reports was paired with a corresponding false inculpatory report, and that other false inculpatory information was "placed into the record" by the prosecution.[4] *Mot. for Recons.* at 2-3 (citing *Objection* at 10-11, 16-19, 20-21). Furthermore, he claims that "[a] fourth Dudley report, which was actually the first examination that the MCCU conducted, also appears to have been tampered with by the prosecution." *Id.* at 3 (citing *Objection* at 13-15). Careful examination reveals that most of the evidence that Mr. Poulin claims was "falsely inculpatory" was not false or contained trivial errors. The Court addresses later the materiality of the several pieces that were arguably falsely inculpatory. Section VIII.D.4.a.iii, *infra*.

### a. The "Data Spread Sheets"

Mr. Poulin alleges that AUSA Malone produced "data spread sheets" that "presented false inculpatory dates of imagery appearing to reside within the prosecutable temporal window." *Objection* at 10 (citing *Van Dyke Aff.* ¶ 4, *Supporting Mem.* at 10, and *Poulin Aff.* ¶ 6). Paragraph 4 of Mr. Van Dyke's Affidavit refers to Exhibit B to the Affidavit, a lengthy listing of files, sizes, and dates. *Van Dyke Aff.* at Ex. B (ECF No. 227-1) (*Data Spreadsheets*).[5] Mr. Poulin accuses AUSA Malone of "falsely declaring that the 'data spread sheets' were inculpatory evidence supporting her claim that the dating and interstate nexus

---

[4] By "placed into the record," Mr. Poulin apparently means that they were placed into the prosecutor's case file and disclosed to the defense. If Mr. Poulin is asserting that these false inculpatory images were placed into evidence during his trial, this is not clear what exhibits he is referring to.

[5] Exhibit B is Bates-stamped 0279-0297, and appears to be the spreadsheets to which Ms. Malone referred in her email of May 6, 2009. *See May 6 Malone Email.*

elements were established." *Objection* at 10 (citing *Supporting Mem.* at 10 and *Poulin Aff.* ¶ 6). He further claims that "[t]he exculpatory evidence that [AUSA] Malone was suppressing from [Ms.] Dudley's DVD Media Examination report would have overwhelmingly reinforced [Mr.] Van Dyke's position and arguments that the dating and nexus issues were unsatisfied and/or nonexistent, and ultimately saved the defense time, money and resources." *Id.*

The DVD Media Examination Report apparently dealt with the forensic certainty of dates obtained from DVDs. *See* Section VII.A.1.a, *supra*. On the other hand, it is not clear from the face of the Data Spreadsheets whether the files they purport to date come from DVDs or hard drives. However, the Court infers that Exhibit B to the Van Dyke Affidavit goes with Exhibit A—as the Affidavit itself strongly suggests. *See Van Dyke Aff.* ¶ 4. Exhibit A describes, in some detail, the process of using computer forensic software called "EnCase" to examine the hard drives of various computers seized in the investigation of Mr. Poulin. *Van Dyke Aff.* at Ex. A *Report of Findings* (ECF No. 225-1) (*Report of Findings*). Amid all the discussion of hard drives in the Report of Findings, there is no mention at all of DVDs or other removable media. *See id.* The Court concludes that Exhibit B describes the creation dates of files on the hard drives seized from Mr. Poulin, not of files on the DVDs. Given that, the DVD Media Examination Report would be of very little relevance to the Data Spreadsheets. It would not, as Mr. Poulin hyperbolically claims, "have overwhelmingly reinforced [Mr.] Van Dyke's position and arguments that the dating and nexus issues were unsatisfied." *Objection* at 10.

In her email of May 6, 2009, AUSA Malone incorrectly associated the Data Spreadsheets with the DVD media examination rather than with the hard drive examination. *See May 6 Malone Email*. Mr. Poulin firmly believes that AUSA Malone was deliberately seeking to mislead. However, given that the Report of Findings to which the spreadsheet was attached was expressly limited to a hard drive investigation, and AUSA Malone had provided that report to the defense a year before the email about DVDs, it seems far more likely that AUSA Malone's error was one of technical misunderstanding.

Furthermore, Mr. Poulin has presented no evidence—other than his own frequently repeated assertions in his briefing—that suggests that the information in the Data Spreadsheets was in any way "false." The Report of Findings describes the process by which EnCase ensures that the information extracted from a hard drive examination is accurate, *Report of Findings* at 3-4, and Mr. Poulin offers nothing that calls this into question. Whatever may be said of any DVD file creation dates—and acknowledging that AUSA Malone's assertion in her May 6 email that the Data Spreadsheets related to DVDs was incorrect—the Report of Findings and Data Spreadsheets themselves are not falsely inculpatory.

In sum, AUSA Malone disclosed to the defense a hard drive examination report of unquestioned veracity, and then a year later claimed that the report applied to DVDs instead. This is not a "falsely inculpatory" report entered into evidence, as Mr. Poulin claims. *Mot. for Recons.* at 3; *Objection* at 10.

### b. Statements That Certain Images Were Produced by a Sony Camcorder

Mr. Poulin alleges that AUSA Malone presented the defense with a false statement from a representative of Sony to the effect that a Sony camcorder generated certain screen images extracted from video evidence. *Mot. for Recons.* at 3 (citing *Objection* at 11). The Objection cites paragraphs 6 and 7 of the Van Dyke Affidavit and pages 13-14 of the Supporting Memorandum, which cites Exhibit D of the Van Dyke Affidavit. Ultimately, this dispute comes down to a statement by AUSA Malone in a letter to Mr. Van Dyke:

> I have been in touch with representatives of Sony, Panasonic and Philips. They have reviewed screen captures like the ones I've included with this letter and have provided, or are providing, me with information on the equipment that generated the codes. For instance, I enclose a letter I received from Sony positively identifying that certain coding information was generated by their camcorder. As I receive additional information from the manufacturers, I will provide it to you as required under Rule 16.

*Van Dyke Aff.* at Ex. D *Re: United States v. Daniel Poulin* (ECF No. 231-1). Mr. Poulin "retrieved the appropriate [Philips] and Sony brochures and demonstrated to AUSA Malone that the exhibits in question were mostly created by a [Philips] recorder, not a Sony recorder." *Van Dyke Aff.* ¶ 7. AUSA Malone later "blocked any of the defense's efforts at a clarifying deposition of Sony, while also opposing a discovery motion for same in Court." *Supporting Mem.* at 14. Mr. Poulin posits without supporting evidence that "AUSA Malone lied to the Court regarding the origin and circumstances of this material." *Id.*

Mr. Poulin also claims in his Affidavit that in a letter of June 19, AUSA Malone described a "quad-split screen image" provided to the defense as being

generated by a Sony Camcorder 2008, after having previously identified it as coming from a Panasonic camcorder. *Poulin Aff.* ¶ 10 (citing *Van Dyke Aff.* at Ex. D). He claims that "[t]his quad-split screen also displays a false date that placed the imagery inside the temporal window." *Id.* He concludes that AUSA Malone must have engaged in lies and evidence tampering; however, he does not explain how he knows that the date was false, and his conclusory assertions of malfeasance against AUSA Malone are without evidentiary support.[6]

Assuming, at worst, that these are misstatements by AUSA Malone and not errors by her contact at Sony, they are in no sense "falsely inculpatory."

###        c.        The Corrective Report of May 5, 2009

The Court recited in detail Mr. Poulin's version of the events purportedly leading to the discovery of the May 4 Corrective Report. Section VII.A.1.b, *supra.* Mr. Poulin further claims that the May 5 Corrective Report, which AUSA Malone did produce to him on May 5, was falsely inculpatory because it contained a "false collateral accusation of media recovered from a computer," specifically from the hard drive attached to Mr. Poulin's laptop. *Objection* at 17.

The May 5 Corrective Report does indeed contain the statement that one pornographic image of the victim was found on a laptop hard drive. *Van Dyke Aff.* at Ex. P, at 4 (ECF No. 234-3) (*May 5 Corrective Report*).[7] Mr. Poulin and Ms. Scovill both swear that Sgt. Lang admitted to them that the "forensic findings

---

[6]        Mr. Poulin spins a murky tale of concocting and planting false evidence with his lawyer in order to induce the prosecutor to produce false evidence. *Poulin Aff.* ¶¶ 8-10. The story, to the extent it can be followed, is incredible, and the Court does not credit it.

[7]        Exhibit P to the Van Dyke Affidavit is split between ECF Nos. 234-2 and 234-3. Pages 1-3 of the Corrective Report are in ECF No. 234-2, while pages 4-5 of the Report and all of the "Errors Report" are in ECF No. 234-3.

existing in the May 5 report produced to the defense were false" and that he "informed AUSA Malone of this on May 6, 2009." *Poulin Aff.* ¶ 33; *Scovill Aff.* ¶ 10(d).[8] Assuming that the affiants truthfully quote Sgt. Lang, the May 5 Corrective Report was falsely inculpatory as to the one image purportedly located on the laptop hard drive. However, this evidence, like all MCCU evidence, was not introduced at Mr. Poulin's trial.

### d. The "Second Media Fraud"

In addition to AUSA Malone's misstatement in her email of May 6 regarding the Data Spreadsheets, Section VII.A.1.a, *supra*, Mr. Poulin claims that AUSA Malone produced "a second set of data spread sheets, again presenting false inculpatory dates of imagery appearing to reside within the prosecutable temporal window." *Objection* at 18 (citing *Supporting Mem.* at 20, *Poulin Aff.* ¶ 22, and *Pet'r's Reply* at 6-7). Pages 6-7 of the Petitioner's Reply cite the Supporting Memorandum at pages 20-22, but those pages do not identify or even mention any second set of data spreadsheets. *See Supporting Mem.* at 20-22. Paragraph 22 of Mr. Poulin's Affidavit describes the circumstances surrounding the Brief Report, but also does not identify or otherwise mention any second set of data that AUSA Malone put into the case file. *See Poulin Aff.* ¶ 22. On this point, the Court is uncertain what second "very serious issue of Media Examination fraud" was "perpetrated on the defense by AUSA Malone." *Objection* at 18. Mr. Poulin has

---

[8]     Mr. Van Dyke does not swear quite so far, claiming only that "Sgt. Lang stated . . . that he had informed AUSA Malone on or about May 6, 2011 [sic, 2009] that the report which had been produced to the defense was inaccurate." *Van Dyke Aff.* ¶ 29.

most certainly not "thoroughly outlined this issue of fraud in the Petition with supporting affidavits." *Id.*

### e. The "Third Issue of Media Examination Fraud

Mr. Poulin characterizes the McFarland Properties Report as a third set of falsely inculpatory data. *Objection* at 20-21. Taking Mr. Poulin's representations of the contents of the Brief Report at face value (though it is not in the habeas record), and extending a few inferences from it, the Court agrees that any attempt to discern the date of a DVD based on its "properties" is not forensically sound. *See* Section VII.A.1.c, *supra*. Thus, the Court agrees that the McFarland Properties Report could reasonably be described as falsely inculpatory.

Furthermore, unlike the May 5 Corrective Report, which the Government did not use at trial, Det. McFarland apparently relied on his Properties Report in his trial testimony. 1 *Tr. of Proceedings*, at 69:14-25, 183:19-24 (ECF No. 196) (1 *Trial Tr.*). However, the McFarland Properties Report did not enter evidence, and Mr. Van Dyke immediately elicited several key admissions from Det. McFarland:

> Q      Knowing the creation date of a subsequent generation doesn't help you date the original, does it?
>
> A      Right. Like I said, I couldn't say which image was the original. All I can say is I know what date that disk was created by the creation date on it.
>
> . . .
>
> Q      And by knowing the date of the creation of the subsequent image, you can't tell the real-time date of the creation of the image one -- generation one.
>
> A      Ah, well, to some extent. I mean, we know, for example, if it's in Howland.

Q      By -- by looking at the substance of the image, you can make some guesses, but --

A      Right.

Q      -- just the mere face of it being a prior generation, you can't tell.

A      Right.

Q      And you don't know whether or not you actually have generation one of any image, right?

A      Ah, that's true.

*Id.* at 184:6-185:7.   In other words, although Det. McFarland continued to assert (apparently incorrectly) that he could accurately date the creation of the DVD, he admitted that he could not use that information to determine when any image on the DVD had been created.

Under these circumstances, the Court does not conclude that there was any prejudice to Mr. Poulin when the Government produced the McFarland Properties Report to him before trial.  The Report may have been incorrect, but it did not come into evidence.  Mr. Van Dyke may well have let stand Det. McFarland's testimony about DVD creation dates based on the Report, but he successfully attacked the contention far more damaging to Mr. Poulin—that one could deduce from the DVD creation date the creation date of any image on the DVD.

## B.    Alleged Evidence Tampering

Mr. Poulin also complains that "a fourth Dudley report, which was actually the first examination that the MCCU conducted, also appears to have been tampered with by the prosecution."  *Mot. for Recons.* at 3 (citing *Objection* at 13-15).  Pages 13-15 of the Objection detail Mr. Poulin's dissatisfaction with the Magistrate Judge's treatment of Mr. Poulin's accusation that the evidence acquisition

documents from the MCCU were falsified to show that a Samsung DVR hard drive came from within a computer connected to the internet. *Objection* at 13-15. The portion of this discussion that touches on a report by Ms. Dudley accuses AUSA Malone of producing "false inculpatory documentation to the defense" and attributing it to Ms. Dudley. *Id.* at 14-15. According to Mr. Poulin, this consisted of a letter stating that "there were two Samsung drives with one of them recovered from within the computer tower." *Poulin Aff.* ¶ 18. He also claims, without analysis or support, that the EnCase entries sheet produced by AUSA Malone, was falsified because it does not look like another EnCase document that Mr. Poulin reviewed. *Id.* (comparing *Poulin Aff.* at Ex. 18a *with Poulin Aff.* at Ex. 18b). He claims that Ms. Dudley later disavowed this report. *Id.* ¶ 19.

This accusation received no discussion in the Court's previous Order, and merits little now. Mr. Poulin has no basis to assert that one EnCase report is inauthentic by comparing it with any other, and his representations about Ms. Dudley's alleged disavowals are hearsay. His allegations of report tampering are "inherently incredible," *David*, 134 F.3d at 477, and at any rate are not material to any evidence presented at his trial. *See* Section VIII.D.4, *infra*. To the extent the Objection alleged a "substantial interference" with the defense, the Court addresses that issue below. Section VIII.D.4.a, *infra*.

Mr. Poulin also alleges that he and Mr. Van Dyke "[d]uring the week prior to the planned misconduct hearing, [Section VIII.B, *infra*], Petitioner [Mr. Poulin] and Attorney Van Dyke photographed a power supply within the E-machine computer

tower that had been altered by the prosecution to accommodate the false presentation that the Samsung drive operated within the computer." *Objection* at 14 (citing *Poulin Aff.* ¶ 17). He also alleges that "[d]ocuments and information eventually obtained by Petitioner demonstrate that [MCCU] and Hancock County personnel also performed six separate steps of evidence manipulation designed to support the Samsung drive in computer falsification." *Id.* (citing *Poulin Aff.* ¶ 5).

In paragraph 17 of his affidavit, Mr. Poulin claims that on April 14, 2009, he and Attorney Van Dyke photographed a power supply plug inside the E-machine tower. *Poulin Aff.* ¶ 17. He further alleges that several weeks later the Government produced to the defense acquisition photos taken in 2006 by Andrea Ogden, an MCCU employee, in which an existing ZIP drive plug had been removed and the Samsung "hard drive plug" installed in the tower. *Id.* (citing *Poulin Aff.* at Ex. 17 (ECF No. 242-4) and *Poulin Aff.* at Ex. 17a (ECF No. 242-5)).[9] He claims that a letter "allegedly authored by examiner Dudley, with attachments from AUSA Malone" falsely stated that there were two Samsung drives, one of which was

---

[9]     Mr. Poulin also claims that these photographs "reveal that the actual Hitachi computer bios had been removed from the file and the Panasonic/Samsung DVR bios inserted in its place, then represented as the computer bios." *Id.* Mr. Poulin does not direct the Court to the "2006 acquisition photos" in support of this assertion. However, the Court notes that "BIOS" is a computer acronym that stands for Basic Input Operating System. DOUGLAS DOWNING, MICHAEL COVINGTON, AND MELODY MAULDIN COVINGTON, DICTIONARY OF COMPUTER AND INTERNET TERMS 55 (10th ed. 2009). A computer's BIOS is "a set of procedures stored on a ROM chip inside PC-compatible computers." *Id.* As a set of software procedures stored within a microchip, the Court wonders whether it would be visible to the naked eye and susceptible to being photographed. The Court assumes that the ROM chip storing the BIOS might be identified by an expert, but Mr. Poulin is not such an expert and has not demonstrated any foundational basis to opine that a particular ROM chip belongs in a Hitachi computer or a Panasonic/Samsnug DVR player.

recovered within the computer tower. *Id*.[10] He claims that AUSA Malone later falsely attributed these errors to Ms. Dudley, despite a report from Ms. Dudley in which she identified a "loose Samsung drive." *Id.* (citing *Van Dyke Aff.* at Ex. P, at 2 (ECF No. 234-2)).

Exhibits 17 and 17a of Mr. Poulin's Affidavit undoubtedly show the interior of some computer, and he has circled certain power supply plugs. The Court takes him at his word that these are the photos he took in 2009. *Poulin Aff.* ¶ 17. However, Mr. Poulin's assertions of evidence tampering are not persuasive. Mr. Poulin does not explain how he can discern a hard drive power supply plug from a ZIP drive power supply plug, and there is no evidence that he is qualified as a computer hardware expert. Furthermore, even assuming that there is some substantive difference between the two kinds of plugs, this is hardly compelling evidence that the particular Samsung drive that so greatly concerns Mr. Poulin was found inside the computer that had the plug. Finally, the Court notes once again that none of this evidence was introduced at trial. The Court analyzes the prejudicial impact of this alleged tampering below.

### C. The MCCU Evidence Intake Form and the Samsung Hard Drive

There is no real dispute that the MCCU incorrectly cataloged the physical computer evidence it received in Mr. Poulin's case; the Recommended Decision acknowledged this error. *Rec. Dec.* at 5-6. In short, it appears that the MCCU logged a loose Samsung hard drive twice, identifying it once by its serial number

---

[10]     Mr. Poulin recites the allegedly falsified EnCase report as an instance of evidence tampering, but the Court has already determined that this factual argument does not hold water. Section VII.B, *supra*.

and once by its part number. *Id.* at 6. The MCCU intake log also wrongly stated that one of the "two" Samsung hard drives was located in the E-Machines computer tower. *Id.*

Although this evidence—like the rest of the MCCU evidence—was not introduced at trial, Mr. Poulin views the erroneous intake form as prejudicial. This is so, he claims, because it suggested computer involvement in his production of child pornography, and "[AUSA] Malone was constantly seeking an enhancement based on the involvement of computers." *Objection* at 13 (citing *Van Dyke Aff.* ¶ 10).[11]

## VIII. LEGAL DISPUTES

### A. Characterization of the Grounds of the Habeas Petition

Mr. Poulin takes issue with the Court's statement that his petition is grounded on ineffective assistance of counsel. *Mot. for Recons.* at 3 (citing *Order* at 9). He accuses the Court of "complete[ly] mischaracteriz[ing]" the grounds asserted in his petition. *Id.*

Mr. Poulin's actual habeas petition—distinct from his Supporting Memorandum—states as grounds:

> Counsel was ineffective for failing to "properly" object to, and appeal, prosecutorial misconduct in the context of Due Process violations under Brady and Giglio, manufacturing evidence, and patterned extrinsic and intrinsic fraud on the court, which improperly influenced the trier and unfairly hampered Petitioner's ability to prepare and present a defense.

---

[11] Although he does not identify it, the "enhancement" of which Mr. Poulin writes is presumably a sentencing enhancement under the United States Sentencing Guidelines. *See* U.S.S.G. § 2G2.1(b)(6) (requiring a two-point enhancement for use of a computer, in certain circumstances, to facilitate the production of child pornography).

. . .

> Counsel was ineffective for failing to "properly" object to, and appeal, the cumulative effective [sic] of the multiple errors in this case, which requires, at a minimum, an evidentiary hearing where Petitioner will have a fundamentally fair opportunity to advance his claims with the benefit of counsel.

*Habeas Pet.* at 4-5. If the Court "completely mischaracterize[ed]" the grounds for Mr. Poulin's petition, so did Mr. Poulin. Citing his Supporting Memorandum, Mr. Poulin insists that what he really meant was the "substantial interference" standard from *United States v. Cronic*, 466 U.S. 648 (1984). *Mot. for Recons.* at 3. In the interest of completeness, the Court will address his specific arguments of substantial interference below. Section VIII.D.4.b, *infra*.

## B.  Alleged "Inducement" of the Defense into an Exclusion Motion

Once again, Mr. Poulin accuses the Court of "utterly mischaracteriz[ing]" his arguments about the Government's concession that it would not use evidence from the MCCU, and the defense motion to exclude. *Mot. for Recons.* at 4. Mr. Poulin's explanation is as follows, verbatim:

> Following partial exposure of the prosecution's Hard Drive acquisition documents as false (Doc. 291 at IV(H)), AUSA Malone aggressively argued in support of their validity, producing more false material to the defense. However, she was eventually forced to admit that the acquisition documents were incorrect (Doc. 291 at IV(H)). She fraudulently declared this to be examiner error, and was instructed to provide an explanation to the defense, which she failed to do (Doc. 291 IV(I)). Malone was also instructed to produce corrective information to the defense, but instead suppressed the exculpatory May 4 authentic Corrective Report and produced a counterfeit inculpatory May 5 alleged Corrective Report to the defense, containing the new false inculpatory accusation (Doc. 291 IV(J)). When confronted by defense counsel about this false inculpatory accusation, AUSA Malone again fraudulently claimed that it was a product of examiner error, but continued to suppress the actual exculpatory May 4 Corrective Report,

and declined to remove or otherwise correct the remaining false inculpatory material (Doc. 291 IV(C), IV(D). At the same tim [sic], she produced more false inculpatory material to the defense (IV(K), IV(M)), while lying to the defense and Court within conferences and memoranda about this material (IV(L)).

*Mot. for Recons.* at 4. Absent from this discussion is a description of how these alleged events related to the Government's concession or to the exclusion motion.

The citations in this paragraph are no more helpful than the paragraph itself. "Doc. 291" refers to Mr. Poulin's Objection to the Recommended Decision. Section IV(H) of the Objection alleges that AUSA Malone used the "counterfeit [evidence] acquisition documents"[12] to represent to Mr. Poulin that she had evidence of "computer involvement" in his crimes, *Objection* at 13-14; the implication from this (discussed in more detail later) is that Mr. Poulin might receive a sentencing enhancement under the United States Sentencing Guidelines (USSG). Section IV(I) accuses the Government of disregarding this Court's Order to produce an explanation of the MCCU's errors. *Id.* at 14-16. Mr. Poulin's argument boils down to his dissatisfaction with the Error Report eventually produced; he claims that it "contain[ed] no explanation whatsoever for the previously submitted false inculpatory acquisition documents." *Id.* at 15-16.

Section IV(J) of the Objection addresses the "very serious issue of Corrective Report fraud perpetrated on the defense and Court," which the Court has addressed previously. Section VII.A.1.b, *supra*; Section VII.A.2.c, *supra*. Section IV(C) relates to the DVD Media Examination Report, Section VII.A.1.a, *supra*, and Section IV(D)

---

[12] They were, apparently, "counterfeit" because they incorrectly listed a Samsung hard drive twice and associated a loose hard drive with a computer. *Objection* at 13-14.

relates to the "Data Spread Sheets." Section VII.A.2.a, *supra*. Section IV(K) addresses the so-called "Second Media Fraud," of which the Court can find no documentary evidence, Section VII.A.2.d, *supra*, while Section IV(M) addresses the McFarland Properties Report, which the Court addressed previously. Section VII.A.2.e, *supra*. Finally, Section IV(L) accuses AUSA Malone of lying to counsel and the Court during various conferences about all of the aforementioned issues. *Objection* at 18-19. Other than the "evidence" previously discussed, Section IV(L) provides no evidence of lies by AUSA Malone.

Virtually none of this material addresses the exclusion motion. In Section IV(L), Mr. Poulin finally touches on this issue:

> [AUSA] Malone's bad faith conduct in this regard would eventually force defense counsel to react by pursuing an exclusion motion, because [AUSA] Malone never actually admitted that the accusation of media recovered from a computer in the counterfeit May 5, 2009 report was false. She merely stated that she would stipulate to error.

*Objection* at 20. However, this statement does not illuminate how the defense's choice to pursue an exclusion motion entitles Mr. Poulin to habeas relief, or how the Government's stipulation not to use any evidence from the MCCU at trial failed to cure any prejudice from the MCCU's errors.

Elsewhere in the Objection (though not cited in the Motion for Reconsideration), Mr. Poulin did raise a legal argument that "forcing" Mr. Van Dyke to pursue an exclusion motion was prejudicial to Mr. Poulin. *Objection* at 32-33. Essentially, he argues that Mr. Van Dyke's lack of knowledge of the later-discovered DVD Media Examination Report and May 4 Corrective Report "represented to counsel that the evidence did not exist and caused him to make pretrial and trial

decisions on the basis of that [false] assumption." *Id.* at 32 (citing *United States v. Bagley*, 473 U.S. 667 (1985)). He posits that if Mr. Van Dyke had had the two reports, it "would have diametrically effected the defense's misconduct suppression exclusion motions [sic] brought before the court for adjudication." *Id.* at 33. Mr. Poulin does not, however, say what the effect would have been or why. He argues vaguely that "[d]isclosure of the exculpatory Media Examination information would have allowed Van Dyke to refute [AUSA] Malone's false inculpatory accusations"— he does not identify them—and "impeach [Det.] McFarland's false evidence/testimony regarding his Properties Report." But the defense was able to do that anyway. Section VII.A.2.e, *supra*. Furthermore, Det. McFarland's did not purport to date the footage on the videos using these dates; he dated them using other means. *See* 1 *Trial Tr.* at 141:23-179:22; 2 *Tr. of Proceedings* at 209:22-212:3 (ECF No. 197) (2 *Trial Tr.*).[13] It was only in response to Mr. Van Dyke's question regarding the creation date of the DVDs themselves—distinct from the images and video on the DVDs—that Det. McFarland referred to checking the "properties" on the disks. *Id.* at 183:19-24.

---

[13] At one point, Det. McFarland purported to date Government's Exhibit 12-JJ-14 using the embedded date on the screen. 1 *Trial Tr.* at 172:3-13. This is different than the method purportedly used to generate the McFarland Properties Report, Section VII.A.2.e, *supra*, though in theory it suffers from the same forensic infirmity; there is no way to know for sure that the date embedded in the footage is accurate without knowing if the video recorder had its date set accurately. However, this statement does not relate to the so-called "Third Issue of Media Examination Fraud" that Mr. Poulin raises in his Supporting Memorandum. *See id.* This was the only image that Det. McFarland dated using any method that relied on the recording device itself. Furthermore, Mr. Van Dyke extracted an admission from Det. McFarland on cross-examination that one could add a time stamp during the video editing process, and that the embedded time stamp did not necessarily represent the date or time on which the video was captured. 2 *Trial. Tr.* at 207:25-208:3.

Mr. Poulin's argument seems to be that if Mr. Van Dyke had had access to the allegedly-suppressed "exculpatory" reports, he could have successfully pursued the remedy of dismissal for misconduct rather than the remedy of evidence exclusion. *See also Supporting Mem.* at 28-30. The Court is not convinced. Granted, at the time of the scheduled hearing on Mr. Poulin's motion to dismiss for prosecutorial misconduct, the Government had not yet agreed to exclude all evidence generated by the MCCU.[14] Armed with the DVD Media Examination Report and the May 4 Corrective Report—assuming they actually existed—Mr. Van Dyke would have had one additional ground in support of dismissal.[15] But dismissal of an indictment is a drastic remedy—so rare, as the Court discusses further below, that it has never been done in the First Circuit—and Mr. Van Dyke would have been no more successful with one additional ground than with the four that he actually used. The Court perceives no tactical decision that Mr. Van Dyke would or could have made differently if he had the reports, *Bagley*, 473 U.S. at 682-83; he would still have filed the same motion to dismiss, with one additional ground. The result would also have been the same—exclusion of the MCCU evidence, which is exactly what Mr. Van Dyke got when AUSA Malone agreed not use it at trial.

---

[14] The Court held a hearing on the motion to dismiss on April 17, 2009. *Minute Entry* (ECF No. 113). The earliest date on which AUSA Malone apparently agreed to exclude the MCCU evidence was June 10, 2009. *Gov't's Supplemental Mem. in Opp'n to Def.'s Mot. to Dismiss for Misconduct* (ECF No. 138).

[15] The amended Motion to Dismiss recited four grounds for relief: an interrogation beyond the scope agreed to by Mr. Poulin's then-counsel, false and inaccurate affidavits in support of search warrants, conflicting and inconsistent information regarding the quantity of cameras seized, and a false affidavit from Sony regarding a computer menu screen. *Def.'s Mot. to Dismiss the Indictment on the Grounds of Prosecutorial/Investigative Misconduct (Modified)*, at 2 (ECF No. 66).

The allegedly-suppressed reports did not even remotely prove that Mr. Poulin was factually innocent of the crimes with which the Government charged him, and Mr. Van Dyke would not have convinced the Court otherwise. Neither distribution nor "computer involvement" were elements of the charged crimes; both issues went to potential sentencing enhancements. *See also* Section VIII.D.4.a.ii (discussing materiality of the allegedly withheld evidence in the context of substantial interference and fraud on the court). At worst, the reports only disproved certain of the Government's evidence that the Government never used anyway, and cast serious doubt on the veracity of the rest of the MCCU's work. The Government's concession that it would not use this evidence completely cured any prejudice to Mr. Poulin at trial, and that is the remedy the Court would have imposed. Even taking Mr. Poulin's rather fantastic allegations at face value, there would have be no grounds for the Court to dismiss the indictment, which was Mr. Van Dyke's object in the misconduct hearing. *See Def.'s Mot. to Dismiss the Indictment on the Grounds of Prosecutorial/Investigative Misconduct (Modified)* (ECF No. 66) (*Am. Mot. to Dismiss*).

## C. Whether Defense Counsel Obtained an Evidentiary Hearing

Not satisfied at attacking AUSA Malone's integrity, Attorney Williams accuses the Court of making false statements in its Order. *Mot. for Recons.* at 4-5. Mr. Poulin, by way of Attorney Williams, points out that the Court's January 15, 2014 Order stated that "[t]he defense lawyer demanded and obtained an evidentiary hearing on the motion to dismiss." *Id.* at 4-5 (quoting *Order* at 10). Mr. Poulin trumpets this phrase as not merely mistaken but actually false because no

evidentiary hearing on these alleged violations was ever held. *Id.* at 4 ("This is NOT correct"), at 5 ("Therefore, the Court's statement that defense counsel demanded [and] "obtained" an evidentiary hearing to address these misconduct issues is false"). He asserts that "[d]efense counsel advanced numerous requests for an evidentiary hearing within the May 20, 2009 conference . . . Defense's offer of proof . . . Defense's statement of issues for adjudication . . . Defense's motion for production of evidence . . . and the August 18, 2009 telephone conference", but the "Court would not allow an evidentiary hearing to address the universe of misconduct issues." *Id.* (internal citations omitted).

Mr. Poulin contends that "[a]n evidentiary hearing was scheduled for April 17, 2009 for the specific purpose of examining the misconduct issues, but this did not occur." *Id.* at 5. He maintains that he repeatedly demanded an evidentiary hearing and

> [d]espite all of these requests, the Court would not allow an evidentiary hearing to address the universe of misconduct issues – presumably relying on AUSA Malone's false representations that these issues were the product of good faith errors, which is now known to be a fraudulent representation. *Therefore the Court's statement that defense counsel demanded [and] "obtained" an evidentiary hearing to address these misconduct issues is false.*

*Id.* at 5 (emphasis added).

Mr. Poulin's recitation grossly mischaracterizes what actually took place. Mr. Poulin's accusations of prosecutorial and investigative misconduct date back to September 20, 2008. *Def.'s Mot. to Dismiss the Indictment on the Grounds of Prosecutorial / Investigative Misconduct* (ECF No. 24). In this motion, Mr. Poulin listed six areas of alleged misconduct. *Id.* at 1-2. Four related to the recording of

telephone conversations that Mr. Poulin has not raised here.[16]  *Id.*  Two of these touch on the issues Mr. Poulin now raises: (1) that the Government and the investigators have provided conflicting evidence as to the number of cameras obtained from the Poulin Islesford residence, and (2) that the Government promulgated a false affidavit from Sony.  *Id.*  On February 25, 2009, Mr. Poulin amended his motion to dismiss.  *Def.'s Mot. to Dismiss the Indictment on the Grounds of Prosecutorial / Investigative Misconduct (Modified)* (ECF No. 66).

In fact, the Court ordered and held an extensive evidentiary hearing on Mr. Poulin's pending motion to dismiss on April 17, 2009.  *Minute Entry* (ECF No. 113).  Just before the scheduled hearing, the lawyers requested a chambers conference.  *Partial Tr. of Proceedings* at 3-7 (ECF No. 194) (*April 17, 2009 Conf.*).  Significantly, in chambers, Mr. Van Dyke began the conference by reminding the Court that "one of the two principal issues of alleged misconduct arises, as the court may recall, out of a - - a computer issue."  *Id.* at 3:12-14.  Mr. Van Dyke informed the Court that in light of recent revelations about the MCCU, he suggested that this part of the case not go forward on April 17, 2009:

> MR. VAN DYKE:  Although I don't know what happened, I think everyone agrees that there was a series of fundamental errors at the crime lab, and it is my preference - - and I think Ms. Malone's preference as well - - that that part of the case be allowed to be resolved in terms of figuring out what really happened, rather than do that part of the case today.
>
> COURT:  That's fine with me.

---

[16]     On December 16, 2008, the Court issued an Order, allowing some but not all discovery on the telephone conversation issues.  *Order on Mot. for Disc.* (ECF No. 52).  On February 25, 2009, Mr. Poulin withdrew grounds one and five of his earlier motion.  *Def.'s Mot. to Dismiss the Indictment on the Grounds of Prosecutorial / Investigative Misconduct (Modified)* at 1 (ECF No. 66).

*Id.* at 4:12-19. Thus, instead of presenting evidence on the MCCU errors, the parties, including specifically Mr. Poulin, asked for additional time for further investigation. *Tr. of Proceedings* at 3:8-9 (ECF No. 262) (Mr. Van Dyke: "[A]s you may recall, we had a hearing, and the computer part of the case was continued pending further investigation") (*May 20, 2009 Conf.*). As this interchange suggests, the Court had scheduled to hear whatever evidence Mr. Poulin wished to present on the issue of Governmental misconduct. If Mr. Poulin had wished to present evidence of the MCCU errors on April 17, 2009, the Court would have allowed him to do so. So, the Court's statement that Mr. Poulin demanded and obtained an evidentiary hearing, it not false; it is true. Mr. Poulin got the evidentiary hearing but (for good reasons) declined to proceed on April 17, 2009 with "that part of the case today." *April 17, 2009 Conf.* at 4:17-18.

Recognizing, however, that Mr. Poulin had raised a serious issue of MCCU mistakes (although it was not yet clear what those errors were), at the April 17, 2009 hearing, the Court agreed with the parties' proposal that they file a stipulation and memoranda concerning Mr. Poulin's "government error and crime lab issues". *Minute Entry* (ECF No. 113). The Stipulation was due by May 8, 2009; the Government's response by May 15, 2009, and Mr. Poulin's reply by May 25, 2009. *Id.* On May 5, 2009, Mr. Poulin moved for a two-week extension to give the parties additional time to stipulate to the Government's errors and to give him additional time to analyze and respond to the MCCU's "corrective report." *Def.'s Mot. to Extend Deadlines for (A) Stipulating to Gov't Errors, (B) Responding to "Corrective"*

*Computer Crime Lab Report and (C) Filing Br. Detailing Applicable Standard to be Applied* (ECF No. 122).

On May 18, 2009, the Government filed a motion for a conference of counsel with the Court. AUSA Malone represented that "[a]fter exhaustive review of the [M]CCU's work on this case, the Government has elected not to use at trial any information the [M]CCU generated during its forensic examination of the evidence recovered from Defendant." *Mot. for Conf. of Counsel* at 1 (ECF No.124). The Court quickly scheduled the requested conference of counsel.

At the conference of counsel on May 20, 2009, the Government took the position that because it had conceded it would not use the MCCU analysis, "it's no longer relevant that there were infirmities in the crime lab's work in this case." *May 20, 2009 Conf.* at 8:21-23. AUSA Malone strongly objected to an evidentiary hearing on the MCCU errors. *Id.* at 9:10-12 ("If we're electing not to use evidence, then I don't understand how it could form the basis for a motion for misconduct"). The Court disagreed with AUSA Malone and observed that Mr. Poulin still had the right to place evidence of the errors before the Court so that it could evaluate his motion to dismiss and the Court said it was "trying to brainstorm" how to get the evidence before the Court so that it could rule on the motion to dismiss without wasting time and money. *Id.* at 8:24-9:5.

At the May 20, 2009 conference of counsel, it was the Government's position that "no further evidence on the work of the [M]CCU need be submitted before the Court rules on the pending motion to dismiss." *Mot. for Conf. of Counsel* at 1.

AUSA Malone noted that it is "Defendant's position, however, that the work of the [M]CCU may still form the basis for dismissal, and that the record therefore should be supplemented." *Id.* The Court asked the AUSA: "[H]ow do I get the information that Mr. Van Dyke wishes to place before me?" *May 20, 2009 Conf.* at 9:16-17. Because the parties did not agree on the facts, the Court suggested that Mr. Van Dyke prepare "an offer of proof, which says, this is what I believe I could prove if the matter were brought to hearing, and then I'd accept the offer of proof." *Id.* at 10:19-22. Once Mr. Van Dyke submitted his offer of proof, the Court suggested it could then determine whether an evidentiary hearing was warranted. *Id.* at 12:21-13:2. The basis of this suggestion, however, was that once AUSA Malone received Mr. Poulin's offer of proof, "then we might have to have an evidentiary hearing to determine because Ms. Malone would have the right to come in and say, no, he couldn't prove much of what he said happened here." *Id.* at 12:1-4. AUSA Malone agreed. *Id. a*t 12:16-19 ("[M]y point is that he and I could probably agree that there were substantial and fundamental problems with the work without there being any kind of a hearing").

Mr. Van Dyke also agreed:

MR. VAN DYKE: I would do an offer of proof, essentially and then - - and then, Gail [Malone], you would weigh in on it, and the court would make a threshold decision whether that was - - whether hearing was necessary or whether it could be resolved without a hearing. Am I correctly understanding you, Your Honor?

THE COURT: Right.

MR. VAN DYKE: I can do that. I can put something together in - - in more than a week that would lay out, in excruciating detail, what happened with the crime lab. I think I understand what happened.

*Id.* at 12:21-13:6.  After setting the dates for the parties' filings, the Court concluded by stating:

> And then at that point, I will - - if I can, I'll rule dispositively on it, and if I feel I need to have an evidentiary hearing, what I'll do is issue an order and then schedule one.

*Id.* at 15:5-8.  Mr. Van Dyke replied: "Very well."  *Id.* at 15:9.  Thus, contrary to Mr. Poulin's accusation, the Court overruled the Government's objection to an evidentiary hearing, allowed Mr. Van Dyke to put his best factual case forward, reserved the right to order an evidentiary hearing, and Mr. Poulin expressly agreed to proceed in this fashion.

On May 28, 2009, Mr. Poulin filed a motion in limine and a memorandum with an offer of proof.  *Mot.* In Limine *Seeking Exclusion of Work Product, Opinions and Materials Derived from or Associated with the Maine Computer Crimes Lab* (ECF No. 132); *Def.'s Mem. in the Form of an "Offer of Proof" Regarding Computer Crime Lab Errors and Associated Mem. of Extant Legal Standard* (ECF No. 133) (*Def.'s In Limine Mem.*).  Mr. Poulin asked that the MCCU work product be excluded from evidence (something the Government agreed to do), that all computer equipment that passed through the hands of the MCCU also be excluded, and that the indictment be dismissed.  *Id.* at 1-2 & n.1.  In his memorandum, Mr. Poulin proffered a long list of errors that the MCCU committed.  *Id.* 1-9.  On June 10, 2009, the Government responded.  *Gov't's Supplemental Mem. in Opp'n to Def.'s Mot. to Dismiss for Misconduct* (ECF No. 138).  On August 17, 2009, the Court denied Mr. Poulin's motion to dismiss the indictment.  *Order on Mot.* In Limine *Seeking*

*Exclusion of Work Product, Opinions and Materials Derived from or Associated with the Maine Computer Crimes Lab* (ECF No. 164). In the Order, the Court granted Mr. Poulin's motion to exclude the MCCU reports, but denied the motion to exclude all computer equipment that had passed though the MCCU. *Id.*

It is true that in his memorandum Mr. Poulin asked the Court to schedule another evidentiary hearing and the Court did not grant his request. *Def.'s In Limine Mem.* at 1. But the Court had accorded Mr. Poulin the functional equivalent of a testimonial hearing, by allowing him to place his best factual case before the Court by way of an offer of proof; the Court saw little to be gained by an extensive hearing involving the testimony of MCCU employees who had already admitted fault. Furthermore, Mr. Poulin had successfully forced the Government to forego the use of the MCCU examination and reports in its prosecution of the case, which appeared and still appears to be a significant concession. The Court declined to exclude from evidence all of the equipment that the MCCU had touched. To do so would have crippled the Government's case, and there was no evidence that the MCCU errors had affected the integrity of the equipment itself as opposed to its contents.

Finally, to obtain the dismissal of an indictment, Mr. Poulin would have had to demonstrate Government misconduct "so appalling and egregious as to violate due process by 'shocking . . . the universal sense of justice.'" *United States v. Luisi*, 482 F.3d 43, 59 (1st Cir. 2007) (quoting *United States v. Russell*, 411 U.S. 423, 432 (1973)). In 2007, the First Circuit observed that "[w]hile the doctrine is often

invoked by criminal defendants, it has never yet been successful in this circuit." *Id.* This 2007 statement by the First Circuit appears still true today. *See United States v. Djokich*, 693 F.3d 37, 43-44 (1st Cir. 2012). Even though the Court excluded the tainted evidence, Mr. Poulin is complaining that this Court failed to dismiss the indictment based on prosecutorial and government misconduct, something that no court in the First Circuit has ever done. The facts of this case did not in 2009 and do not today provide any basis to break new ground and dismiss a production of child pornography case in these circumstances.

### D. Substantial Interference, Fraud on the Court, Presumption of Ineffectiveness, and Materiality of Discovery Violations

Mr. Poulin renews his arguments that the alleged actions by the prosecution worked a "substantial interference" with his defense under *Anderson v. Cryovac*, 862 F.2d 910 (1st Cir. 1988), and constituted "fraud on the court" under *Aoude v. Mobil Oil Co.*, 892 F.2d 1115 (1st Cir. 1989). His basic premise, under both theories, is that his defense was "forced" to abandon two "postures": first, that the victim was not a minor and the visual depictions were not produced using materials transported in interstate commerce; and, second, that the prosecution engaged in misconduct that merited dismissal. *Mot. for Recons.* at 5-6. This argument constitutes the bulk of the Motion for Reconsideration. *Id.* at 5-13. Interleaved with this argument are additional arguments for discovery violations under *Brady v. Maryland*, 373 U.S. 83 (1963), and for presumed ineffectiveness of counsel under *Strickland*, 466 U.S. 668, and *United States v. Cronic*, 466 U.S. 648 (1984).

## 1. Mr. Poulin's Position

### a. Substantial Interference

Mr. Poulin argues that the investigators in his case committed a wide variety of misconduct,[17] and that AUSA Malone prevented the defense from establishing this as fact through fraud and misrepresentation.[18] *Mot. for Recons.* at 6. He complains that his defense was "compelled" to spend time and resources attempting to prove its point about investigative fraud, which he characterizes as "fraud in the context of discovery violations." *Id.* He views the three "exculpatory" reports as "material to preparing a defense." *Id.* He enumerates "evidence tampering by agents of the government, that were belittled by the prosecutor, while bad faith stipulations of 'error' were presented, material false grand jury testimony was withheld, and the prosecution has [sic] engaged in serious elements of fraud with forensic and scientific evidence that exercised control over the defense." *Id.* at 6-7.

---

[17] As evidence of this alleged investigative malfeasance, Mr. Poulin cites the following: (1) his original *Motion to Dismiss the Indictment on the Grounds of Prosecutorial / Investigative Misconduct* (ECF No. 24); (2) his *Defendant's Motion to Suppress* (ECF No. 26); (3) his *Defendant's Motion for Bill of Particulars* (ECF No. 27); (4) his *Motion for Discovery* (ECF No. 33); (4) his *Defendant's Motion to Dismiss the Indictment on the Grounds of Prosecutorial / Investigative Misconduct (Modified)* (ECF No. 66); (5) his *Motion In Limine Seeking Exclusion of Recording of October 27, 2006 Poulin Interview* (ECF No. 75); (6) his *Defendant's Motion for Leave to File an "Aid to Court" Pre-Hearing Memorandum* (ECF No. 90); (7) a hearing held on May 10, 2009, *Minute Entry* (ECF No. 108); (8) the hearing on his exclusion motion on May 17, 2009, *Minute Entry* (ECF No. 113); (8) his *Defendant's Memorandum in the Form of an "Offer of Proof" Regarding Computer Crime Lab Errors* (ECF No. 133); (9) his *Defendant's Statement of Issues Pending for Court Adjudication* (ECF No. 146); and (10) his *Defendant's Motion for Order Compelling Production by Government of Original Video and Digital Material to Retained Expert* (ECF No. 151). The Court already ruled on all of these matters. *Order on Mots. to Dismiss the Indictment on the Grounds of Prosecutorial / Investigative Misconduct* (ECF No. 157); *Order on Mot. to Suppress* (ECF No. 155); *Order on Def.'s Mot. for Bill of Particulars* (ECF No. 49); *Order on Mot. for Disc.* (ECF No. 52); *Order on Mot. In Limine Seeking Exclusion of Recording of October 27, 2006 Poulin Interview* (ECF No. 153); *Order Granting Without Objection Mot. for Leave to File "Aid to Court"-Type Pre-Hearing Mem.* (ECF No. 106); *Order on Def.'s Mot. for Order Compelling Produc. By Gov't of Original Video and Digital Material to Retained Expert* (ECF No. 163).

[18] In support of this statement, Mr. Poulin cites "Pttn, affidavits, reply brief, and Objection brief."

Mr. Poulin insists that he has two parallel theories of habeas relief: "substantial interference" under *Cryovac* and "Fraud on the Court doctrine" under *Aoude.* *Id.* at 7. He views the alleged DVD Media Examination Report, the Data Spreadsheets from the hard drive examination, the elusive "Second Media Fraud," and AUSA Malone's statements that certain screen captures came from a Sony camcorder as substantially interfering with his ability to build, prepare and present his case. *Id.* at 8. He takes issue with AUSA Malone's opposition to his efforts to depose a Sony representative. *Id.* He believes that the prosecutor "elaborated upon" the Sony camcorder connection to prove "an imagery device connection," and again accuses AUSA Malone of lying to the Court "about the discovery, correction, and origin disclosure of this material."[19] *Id.* He views AUSA Malone's statement in her May 6 letter, that the Data Spreadsheets related to DVDs rather than hard drives, and the errors in the intake sheets from MCCU, as amounting to "physical evidence tampering, and the production of false inculpatory documentation," which prevented him from conducting an examination into the MCCU errors. *Id.* He also views the "suppression" of the Brief Report and the production of the McFarland Properties Report as "plainly and convincingly foreclos[ing] the defense's ability to build, prepare and present a defense." *Id.* at 8-9.[20]

---

[19] There is a dispute between the Government and Mr. Poulin about who told whom, and when, that the assertion about a Sony camcorder was incorrect. The Government maintains that it discovered the error on its own before Mr. Poulin raised it, *Mem. in Opp'n to Def.'s Mot. to Dismiss for Misconduct* at 9 (ECF No. 81), while Mr. Poulin insists that he raised it first. *Poulin Aff.* ¶¶ 13-14.

[20] Mr. Poulin also mentions briefly that

The Prosecution's conduct also falls within the Brady line of cases under a Kyles standard of materiality. . . . Furthermore, the prosecutor's conduct involved a pattern

### b.   Fraud on the Court

Mr. Poulin next turns to the "Fraud on the Court" doctrine first enunciated in *Aoude v. Mobil Oil Corp. Id.* at 9.  He characterizes the alleged malfeasance as an "'unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the [t]rier or unfairly hampering the . . . opposing party's claim or defense.'"  *Id.* at 9 (quoting, with alterations, *Aoude*, 892 F.2d at 1118).

Mr. Poulin first focuses on the May 5 Corrective Report, which he points out the Court ordered "as a curative instruction." *Id.*  He again insists that AUSA Malone suppressed the May 4 Corrective Report and instead produced the May 5 Corrective Report. *Id.*  He concludes that she did so "in order to deceive the defense and the Court." *Id.*  He characterizes the "fraud" of the Corrective Report as "material" and "done to gain tactical advantage, which it obviously did, because the defense was forced to react and pursue an exclusion motion." *Id.*  He also claims that the exclusion motion "actually served to exclude the exculpatory evidence from all the examinations that the prosecution was actively suppressing."  Mr. Poulin

---

of presenting known false evidence, with related false testimony before the Grand Jury and Court.

*Id.* at 9 (citing *Kyles v. Whitley*, 514 U.S. 419 (1995)).  Mr. Poulin cites no evidence for this very serious claim.  In his Objection, he attacked the Magistrate Judge's interpretation of his "criticisms of the McFarland grand jury testimony."  *Objection* at 7-8 (citing *Poulin Aff.* ¶¶ 1, 5, "Poulin Aff. at C," *Am. Mot. to Dismiss* at 3 n.1, and *Supporting Mem.* at 8-9).  Mr. Poulin's Affidavit is denominated by numeric paragraphs, as are the supporting exhibits; the Court cannot locate the "C" pinpoint citation that he offers.  Footnote 1 of Mr. Poulin's motion to dismiss is an assertion of counsel, not sworn evidence, and it does not cite evidence.  *See Am. Mot. to Dismiss* at 3 n.1.  Paragraph 1 of Mr. Poulin's Affidavit claims that Det. McFarland's affidavit in support of his search warrant was false, but does not mention the Grand Jury; neither does paragraph 5.  Pages 8 and 9 of the Supporting Memorandum are likewise devoid of any reference to Grand Jury testimony.  The Court, perceiving no evidentiary support for Mr. Poulin's vituperative allegations about the Grand Jury testimony, does not address the merits of these claims.

concludes that this violates both the "Fraud on the Court" doctrine and also *Bagley*. *Id.* at 8-9.

Mr. Poulin next attacks the Court's reliance, in its previous order, on *United States v. Yeje-Cabrera*, 430 F.3d 1 (1st Cir. 2005) to analyze the Fraud on the Court claim. *Id.* at 9. Specifically, he disputes that *Yeje-Cabrera* requires that the fraud affect the verdict. *Id.* at 10 (citing *Order* at 8). He quotes with alterations *Glenwood Farms Inc. v. O'Connor*, 666 F. Supp. 2d 154 (D. Me. 2009) for the proposition that "'the First Circuit formulation of the standard appears to allow for a scheme to defraud the Court exists, but is ultimately unsuccessful.'"[21] He insists that "because '[t]he failure of a party's corrupt plan [the government's unconscionable scheme to withhold and manipulate evidence] does not immunize the defrauder from the consequences of his misconduct,' and relief must be made available." *Id.* (quoting *Glenwood Farms*, 666 F. Supp. 2d at 178). However, Mr. Poulin also claims, without citation, that the alleged fraud by the AUSA did affect the verdict. *Id.*

Mr. Poulin finally attacks the Court's conclusion that the formulations in *Yeje-Cabrera* and *Cryovac* "'are not contradictory.'" *Id.* (quoting *Order* at 8). He sees *Yeje-Cabrera* as making a "general generic statement that the fraud must be directed at the Court," while *Cryovac* "announces that Fraud occurs when it has 'substantially . . . interfered with the aggrieved party's ability fully and fairly to prepare for and proceed at trial.'" *Id.* (quoting *Cryovac*, 862 F.2d at 924).

---

[21] The actual quote from *Glenwood Farms* is: "[T]he First Circuit's formulation of the standard appears to allow for situations where a scheme to deceive the court exists, but is ultimately unsuccessful." 666 F. Supp. 2d at 178.

## 2. The Government's Response

In its reply to the Motion for Reconsideration, the Government does not address Mr. Poulin's legal analysis of the "substantial interference" theory, limiting itself to a discussion of the "fraud on the court" theory. *See Gov't's Opp'n* at 1-10. The Government argues that, in a habeas petition, a "fraud on the court" claim must in some way interfere with Mr. Poulin's Sixth Amendment right to counsel. *Id.* at 4. Given that, the Government argues, the case of *Strickland v. Washington* requires Mr. Poulin to establish that the outcome of the proceeding would have been different but for the alleged fraud. *Id.* (citing *Strickland*, 466 U.S. at 684).

Even viewed as a claim independent of any constitutional claim, the Government urges that "fraud on the court" requires even more than deliberate misconduct by an attorney; the malfeasance must go directly to the operation of the court itself or "'unfairly hamper the presentation of the opposing party's claim or defense.'" *Id.* at 5 (quoting *Fernandez v. Leonard*, 963 F.2d 459, 462-63 (1st Cir. 1992)). It points out that *Anderson v. Cryovac*, relied upon by Mr. Poulin, "distinguished malfeasance from fraud and did not even attempt to define 'fraud on the court.'" *Id.* (citing *Cryovac*, 862 F.2d at 923-24).

As to the alleged *Brady* violation, the Government renews its argument that there must be a finding of materiality of the nondisclosure; that is, that there must be "'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* at 6 (quoting *United States v. Benjamin*, 252 F.3d 1, 11 (1st Cir. 2001)).

The Government concludes by arguing that the Court need not revisit any previous factual findings. *Id.* at 7-8.

### 3. Mr. Poulin's Reply

Mr. Poulin's reply memorandum on this issue presses his contention that there is a meaningful distinction between *Cryovac* and *Yeje-Cabrera*. *Cryovac*, he argues, provides that it is fraud to "'substantially . . . interfere[] with the aggrieved party's ability FULLY and FAIRLY to prepare for and proceed at trial.'" *Pet'r's Second Reply* at 3 (quoting *Cryovac*, 862 F.2d at 924) (emphasis added by Mr. Poulin). Mr. Poulin insists that, to meet this standard, he need only show that "there was egregious misconduct, by an officer of the Court, directed at the Court itself." *Id.* He insists that *Cryovac* does not require a showing that the fraud affected the verdict, but that at any rate he has met it "because the egregious conduct of the AUSA effected [sic] counsel's ability to fully and fairly defend Petitioner." *Id.* at 4. He does not, however, say what this effect was. *See id.*

Mr. Poulin further quotes *Cryovac* for the proposition that "'where concealment was knowing and purposeful, it seems fair to presume that the suppressed evidence would have damaged the nondisclosing party,'" and that "'where one party wrongfully denies another the evidence necessary to establish a fact in dispute, the court MUST draw the strongest allowable inferences in favor of the aggrieved party.'" *Id.* at 4-5 (quoting *Cryovac*, 862 F.2d at 924) (emphasis added by Mr. Poulin). He places the burden on the Government to prove that the withheld evidence "combined with the false evidence they placed into the record, was in fact inconsequential." *Id.* at 5 (citing *Cryovac*, 862 F.2d at 925).

Mr. Poulin returns to his earlier arguments that the alleged DVD Media Examination Report amounted to a fraud, and further that they "infected the trial in the form of false evidence and testimony that would have been directly negated by the suppressed exculpatory forensic information." *Id.* at 6 (citing to *Supporting Mem.* at 25-26 (discussing Det. McFarland's testimony about the DVD creation dates)).

Returning to the standard of review, Mr. Poulin insists that he need only show a "reasonable probability" of a different result but for the alleged fraud because he has timely filed a habeas petition. *Id.* at 7 (citing *Pet'r's Reply* "throughout" and *Objection* at 2-5). He further defines "reasonable probability" as "probability sufficient to undermine confidence in the outcome of the trial." *Id.* at 8 (citing *Bagley*, 473 U.S. 667). He insists that "*Bagley* . . . is not a 'sufficiency of the evidence' test," and that he "'need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence there would have been enough left to convict.'" *Id.* (quoting *Haley v. City of Boston*, No. 09-10197-RGS, 2010 U.S. Dist. LEXIS 82304, at *8 (D. Ma. 2010)). Mr. Poulin maintains that

> Clearly, the Court's comment that nothing Petitioner "alleges effected the verdict," . . . is the wrong standard of review for Petitioner's claims, because the "question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial,["] as discussed . . . in *Haley*.

*Id.* (citing *Order* at 8).

Mr. Poulin applies this principle to Ms. Malone's mischaracterization of the Data Spreadsheets in her May 6 email and to the allegedly-suppressed May 4

Corrective Report, *Mot. for Recons.* at 9-10, insisting that "an Assistant United States Attorney is directly implicated in the production of false [counterfeit] inculpatory documentation, then lying to the defense and Court regarding the nature and origin of this falsified evidence." *Id.* at 9. He insists that this "fraud" is "conceded and uncontested by the government," and returns to his earlier argument that this fraudulently induced Mr. Van Dyke to engage in an exclusion motion rather than pursuing a misconduct motion. *Id.*[22]

### 4.    Discussion

Mr. Poulin does not consistently distinguish his analyses of the various litigation misconduct theories in *Cryovac* and *Aoude*, the presumption of prejudice under *Cronic*, and discovery violations under *Brady*.[23] Although in this case they are mostly grounded on the same alleged facts, these are distinct legal theories of relief. The Court considers each in turn, understanding that Mr. Poulin considers the misconduct interrelated.

---

[22]    In his Motion for Reconsideration, Mr. Poulin refers to an argument in the Objection that his habeas counsel has learned of "further evidence of prosecutorial misconduct" concerning testimony of Det. McFarland to the Grand Jury. *Mot. for Recons.* at 8-9 (citing Objection at 33-36). Pages 33-36 of the Objection contain abundant accusations of false testimony with absolutely no citations to any additional evidence. *See Objection* at 33-36 (citing only existing docket entries on which the Court has already ruled). Assertions of counsel are not evidence, and the Court does not credit Mr. Poulin's lengthy, vituperative factual allegations in this section of his briefing.

[23]    For instance, Mr. Poulin claims that "*U[nited] S[tates] v. Cronic*, 466 U.S. 648, at 661 (1984) controls his claim that substantial interference rendered defense counsel ineffective." *Pet'r's Second Reply* at 5. As explained in detail below, "substantial interference" has a well-defined analytic structure that is distinct from the "presumption of prejudice" established by *Cronic*. *Compare* Section VIII.D.4.a (analyzing substantial interference) *with* Section VIII.D.4.b (analyzing the presumption of prejudice). While both claims operate from a common set of alleged facts, this does not collapse the correct legal analysis.

### a. "Substantial Interference" vs. "Fraud on the Court"

### i. Standard of Proof

Mr. Poulin takes issue with the Court's previous statement that the "substantial interference" standard from *Cryovac* is "not contradictory" with *Yeje-Cabrera*, and that "the significance of any distinction between them depends upon the impact on the verdict of the Task Force's alleged malfeasance and the prosecutor's actions." *Order* at 8. This was a terse summary of the distinctions between the two standards, and the Court offers some additional clarifications. However, nothing about these clarifications changes the result.

*Anderson v. Cryovac* is the seminal case on the "substantial interference" theory. It is also, by its own terms, inapplicable to Mr. Poulin's criminal conviction. *Cryovac* is a judicial gloss on Federal Rule of Civil Procedure 60(b). 862 F.2d at 923. While "Rule 60(b) has an unquestionably valid role to play in habeas cases," *Gonzalez v. Crosby*, 545 U.S. 524, 534 (2005), that role is limited to relief from judgments in the habeas matter itself—such as, for instance, denial of the writ. *See id.*[24] However, Federal Rule of Civil Procedure 60(b) "does not provide relief from judgment in a criminal case." *United States v. Johnson*, 159 Fed. App'x 835, 838-39

---

[24] The Supreme Court wrote:

> [Rule 60(b)] is often used to relieve parties from the effect of a default judgment mistakenly entered against them, . . . a function as legitimate in habeas cases as in run-of-the-mine civil cases. The Rule also preserves parties' opportunity to obtain vacatur of a judgment that is void for lack of subject-matter jurisdiction-a consideration just as valid in habeas cases as in any other, since absence of jurisdiction altogether deprives a federal court of the power to adjudicate the rights of the parties. . . . In some instances, we may note, it is the State, not the habeas petitioner, that seeks to use Rule 60(b), to reopen a habeas judgment granting the writ.

*Gonzalez*, 545 U.S. at 534 (internal citations omitted).

(10th Cir. 2005); *United States v. O'Keefe*, 169 F.3d 281, 289 (5th Cir. 1999) (Dennis,

J., dissenting); *United States v. Mosavi*, 138 F.3d 1365, 1366 (11th Cir. 1998); *see*

*also* FED. R. CIV. P. 1 ("These rules govern the procedure in all civil actions and

proceedings in the United States district courts, except as stated in Rule 81"); FED.

R. CIV. P. 81(a)(4) ("These rules apply to proceedings for habeas corpus . . . to the

extent that the practice in those proceedings . . . (A) is not specified in a federal

statute . . . [or] the Rules Governing Section 2255 Cases").  Mr. Poulin does not

offer, and the Court cannot locate, any criminal case citing *Cryovac*.[25]

Nonetheless, for the purposes of discussion, the Court will skip over that

barrier and assume that the "substantial interference" theory could apply to a

criminal conviction.   Federal Rule of Criminal Procedure 33(a), providing for a new

trial "if the interest of justice so requires," could conceivably embrace a "substantial

interference" analysis.

The *Cryovac* Court summarized the applicable analytical framework:

> [I]n motions for a new trial under the misconduct prong of Rule
> 60(b)(3), the movant must show the opponent's misconduct by clear
> and convincing evidence.  Next, the moving party must show that the
> misconduct substantially interfered with its ability fully and fairly to
> prepare for, and proceed at, trial.  This burden may be shouldered
> either by establishing the material's likely worth as trial evidence or
> by elucidating its value as a tool for obtaining meaningful discovery.
> The burden can also be met by presumption or inference, if the movant
> can successfully demonstrate that the misconduct was knowing or
> deliberate.  Once a presumption of substantial interference arises, it

---

[25]     *United States v. Cronic*, offered by Mr. Poulin in support of his "substantial interference"
theory, was an opinion on an appeal in a criminal case, addressing the possibility of "external
circumstances" that may create a presumption of ineffectiveness under *Strickland v. Washington*.
466 U.S. at 657-66.  It had nothing to do with, and did not mention, Rule 60(b) or any other Federal
Rule of Civil Procedure.  *See* 466 U.S. at 649-67.  The Court addresses the *Cronic* "external
circumstances" theory below.

can alone carry the day, unless defeated by a clear and convincing demonstration that the consequences of the misconduct were nugacious. Alternatively, if unaided by a presumption—that is, if the movant is unable to prove that the misconduct was knowing or deliberate—it may still prevail as long as it proves by a preponderance of the evidence that the nondisclosure worked some substantial interference with the full and fair preparation or presentation of the case.

*Cryovac*, 862 F.2d at 926. In *Beatrice Foods*, a later iteration of *Cryovac*, the First Circuit further held that the strength or weakness of other evidence of culpability is "an important factor bearing on the determination of whether nondisclosure amounted to a substantial interference." 900 F.2d at 392.

The First Circuit's enunciation of a "fraud on the court" standard began in *Aoude*.[26] There, the Court held that

[a] "fraud on the court" occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense.

*Aoude*, 892 F.2d at 1118. In *Yeje-Cabrera*, the Court briefly restated the standard using different words: "In rare instances, the doctrine of fraud on the court will warrant remedial action. . . . [A] determination of fraud on the court may be justified only by the most egregious misconduct directed to the court itself, and it must be supported by clear, unequivocal and convincing evidence." 430 F.3d at 28

---

[26] Federal Rule of Civil Procedure 60(d)(3) recognizes that a court has power to "set aside a judgment for fraud on the court." However, the *Aoude* Court explicitly based its "fraud on the court theory" on the district court's inherent powers "to deny the court's processes to one who defiles the judicial system by committing a fraud on the court." *Aoude*, 892 F.2d at 1118. In other words, the *Aoude* holding, unlike that of *Cryovac*, is not a judicial gloss on any particular Federal Rule of Civil Procedure.

n.22 (internal citations, quotations, and alterations omitted).[27]   The Court later observed that "'fraud on the court' must be something on the order of bribing a judge." *United States v. 6 Fox Street*, 480 F.3d 38, 47 (1st. Cir. 2007)).

This Court previously stated that the *Cryovac* substantial interference theory is "not contradictory" with the *Yeje-Cabrera* formulation of fraud on the court. *Order* at 8.   This is a correct statement of the law.   *Cryovac* requires clear and convincing evidence of the opponent's misconduct, 862 F.2d at 926; so do both *Yeje-Cabrera*, 430 F.3d at 28 n.22, and *Aoude*.   892 F.2d at 1118.   *Cryovac* provides for a detailed burden-shifting mechanism that *Aoude* and *Yeje-Cabrera* do not, but this does not mean that *Cryovac* contradicts them; it simply means that it provides additional detail on how a litigant can meet his burden of proof under Rule 60(b)(3) once a movant has shown clear and convincing evidence of misconduct.   The fraud on the court standard under *Aoude* is at once both broader than substantial interference (in that it is not limited to actions by an opposing party), but also requires even more egregious conduct.   *See 6 Fox Street*, 480 F.3d at 47.   To say that *Cryovac* has a burden-shifting mechanism and *Yeje-Cabrera* does not, is simply to illuminate the different contexts of the two theories.   In other words, the fact that *Cryovac* provides a burden-shifting mechanism under Rule 60(b)(3) does not mean that it is improper to apply the more straightforward *Yeje-Cabrera* standard when evaluating a claim of fraud on the court.   For the purposes of this case, what

---

[27]     The *Yeje-Cabrera* Court did not cite *Aoude*.   *See* 430 F.3d at 1-30.

matters is that both standards require a threshold showing of clear and convincing evidence of the misconduct. *See* Section VIII.D.4.a.iii, *infra*.[28]

### ii. Materiality

The Court also previously stated that "the significance of any distinction between [substantial interference and fraud on the court] depends upon the impact on the verdict of the Task Force's alleged malfeasance and the prosecutor's actions." *Order* at 8. Put another way, the Court determined that both substantial interference and fraud on the court require an analysis of the materiality of the misconduct, but observed that the two theories might require distinct analyses of materiality. Mr. Poulin has not demonstrated that this is a "manifest error of law"; in fact, it is fully supported by the caselaw.

In *Beatrice Foods*, the First Circuit rejected the appellant's argument that the district court improperly considered the strength of other culpability evidence when determining that the alleged discovery misconduct had worked no "substantial interference." 900 F.2d at 391. The Court held that the district court

---

[28] Mr. Poulin also states that "[t]he Magistrate in this case has previously recognized 'the obvious difference' between" the *Cryovac* theory and the "fraud on the Court formulation described in *Yeje-Cabrera*." *Pet'r's Second Reply* at 3 (citing *Irving v. Camden*, No. 10-cv-00367-MJK, 2012 U.S. Dist. LEXIS 81944, (D. Me. June 13, 2012)). He further opines that "[h]ow these standards could have been misapprehended is quite shocking." *Id.* What the Magistrate Judge found "obvious" in *Irving* is the difference between Federal Rule of Civil Procedure 60(b)(3), addressing "fraud . . . misrepresentation, or misconduct by an opposing party," and Federal Rule of Civil Procedure 60(d)(3), addressing "fraud on the court." *Irving*, 2012 U.S. Dist. LEXIS 81944, at *5. The *Irving* decision that Mr. Poulin cites was an order denying relief from a final judgment in a civil matter, and the Magistrate Judge correctly noted that Rule 60(d)(3) is phrased more broadly than Rule 60(b)(3). As explained above, *supra* note 26, the *Aoude* "fraud on the court" theory is not based on Rule 60(d)(3) at all. Granted, in its discussion of Rule 60(d)(3) the *Irving* Court cited certain decisions of the First Circuit descended from *Aoude*. *Id.* at *5-6 (citing *6 Fox Street*, 480 F.3d 38 and *Roger Edwards, LLC v. Fiddes & Son Ltd.*, 427 F.3d 129 (1st Cir. 2005)). However, nothing about *Irving* suggests that analysis of the alleged fraud under Rule 60(b)(3) is "contrary" to analysis under *Aoude* or vice versa.

was right not to focus exclusively on the evidence of the defendants' concealment of discovery materials: "In this case, it was eminently reasonable to posit the strength or weakness of plaintiffs' evidence [of substantively culpable actions by the defendant] as an important factor bearing on the determination of whether nondisclosure amounted to a substantial interference." *Id.* at 392. This is a materiality analysis, and *Beatrice Foods* demonstrates that it is correct to perform such an analysis when evaluating substantial interference.

Materiality is also a consideration when evaluating fraud on the court. Indeed, the *Aoude* Court expressly performed a materiality analysis when determining that the misconduct at issue deserved sanction. 892 F.2d at 1120. The Court found that "[t]he [fraudulent conduct] clearly had the capacity to influence the adjudication and to hinder [the defendant's] presentation of its case." *Id.* The Court then made the statement on which Mr. Poulin places much reliance: "The failure of a party's corrupt plan does not immunize the defrauder from the consequences of his misconduct." *Id.* But this does not obviate the materiality analysis that the Court performed immediately prior; it simply states that if a party tries and fails to produce material fraud, the failure does not make the fraud immaterial.

The *Yeje-Cabrera* formulation also requires a materiality analysis. In defining fraud on the court, the *Yeje-Cabrera* Court stated: "'[F]raud cognizable to maintain an untimely independent attack upon a valid and final judgment has long been regarded as requiring more than common law fraud.'" 430 F.3d at 28 n.22

(quoting *Geo. P. Reintjes Co. v. Riley Stoker Corp.*, 71 F.3d 44, 48 (1st Cir. 1995)). Common law fraud requires that the fraudulent statements be material, *e.g.*, *Diversified Foods, Inc. v. First Nat'l Bank of Boston*, 605 A.2d 609, 615 (Me. 1992); if fraud on the court requires "more than common law fraud," it must also require materiality.

Mr. Poulin argues that the *Yeje-Cabrera* formulation is only limited to "remedial action" for untimely filed petitions for relief from judgment. *Mot. for Recons.* at 9. However, the Court does not consider *Yeje-Cabrera* to apply only to untimely-filed motions under Rule 60(d)(3). The First Circuit quoted the language about an "untimely independent attack" in the context of defining "fraud on the court," and did so with a "*see*" citation signal, indicating an inferential link from the authority to the proposition. The Court cited the quoted language, from *Geo. P. Reintjes Co.*, for the principal proposition that "[i]n rare instances, the doctrine of fraud on the court will warrant remedial action." *Yeje-Cabrera*, 430 F.3d at 28 n.22. This statement does not limit itself only to untimely-filed motions; it is a broadly-worded explanation about what is and is not "fraud on the court." In this context, it is not reasonable to read the *Geo. P. Reintjes Co.* quote to limit the principal assertion only to instances of untimely attack on a final judgment.

This leads back to the Court's previous statement that "the significance of any distinction between [substantial interference and fraud on the court] depends upon the impact on the verdict of the Task Force's alleged malfeasance and the prosecutor's actions." Materiality is subtle and complex, performed differently

depending on the context. For instance, discovery violations under *Brady* require a very particular materiality assessment distinct from materiality under common law fraud. *See* Section VIII.D.4.c, *infra* (analyzing *Brady* materiality). Thus, although both substantial interference and fraud on the court require materiality, the analyses under the two standards are not necessarily the same. It is this distinction to which the Court referred when it previously wrote that "the significance of any distinction between them depends upon the impact on the verdict of the Task Force's alleged malfeasance and the prosecutor's actions."

### iii. Analysis

To sum up the analytical framework: both "substantial interference" and "fraud on the court" require at least (1) that Mr. Poulin demonstrate the alleged wrongful conduct by clear and convincing evidence, and (2) that the alleged fraud be material to the outcome of his case. The Court need not reach any of the distinctions between the two theories because Mr. Poulin fails to meet either threshold requirement.

In deciding whether to grant an evidentiary hearing on a habeas petition, the Court is not required to view all proffered evidence in a light most favorable to Mr. Poulin, as it would be in a motion to dismiss or for summary judgment. *David*, 134 F.3d at 477-78. Evidence of the existence of the three "exculpatory" reports is exceedingly scanty. Indeed, the Court is not (and was not in its previous Order) required to credit their existence at all for the simple reason that they are "'inherently incredible.'" *Id.* at 477 (quoting *United States v. McGill*, 11 F.3d 223,

226 (1st Cir. 1993)).[29]  Furthermore, what little evidence Mr. Poulin proffers of their existence is almost entirely inadmissible hearsay, which is another ground to deny relief.  *See Barrett v. United States*, 965 F.2d 1184, 1195 (1st Cir. 1992) (holding a habeas petition inadequate on its face when it was supported entirely by inadmissible evidence).

As for the "false inculpatory" reports, the Court can locate no evidence at all of the purported "Second Media Fraud."  Section VII.A.2.d, *supra*.  By contrast, the other reports—the data spreadsheets from the hard drive examination, Section VII.A.2.a, *supra*, AUSA Malone's statements about Sony camcorders, Section VII.A.2.b, *supra*, the Corrective Report of May 5, Section VII.A.2.c, *supra*, and the McFarland Properties Report, Section VII.A.2.e, *supra*, clearly do exist.  However, any conclusion that these are "falsely inculpatory" is necessarily based on the (posited) existence of the exculpatory reports—and, in parallel, on reading a sinister conspiracy into AUSA Malone's occasional misstatements and errors in communicating with Mr. Van Dyke.

The Court finds that of Mr. Poulin's proffered evidence, that part that could conceivably be viewed as demonstrating improper conduct consists of "threadbare allusions to . . . phantom" documents and conclusory allegations of malfeasance.  *David*, 134 F.3d at 478.  Furthermore, the Court, having presided over the extensive pre-trial motion practice in this case and ruled on all of the decisions that Mr. Poulin cites as evidence of AUSA Malone's lying and misrepresentation to the

---

[29]   "To progress to an evidentiary hearing, a habeas petitioner must do more than proffer gauzy generalities or drop self-serving hints that a constitutional violation lurks in the wings."  *David*, 134 F.3d at 478.

Court, and having carefully reviewed his proffered evidence of misconduct, is convinced that he cannot demonstrate any fraud or misconduct on the part of AUSA Malone. What he has put forward warrants no evidentiary hearing. *See generally* Section VII, *supra.*

The Court also concludes, as it did previously, that under any materiality standard, Mr. Poulin's allegations of prosecutorial malfeasance—even if he could prove them by clear and convincing evidence, which he cannot—are immaterial because their withholding worked no discernible prejudice to Mr. Poulin. The key to understanding why is to appreciate their relationship to the case actually presented by the Government.

Here, the Government stipulated that it would not use any evidence generated by the MCCU at trial, the Court entered an order to that effect, and the Government complied with that order. *United States v. Poulin*, No. CR-08-50-B-W, 2009 WL 2618813, at *2. (D. Me. Aug. 24, 2009). The allegedly-withheld DVD Media Examination Report was material to the digital timestamps of the images on the DVDs—but the Government did not use any digital timestamps on files within the DVDs to establish the creation dates of the files or of the DVDs themselves. At worst, the DVD Media Examination Report could have proved that the Government was unable to discern the dates of the images on the DVDs *from their timestamps*— but it most certainly did not cast doubt on the methods actually used to date the videos that entered evidence. Section V.C, *supra.*

The May 4 Corrective Report, if it existed, was only material to the one image that the May 5 Corrective Report claimed was found on the laptop hard drive—but the Government never introduced evidence of that image at trial. The Brief Report summarized the DVD Media Examination Report and contradicted the McFarland Properties Report—but the Government never introduced the McFarland Properties Report itself at trial. Det. McFarland referred to the dates in his report in his testimony, but the defense successfully blunted this testimony by eliciting Det. McFarland's admission that he could not determine the date of the original images from the DVD's creation date. Section VII.A.2.e, *supra* ("The 'Third Issue of Media Examination Fraud'").

In sum, none of the supposedly-withheld information affected the evidence against Mr. Poulin that the Government presented at trial. Whatever prejudice may have arisen from the Government's assumed withholding of the information was cured when the Government agreed not to use any of the evidence to which the withheld information related.

The Court has repeated here, once again, its previous conclusion that the evidence against Mr. Poulin was "bullet-proof." *Order* at 11-16; Section V.E, *supra*. None of the allegedly withheld information cast even a shred of doubt on the outcome of the bench trial, in which this Court acted as fact-finder. *See Order* at 11-16. The allegedly withheld information did not have "the capacity to influence the adjudication and to hinder [Mr. Poulin's] presentation of [his] case," *Aoude*, 892 F.2d at 1120, because none of the evidence generated by the MCCU was introduced

at trial. Nor did it "contribute[] significantly to preparation and presentation of [his] case." *Beatrice Foods*, 900 F.2d at 392. Mr. Poulin knew that the Government would not introduce this evidence several months before his trial began, and had plenty of time to absorb the changed situation into his trial strategy.[30] That Mr. Poulin and Mr. Van Dyke were heavily focused on "computer involvement" and distribution of the child porn during the run-up to the trial does not alter this outcome. As the Magistrate Judge wrote:

> Poulin's notion that disproving computer involvement and Internet distribution would demand an acquittal . . . is legally erroneous. The government did not charge distribution and stated early in the discovery process that it did not intend to prove that Poulin distributed child pornography. Poulin may well have believed that computer involvement was the most important issue in the case, but it simply was not a legal element of the production charge. Computer involvement is not even necessary to a conviction for possession under 18 U.S.C. § 2252(a)(4)(B). Once the grand jury returned an indictment charging production, computer involvement was neither essential to conviction, 18 U.S.C. § 2251(a), nor material to the sentencing guidelines analysis.

*Rec. Dec.* at 23.

The Magistrate Judge's analysis demonstrates why Mr. Poulin's claim of prejudice from the alleged "exculpatory" reports, the alleged "false inculpatory" reports, the erroneous intake documents, and the alleged evidence tampering to support a Samsung drive in a computer, is simply incorrect. These items were not introduced at trial, were irrelevant to the evidence that was introduced at trial, and were unnecessary for the Government to prove its case. Mr. Poulin has given the

---

[30] As noted previously, *supra* note 14, the Government agreed to exclude all MCCU evidence on June 10, 2009, *Gov't's Supplemental Mem. in Opp'n to Def.'s Mot. to Dismiss for Misconduct* at 8-9; Mr. Poulin went to trial on September 8, 2009. *Minute Entry* (Sept. 8, 2009).

Court no concrete explanation of how his ability to prepare for trial was impacted by AUSA Malone' frequent pre-trial references to the possibility of a sentencing enhancement for computer involvement and distribution. There is no suggestion of any decision that Mr. Van Dyke would have made differently had AUSA Malone not made credible threats to seek these enhancements; furthermore, any possible impact on Mr. Van Dyke's trial preparation evaporated in June of 2009, when the Government agreed not to use any MCCU evidence at trial. The MCCU evidence could conceivably have been relevant to Mr. Poulin's guideline calculation under the United States Sentencing Guidelines—but the Government did not introduce any MCCU evidence at sentencing either, and in fact the Court sentenced Mr. Poulin to the mandatory minimum for his crime.

In sum, Mr. Poulin has not demonstrated any manifest error of fact or law in the Court's previous conclusion that *Cryovac* and *Yeje-Cabrera* "are not contradictory, and in any event the significance of any distinction between them depends upon the impact on the verdict of the Task Force's alleged malfeasance and the prosecutor's actions." *Order* at 8. Mr. Poulin cannot demonstrate the alleged malfeasance by clear and convincing evidence, and even if he could, the alleged malfeasance is immaterial to his conviction.

### b. Presumption of Prejudice under *Strickland* and *Cronic*

Mr. Poulin also claims that the Court misunderstood his *Strickland* argument of ineffective assistance of counsel. *Mot. for Recons.* at 3. Specifically, he faults the Court for failing to apply the "presumption of prejudice" theory of *United*

*States v. Cronic*, 466 U.S. 648 (1984). *Id.* He is correct that the Court did not include it among "those issues that merit discussion" in its previous Order. *Order at 5.*

*Strickland* and *Cronic*, decided on the same day by the same Supreme Court, represent two avenues for habeas relief when there has been a "breakdown in the adversarial process that implicates the Sixth Amendment." *Cronic*, 466 U.S. at 657 n.20. *Strickland* held that a criminal accused is denied his right to counsel under the Sixth Amendment when his lawyer's performance fell below an "objective standard of reasonableness" and the errors were "prejudicial to the defense." *Strickland*, 466 U.S. at 688, 692. "In certain Sixth Amendment contexts, prejudice is presumed," *id.*; among these "are various kinds of state interference with counsel's assistance." *Id.* (citing *Cronic*, 466 U.S. at 659 & n.25). A defendant can in some cases prevail on an ineffective assistance claim without showing prejudice "when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Cronic*, 466 U.S. at 659-60.

The *Cronic* Court offered *Powell v. Alabama*, 287 U.S. 45 (1932), as a canonical example of surrounding circumstances that rendered counsel ineffective without a showing of prejudice. In *Powell*,

> [t]he defendants had been indicted for a highly publicized capital offense. Six days before trial, the trial judge appointed "all the members of the bar" for purposes of arraignment. "Whether they would represent the defendants thereafter if no counsel appeared in their

behalf, was a matter of speculation only, or, as the judge indicated, of mere anticipation on the part of the court." . . . On the day of trial, a lawyer from Tennessee appeared on behalf of persons "interested" in the defendants, but stated that he had not had an opportunity to prepare the case or to familiarize himself with local procedure, and therefore was unwilling to represent the defendants on such short notice. The problem was resolved when the court decided that the Tennessee lawyer would represent the defendants, with whatever help the local bar could provide.

"The defendants, young, ignorant, illiterate, surrounded by hostile sentiment, haled back and forth under guard of soldiers, charged with an atrocious crime regarded with especial horror in the community where they were to be tried, were thus put in peril of their lives within a few moments after counsel for the first time charged with any degree of responsibility began to represent them."

*Cronic*, 466 U.S. at 659-60 (quoting *Powell*, 287 U.S. at 56-58) (internal citations omitted). The *Cronic* Court observed that under these circumstances, "ineffectiveness was properly presumed without inquiry into actual performance at trial." *Id.* at 661. The Court contrasted *Powell* with *Avery v. Alabama*, 308 U.S. 444 (1940), observing that no presumption of prejudice arose when "counsel was appointed in a capital case only three days before trial, and the trial court denied counsel's request for additional time to prepare." *Id.* (citing *Avery*, 308 U.S. at 450-53).

In the case before the *Cronic* Court, the criminal defendant was accused of bank fraud by way of a "check kiting" scheme. *Id.* at 650-51. The trial court appointed "a young lawyer with a real estate practice" as defense counsel and "allowed him only 25 days for pretrial preparation, even though it had taken the Government over four and one-half years to investigate the case and it had reviewed thousands of documents during that investigation." *Id.* at 649. Despite

the lawyer's youth, inexperience in criminal defense, and lack of preparation time, the Court held that the circumstances did not justify a presumption of prejudice without an evaluation of the lawyer's actual performance. *Id.* at 663-66.

The First Circuit has recognized that the *Cronic* presumption of prejudice is "exceedingly narrow." *United States v. Theodore*, 468 F.3d 52, 56 (1st Cir. 2006). "The 'circumstances leading to counsel's ineffectiveness [must be] so egregious that the defendant was in effect denied any meaningful assistance at all.'" *Id.* at 56 (quoting *United States v. Griffin*, 324 F.3d 330, 364 (5th Cir. 2003)). The Court noted that "[t]he *Cronic* exception has been applied in cases where counsel slept as evidence was being introduced against the defendant, . . . where counsel adopted and acted upon a belief that his client should be convicted, . . . and where counsel sat silently throughout the entire trial." *Id.* (internal citations omitted).

Very few cases since *Cronic*—in any court—have applied the presumption of prejudice to alleged government interference with defense counsel. It is cited more often in an effort to establish a presumption of prejudice in cases of egregious errors by counsel. *E.g.*, *Theodore*, 468 F.3d at 56-57, (holding that no presumption was generated when counsel's performance was "abysmal" but "did subject the prosecutor's case to some adversarial testing" and was "not tantamount to non-representation"). Recently, a district court rejected a *Cronic* argument based on alleged mischaracterizations and disclosures by the government. *Cohen v. United States*, Nos. 07 Civ. 7397(GBD), 01 Cr. 1208(GBD), 2013 WL 5882923 (S.D.N.Y. Oct. 29, 2013). In *Cohen*, the petitioner alleged that the Government mischaracterized

his proffer statements and then threatened to use them against him, *id.* at *6; failed to disclose material that would impeach the credibility of a government witness, *id.*; and failed to produce evidence that would be helpful to his case. *Id.* at *7. The Court ruled, in the main, that the petitioner had failed to present sufficient admissible evidence to establish these claims, and that the Government's disclosure was sufficient to put the defendant on notice of the evidence supposedly in its possession. *Id.* at *6-7.

To succeed on a claim of ineffective assistance of counsel in a habeas proceeding, Mr. Poulin would have to prove the facts giving rise to the claim by a preponderance of the evidence. *See Burdine v. Johnson*, 262 F.3d 336, 366 (5th Cir. 2001). The Court already concluded that it is exceedingly unlikely that Mr. Poulin could back up his factual allegations with evidence sufficient to surmount the "clear and convincing" standard required for fraud, Section VIII.D.4.a, *supra*; the Court further finds, for the reasons discussed above, that he is no more likely to meet a "preponderance of the evidence" standard. His factual allegations are based on hearsay, conclusory accusations of malfeasance, and a story that is "inherently incredible." *David*, 134 F.3d at 477.

However, even if Mr. Poulin were to prove these facts, they do not give rise to a presumption of prejudice under *Cronic*. The *Cronic* presumption is reserved for situations where the external circumstances—whatever their origin—are so crushingly egregious that they render counsel effectively absent. *See Theodore*, 468 F.3d at 56-57. Mr. Poulin's allegations do not rise to that level. At worst, he has

alleged that AUSA Malone deliberately withheld from the defense certain reports that would have shown that other evidence produced to him in discovery was incorrect, and produced to him certain reports that were falsely inculpatory. He has accused her of lying to defense counsel and the Court about these discovery violations and about the nature of certain evidence. He claims that she "induced" his defense counsel to change his "posture" from alleging prosecution misconduct to suppressing evidence. He has alleged that she outright fabricated an EnCase report. Even taking these claims at face value—which, to be clear, the Court does not—they did not render Mr. Van Dyke effectively absent. Even had they rendered his performance "abysmal", which again the Court does not find, they would not give rise to a *Cronic* presumption if Mr. Van Dyke still managed to test the Government's case, which he more than did.

The merits of the *Cronic* claim are so remote that the Court previously declined to address it, and the point needs no further belaboring now. Mr. Poulin has not generated a *Cronic* presumption of prejudice and has shown no manifest error of law in the Court's previous analysis of prejudice under *Strickland*. *Order* at 11-16.

### c.  Materiality of Assumed Discovery Violations under *Brady*, *Bagley*, and *Kyles*

Mr. Poulin's final cognizable legal theory[31] is that the alleged withholding of the "exculpatory reports" violated the Government's discovery obligations under

---

[31]  "Several of plaintiffs' objections do not warrant, and have not received, extended comment. It suffices to say that [the Court has] considered and rejected them." *Beatrice Foods*, 900 F.2d at 396 n.8.

*Brady v. Maryland*.   First, the Government is correct that Mr. Poulin could have raised these issues on direct appeal, *see Gray v. Netherland*, 518 U.S. 152, 161-62 (1996), but did not.   *See Br. of Appellant*, *United States v. Poulin*, 631 F.3d 17 (1st Cir. 2011), 2010 WL 3213229 (*Br. of Appellant*).   Mr. Poulin must therefore overcome the burden of his own procedural default.   *United States v. Frady*, 456 U.S. 152, 167-68 (1982).   To do this, he must show "both (1) 'cause' excusing his . . . procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains."   *Id.* at 168; *accord Bucci v. United States*, 662 F.3d 18, 27 (1st Cir. 2011).

Mr. Poulin's original habeas petition claimed that Mr. Van Dyke "was ineffective for failing to 'properly' object to, and appeal, prosecutorial misconduct in the context of Due Process violations under Brady and Giglio."   *Habeas Pet.* at 4. However, Mr. Poulin insists in his Motion for Reconsideration that the Court erred in interpreting his Habeas Petition to state a standard *Strickland* claim grounded on ineffective assistance by Mr. Van Dyke.   *Mot. for Recons.* at 3; Section VIII.A, *supra*.   Since Mr. Poulin insists with great fervor that his Sixth Amendment claim is based on "external impediments" rather than Mr. Van Dyke's incompetence, *Mot. for Recons.* at 3, the Court will not interpret his Habeas Petition to explain away his procedural default in failing to raise the *Brady* issues on direct appeal.

At any rate, reasonable choices by appellate counsel regarding which issues to raise and which to abandon are afforded great deference under the *Strickland* analysis, *Smith v. Murray*, 477 U.S. 527, 535-36 (1986), and the Court would not

find Mr. Van Dyke's choice ineffective even if Mr. Poulin had hewed to a standard *Strickland* theory of relief. Mr. Van Dyke's appellate strategy was to argue that the statute under which Mr. Poulin was convicted violated the United States Constitution and that the evidence was insufficient to support conviction. *See Br. of Appellant* at *1-25. Mr. Van Dyke could reasonably have concluded that the *Brady* claims were not worth raising on appeal because they were inconsistent with his appellate strategy. He could also have concluded, as the Court explains in more detail below, that the *Brady* claims were not a promising appellate issue because there is little evidence of material prejudice to Mr. Poulin at his trial.

In short, Mr. Poulin has not given the Court any viable explanation of why he declined to raise the *Brady* issues on direct appeal. Therefore, as a threshold matter, the Court finds that Mr. Poulin has procedurally defaulted on his *Brady* claims.

However, even if Mr. Poulin had not procedurally defaulted, he would not be entitled to habeas relief under *Brady*. *Brady* holds that the prosecution may not suppress evidence that is "material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. *Giglio v. United States*, 405 U.S. 150 (1972), extends that principle to evidence that could impeach the credibility of a key government witness. *Id.* at 154-55. *Brady* and *Giglio* both require that the withheld evidence be material:

> We do not, however, automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict. . . . A finding of materiality of the evidence is required under

> *Brady* . . . . A new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .

*Giglio*, 405 U.S. at 154 (internal quotations and citations omitted).

In *United States v. Bagley*, 473 U.S. 667 (1985), the Supreme Court established a test for materiality under *Brady*: "[A] constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *Id.* at 678. A plurality of the Court further held that "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.*

In *Kyles v. Whitley*, 514 U.S. 419 (1995), the Court further refined this standard, holding that a *Bagley* error is not subject to harmless error review and that the withheld evidence should be considered cumulatively to determine whether it is material. *Id.* at 436-38. In assessing materiality, the *Kyles* Court considered the weight of the evidence that would have remained "unscathed" by the undisclosed material, *id.* at 451, and reiterated that "the question is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same." *Id.* at 453.

The allegedly-withheld evidence casts no doubt at all on the outcome of the bench trial in this case. The Court has previously recounted the extensive evidence the Government presented at trial and its overwhelming proof of Mr. Poulin's guilt

of the charged crime. *Order* at 11-16; Section V, *supra*. The allegedly-withheld "exculpatory" reports call none of that evidence into question. The evidence supporting Mr. Poulin's conviction simply had nothing to do with the MCCU. The DVD Media Examination Report, assuming it exists and says what Mr. Poulin claims, does not call into question the dates of the images because the Government dated them using other means. *See id.* Likewise, the May 4 Corrective Report is immaterial to Mr. Poulin's conviction because the Government did not introduce any evidence from the May 5 Corrective Report, supposedly contradicted by the May 4 Corrective Report. Nothing about the alleged contents of the May 4 Corrective Report casts any doubt on the evidence that the Government actually presented. And the Brief Report, while it may have called into doubt the veracity of Det. McFarland's brief cross-examination statement about checking the DVD "properties," would not have impugned any of his testimony in the Government's direct examination, and would not materially have changed the Court's opinion of his veracity. Even on cross-examination, the Brief Report would add nothing to Mr. Van Dyke's successful challenge to Det. McFarland's statement about dating the images using the "properties." Section VII.A.2.e, *supra*.

What the *Bagley-Kyles* materiality analysis in this case boils down to is that none of the allegedly-withheld information had anything to do with the evidence on which the Court, as fact-finder, found Mr. Poulin guilty of production of child pornography. After carefully and cumulatively reviewing Mr. Poulin's factual allegations, and even assuming—only for purposes of this motion—that every word

of them is true, the Court is exceedingly "confident that the [fact-finder's] verdict would have been the same," *Kyles*, 514 U.S. at 453, if the Government produced all of the "exculpatory" evidence to Mr. Poulin. The Court finds "beyond a reasonable doubt that, had the information that the Government [possessed] been disclosed, the result of the criminal prosecution would not have been different." *Bagley*, 473 U.S. at 684.

The Court previously described in detail the evidence of Mr. Poulin's guilt, but did not explicitly perform a *Bagley-Kyles* materiality analysis. *See Order*. The Court has now done so to assuage Mr. Poulin's concerns that it did not sufficiently consider these legal theories.

### E. Conclusion

This Court previously denied Mr. Poulin's habeas petition because his allegations of prosecutorial conduct, even if true, did not cast doubt on the guilty verdict. The Court has addressed certain legal theories and factual disputes that Mr. Poulin faulted it for omitting previously, but Mr. Poulin has not shown any manifest error of fact or law in the Court's previous conclusions. Furthermore, virtually none of the proffered evidence supporting Mr. Poulin's factual allegations raises the possibility that he could prove the facts he alleges by even a preponderance of the evidence. The Court therefore affirms its denial of Mr. Poulin's Motion to Vacate, Set Aside or Correct Sentence.

## IX. CERTIFICATE OF APPEALABILITY

Under Rule 11 of the Rules Governing § 2255 Proceedings, "[t]he district court must issue or deny a certificate of appealability when it enters a final order

adverse to the applicant." RULES GOVERNING § 2255 PROCEEDINGS, RULE 11(a).[32]

The Magistrate Judge recommended that no certificate of appealability issue, *Rec. Dec.* at 30, and the Court affirmed that recommendation without discussion. *Order* at 17. Mr. Poulin urges the Court to reconsider. *Mot. for Recons.* at 2.

A certificate of appealability should issue if the petitioner demonstrates that "'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). The Court is cognizant that this standard requires it to evaluate in good faith whether its own decision might be wrong—a challenging task for any human institution. The Court endeavored to perform precisely that evaluation in this Order.

The Court has taken Mr. Poulin's assertions of legal error seriously. After careful consideration and reconsideration, the Court has no doubt that it correctly interpreted and applied the legal standards on which this Order rests. Furthermore, the Court perceives no unsettled legal issues that "deserve encouragement to proceed further." *Id.* No certificate of appealability will issue from this Court.

---

[32] These Rules are found in 28 U.S.C. pt. VI, ch. 153.

## X.  CONCLUSION

The Court DENIES the Government's Motion Invoking the Court's Lack of Jurisdiction (ECF No. 303) and DENIES Mr. Poulin's Motion for Reconsideration (ECF No. 296).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 24th day of April, 2014